UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN DIVISION

Chapter 7 Case No 1-21-41803-JMM
Adversary No. 1-21-01180-JMM
------------------------------------------X
In re

DAVID CAMEO,

                          Debtor.

------------------------------------------X
AMAZON.COM SERVICES, LLC

                          Plaintiff,

       -against-

DAVID CAMEO, an individual,

                          Defendant.

------------------------------------------X
               DATE: October 30, 2023
               TIME: 10:00 a.m.


     REMOTE VIDEOTAPED DEPOSITION of

GARY LAMPERT, taken by the Plaintiff,

pursuant to a Subpoena and to the Federal

Rules of Civil Procedure, held remotely via

Zoom Videoconference, before Suzanne

Pastor, a Notary Public of the State of New

York.

```
 1   A P P E A R A N C E S:
     (All appearances via Zoom)
 2

 3   DAVID WRIGHT TREMAINE, LLP
     Attorneys for the Plaintiff
 4         1251 Avenue of the Americas
           21st Floor
 5         New York, New York 10020-1104
     BY:   JOHN M. MAGLIERY, ESQ.
 6         212.603.6444
           johnmagliery@dwt.com
 7   AND:  BRITTNI HAMILTON, ESQ.
           213.655.9649
 8         brittnihamilton@dwt.com

 9


10
     MORRIS & TENENBAUM
11   Attorneys for the Defendant and Witness
           87 Walker Street, 2nd Floor
12         New York, New York 10013
     BY:   BRIAN J. HUFNAGEL, ESQ.
13         212.620.0938

14            -and-

15   LAW OFFICE OF LUST & LEONOV
           75 Maiden Lane
16         New York, New York 10038
     BY:   ROMAN LEONOV, ESQ.
17         212.518.1503
           (Via Telephone)
18

19


20
     ALSO PRESENT:
21
           JOSE RIVERA, Videographer
22         U.S. Legal Support

23            *         *
24

25
```

```
 1              THE VIDEOGRAPHER:  We are now

 2        on record.  This is the remote video

 3        recorded deposition of Gary Lampert

 4        being taken by counsel for the

 5        plaintiff.

 6              Today is Monday, October 30,

 7        2023.  The time is now 10:09 a.m. in

 8        the Eastern Time Zone.

 9              We are here in the matter of

10        Amazon.com Services, LLC versus David

11        Cameo and individuals.  My name is

12        Jose Rivera, remote video technician

13        on behalf of U.S. Legal Support.

14              At this time will the reporter,

15        Sue Pastor, on behalf of U.S. Legal

16        Support please enter the statement

17        for remote proceedings into the

18        record, after which the court

19        reporter will swear in the witness.

20              THE REPORTER:  Good morning.

21        The attorneys participating in this

22        deposition acknowledge that I am not

23        physically present in the deposition

24        room and that I will be reporting

25        this deposition remotely.
```

1           They further acknowledge that

2       in lieu of an oath administered in

3       person, I will place the witness

4       under penalty of perjury.

5           The parties and their counsel

6       consent to this arrangement and waive

7       any objections to this manner of

8       reporting.  Please indicate your

9       agreement by stating your name and

10      your agreement on the record.

11          MR. MAGLIERY:  John Magliery,

12      we agree, for the plaintiff.

13          MR. HUFNAGEL:  Brian Hufnagel

14      of Morris & Tannenbaum for the

15      witness, we agree as well.

16          THE REPORTER:  Mr. Lampert,

17      please raise your right hand.

18          Do you swear or affirm that the

19      testimony you are about to give will

20      be the truth, the whole truth, and

21      nothing but the truth?

22          THE WITNESS:  Yes.

23          THE REPORTER:  Thank you.

24          Counsel, you're all set.

25          MR. MAGLIERY:  Thank you.

1    EXAMINATION

2    BY MR. MAGLIERY:

3        Q.    Good morning, Mr. Lampert.  As

4    you just heard, I am one of the attorneys

5    for Amazon.com Services LLC in the

6    adversary proceeding and bankruptcy against

7    David Cameo.

8            I understand you testified in

9    your past, but I'll still ask you to

10   confirm that you understand the oath you've

11   just taken is the same one you would give

12   if you were testifying in a court of law.

13       A.    Yes.

14       Q.    Will you agree to tell me if

15   you don't understand any of my questions so

16   I can rephrase them?

17       A.    Yes.

18       Q.    Are you aware of any condition

19   that would affect your memory today?

20       A.    No.

21       Q.    Have you ever been deposed

22   before?

23       A.    Yes.

24       Q.    Approximately how many times?

25       A.    Probably around 10 times -- 10

1    to 15 times.

2        Q.    And do you recall when you gave

3    the last of those depositions before this

4    one?

5        A.    My last deposition was several

6    years ago.  I've had a -- I'd have to check

7    my records for the exact date, but it was

8    at least four years ago.

9        Q.    Okay.  And are you currently

10   employed, sir?

11       A.    Yes, I am self employed.

12       Q.    What's the name of your firm?

13       A.    Gary R. Lampert, CPA.

14       Q.    And does that company perform

15   solely forensic services or do you do other

16   accounting services as well?

17       A.    Solely forensic and bankruptcy

18   services.

19       Q.    Was there a time in your past

20   when you performed other types of

21   accounting services?

22       A.    Yes.

23       Q.    And how long ago was that?

24       A.    Prior to 1990.

25       Q.    I see.  And has your exclusive

 1   employment or business after 1990 been

 2   forensic and bankruptcy accounting

 3   services?

 4        A.    Since 1990 it's been primarily

 5   bankruptcy and forensic services.

 6        Q.    I don't mean to be pedantic,

 7   but when you say "primarily," were there

 8   other occasions when you performed other

 9   services as well?

10        A.    No, not that I recall.

11        Q.    And did you have your firm

12   since 1990?

13        A.    No.  My firm started in 2005.

14        Q.    Are you the sole owner of your

15   firm?

16        A.    Yes.

17        Q.    Any other employees of your

18   firm?

19        A.    Yes.

20        Q.    How many?

21        A.    One.

22        Q.    Is that person an accountant?

23        A.    No.

24        Q.    Is it an administrative person?

25        A.    She's a paraprofessional.

1      Q.    How long has she been with you?

2      A.    Since 2005.

3      Q.    What's her name?

4      A.    Nora McKinney.

5      Q.    Did she aid or assist you in

6   your engagement on behalf of David Cameo?

7      A.    Yes.

8      Q.    By whom were you employed

9   before 2005?

10      A.    In 1990 to approximately 2005 I

11   was employed by Eli Rossman, CPA.

12      Q.    Approximately how many other

13   accountants were employed by that firm?

14      A.    Approximately five.

15      Q.    Before 1990 what did you do

16   professionally?

17      A.    Prior to Eli Rossman I was a

18   controller for a firm in Long Island for

19   about six months, and prior to that I

20   worked for Seymour Schneidman & Associates,

21   which is an accounting firm in Manhattan,

22   from -- for a couple years.  I don't

23   remember the exact dates.

24           And prior to that I worked for

25   an accounting firm called Tanten &

1    Shavelson from approximately 1980 to

2    approximately 1988.

3         Q.    Okay.  Have you been an

4    accountant since 1980?

5         A.    Yes.

6         Q.    When did you become a certified

7    public accountant?

8         A.    In 1982.

9         Q.    Just to complete the history,

10   sir, where did you go to school for your

11   college or postgraduate education?

12        A.    I got my bachelor's degree at

13   Pace University, and I got a Master's in

14   taxation at CW Post.

15        Q.    Okay, great.  Does your current

16   firm maintain business offices?

17        A.    Yes.

18        Q.    Where are those located?

19        A.    I have one office in -- the

20   address is 100 Merrick Road, Rockville

21   Centre in New York 11570.

22        Q.    Is that in Nassau County?

23        A.    Yes.

24        Q.    And do you reside in Nassau

25   County?

```
 1        A.    Yes.

 2        Q.    Have you ever been a party to a

 3   lawsuit either personally or the Gary

 4   Lampert, CPA company?

 5        A.    Personally I was involved in my

 6   divorce proceeding.

 7        Q.    Mm-hmm.

 8        A.    That's the only lawsuit that I

 9   am aware of.

10        Q.    All right, let's go ahead and

11   mark our first exhibit, which is going to

12   be familiar to you.  It's your report.

13   Bear with me.

14             Lampert, and for that matter

15   Mr. Hufnagel, the way we have shared

16   exhibits is to place them into the chat

17   box.

18             So Mr. Lampert, if you would

19   click on the chat box, a white side bar

20   should open on your computer.

21             MR. HUFNAGEL:  Hold on one

22        second.  It's asking me to download

23        the document, not to open it.

24        Q.    Yes, so I was just going to

25   explain when you click on it, it will give
```

1    you an option to download.  You could pick

2    a folder, you could call it "Cameo

3    deposition."  All the documents will end up

4    in that folder and you will have them for

5    the future as well.

6            This document, for the court

7    reporter, I'm continuing the numbering, and

8    it's Plaintiff's Exhibit 106, the report of

9    Gary Lampert.

10            (Whereupon, Rebuttal Report of

11        Mr. Lampert was marked as Plaintiff's

12        Exhibit 106 for identification as of

13        this date by the Reporter.)

14            MR. HUFNAGEL:  What was the

15        number you have on this again?

16            MR. MAGLIERY:  Plaintiff's

17        Exhibit 106.  And the file should say

18        that, I hope.

19            MR. HUFNAGEL:  106?

20            MR. MAGLIERY:  106.

21            Is it coming through for you?

22            MR. HUFNAGEL:  Yes.  We also

23        have a copy of this particular

24        exhibit.  So I'm going to hand the

25        witness a printed copy just for ease

1           of review.  But we will of course, if

2           needed, review the Adobe version as

3           we go through this.  Thank you.

4      Q.    The official one will be the

5  one I put in the chat box, but I put the

6  entire report with exhibits, so I think we

7  should be looking at the same thing.

8           MR. HUFNAGEL:  You can look at

9           this one unless there's a difference.

10          We'll look at both.  We'll look at

11          both, John.

12          MR. MAGLIERY:  I'm sure the

13          paper one will be just fine.  I put

14          the full -- as I said, the full

15          report.

16     Q.    Mr. Lampert, could we turn in

17  the report to your CV, which is Exhibit A.

18     A.    Okay.

19     Q.    In how many cases do you think

20  you've been retained to testify as an

21  expert in your career?  And I'm making the

22  distinction between your services in

23  bankruptcy as an examiner.  So let's focus

24  first on forensic work.

25     A.    For the forensic, we'll call it

1    the forensic non-bankruptcy work if that's

2    okay.

3        Q.    That's fine.

4        A.    For the forensic work I have

5    not testified in any matter.  I was

6    retained and there was a possibility of

7    providing testimony, but I did not provide

8    any testimony in any of my non-bankruptcy

9    forensic work.

10       Q.    Okay, and so how many

11   non-bankruptcy forensic engagements have

12   there been?

13       A.    I don't recall exactly.  I'd

14   have to check my records to give you the

15   number.

16       Q.    Is it less than five?

17       A.    I don't recall.

18       Q.    And then in bankruptcy, how

19   many times have you been retained by a

20   party in bankruptcy to provide expert or

21   accounting services?

22       A.    I've been retained in well over

23   500 cases in bankruptcy.  They all didn't

24   require any testimony.  Usually there's

25   always the possibility of providing

1    testimony in most of the cases.

2         Q.    In how many cases in bankruptcy

3    did you provide testimony?

4         A.    I don't recall the exact

5    number.  I'll have to check my records.

6         Q.    Do you think that's less than

7    five?

8         A.    I think it's more than five.

9         Q.    Can you give me an order of

10   magnitude?  Is it ten or a hundred or a

11   thousand?

12        A.    I'd really -- it's probably

13   more than ten, but I'd like to check my

14   records.

15        Q.    In those bankruptcy retentions,

16   how often by proportion were you retained

17   by the trustee as opposed to another party?

18        A.    Most of the times I was

19   retained by the trustee.

20        Q.    Would you say it was -- again,

21   I'm not looking for an exact number, but

22   was it 90 percent of the time or 75 percent

23   of the time or just the majority of the

24   time?

25        A.    Are you just referring to the

1    cases where I provided testimony, or all

2    the cases?

3         Q.    All the cases.  I'm sorry,

4    thanks for that clarification.

5         A.    Probably at least 90 percent of

6    the time I was retained by the trustee.

7         Q.    How many times have you been

8    retained by the debtor before?

9         A.    I don't recall the exact

10   number.  I'd have to check my records.

11        Q.    Have you ever been retained by

12   the debtor before?

13        A.    Yes.

14        Q.    Do you think it's less than

15   five times?

16        A.    I don't remember.  It's

17   probably more than five times, but I have

18   to check my records.

19        Q.    When was your last professional

20   engagement before this one?

21        A.    I've been retained in

22   bankruptcy cases during the past few years,

23   so I don't --

24        Q.    Okay.

25        A.    I don't recall the exact dates.

1      Q.    That's fine.  And when was your

2   last engagement for a debtor before this

3   one?

4      A.    I don't recall.  I'd have to

5   check my records.

6      Q.    Do you think it was more than a

7   year ago?

8      A.    I don't recall.  I'd have to

9   check.

10      Q.    Okay, what records would you

11   check to answer all these questions about

12   your prior engagements?

13      A.    I'd check my case files and

14   determine the dates that I commenced

15   working on the cases.

16      Q.    Okay.

17            All right, in your report on

18   page 3, Section 3, it's called "Recent

19   testimony," you say, "During the last four

20   years I have not testified as an expert

21   witness as an accountant at trial or at

22   deposition," is that correct?

23      A.    Yes.

24      Q.    When was the last time you gave

25   testimony as either a trial witness or a

1   deponent in any case?

2       A.   I don't remember the last date.

3   I'd have to check my records.

4       Q.   How did you determine that four

5   years was the period that you report in

6   this "recent testimony" section?

7       A.   Well, I know I haven't

8   testified in the last four years.  So my

9   testimony -- the last time I testified

10  would go back more than four years.

11      Q.   Do you remember if it was five

12  years ago or ten years ago?  Do you have

13  any approximation of the last time you gave

14  testimony?

15      A.   It was several years ago.  I'd

16  have to go back and check my records.

17      Q.   It was between five and ten

18  years ago?

19      A.   I really don't recall.  I'd

20  have to go back and check my records.

21      Q.   Have you been deposed before?

22      A.   Yes.

23      Q.   How many times?

24      A.   I'd say approximately 10 to 20

25  times.  I don't have the exact number.

1        Q.    And have you ever given

2   testimony at a trial or hearing before?

3        A.    Yes.

4        Q.    And how many times have you

5   done that?

6        A.    I'd have to check.  I don't

7   recall the exact number.

8        Q.    Fewer than the number of times

9   you gave deposition testimony though,

10  right?

11       A.    Excuse me?

12       Q.    It was fewer than the number of

13  times you gave deposition testimony?

14       A.    Yes.

15       Q.    Okay.

16            MR. MAGLIERY:  Counsel, we'll

17        call for the production of at least a

18        list of every case in which

19        Mr. Lampert has given testimony.  I

20        think that's something we're entitled

21        to.

22            I will forgo the list of all

23        500 cases in which he's been retained

24        though.  I can understand that being

25        burdensome.

1              MR. HUFNAGEL:  Restate that.

2        So a list of all cases where he's

3        testified?

4              MR. MAGLIERY:  Correct.

5              MR. HUFNAGEL:  And what is the

6        time period that you are requesting?

7              MR. MAGLIERY:  Well, if it's 10

8        to 20 cases, that doesn't seem to be

9        overly burdensome, so I'd ask for all

10       of them.  We can debate it off the

11       record.  I'm just putting the request

12       in.

13             MR. HUFNAGEL:  Right, that's --

14       Q.    Mr. Hufnagel and I will later

15  sort it out.  We don't need to worry about

16  it this second.

17             Have you ever been the subject

18  of a challenge about your qualifications as

19  an expert in any case?

20       A.    Not that I recall.

21       Q.    What did you do to prepare for

22  today's deposition?

23       A.    I reviewed my report, the

24  Amazon expert report, the deposition

25  transcripts of Mr. Cameo -- when I refer to

1    "Mr. Cameo" I'm referring to David Cameo,

2    Ari Cameo, Shoshana Ostran, general ledgers

3    and other documents that were produced in

4    the case.

5        Q.    Is that what you did to prepare

6    your report or prepare to today's

7    deposition?

8        A.    Both.  Well, when I prepared by

9    report I didn't look at my report yet

10   because it was not prepared.

11       Q.    Fair enough.

12       A.    But I did review the documents

13   that I mentioned in addition to perhaps

14   other documents.

15       Q.    Can you remember any other

16   documents other than the ones you listed

17   that you reviewed?

18       A.    That I reviewed in connection

19   with my testimony or in connection with my

20   report?

21       Q.    Let's start with the testimony.

22   Because I think there's a list in the

23   report of what you looked at.  So I'm

24   asking if you looked at anything else to

25   prepare for today.

Gary Lampert
October 30, 2023

```
 1        A.    Other than the documents that I

 2   just mentioned?

 3        Q.    Yes.

 4        A.    I looked at some tax returns.

 5        Q.    Okay, and did you meet with

 6   counsel?

 7        A.    Excuse me?

 8        Q.    Did you meet with counsel to

 9   prepare for the deposition?

10        A.    No.  I spoke with them over the

11   phone.

12        Q.    Okay, and how many times did

13   you speak with them?

14        A.    Once.

15        Q.    And was that --

16        A.    This is in connection with

17   the -- this is just in connection with the

18   testimony, is that correct?

19        Q.    Correct, correct.  And was that

20   Mr. Hufnagel or Mr. Leonov or both of them?

21        A.    It was both.

22        Q.    Do you remember when that call

23   took place?

24        A.    A few days ago.

25        Q.    Do you remember how long it
```

Gary Lampert
October 30, 2023

 1  took?

 2       A.    Less than an hour.  I don't

 3  recall the exact time.

 4       Q.    Now, Mr. Lampert, let's go to

 5  the beginning of the report if we could.

 6  Page 1, "Introduction."  You say that you

 7  were retained by David Cameo in this

 8  matter, I'm paraphrasing, and you say, "I

 9  was asked by Cameo to review the report of

10  the expert retained by Amazon.com Services,

11  LLC in the subject matter and prepare a

12  report to rebut the opinions and

13  conclusions within the report as

14  necessary."  Do you see that?

15       A.    Yes.

16       Q.    Do you apply any industry

17  standards that exist for that kind of

18  examination?

19            MR. HUFNAGEL:  Can you restate

20       that question?  I'm confused myself.

21       So please --

22       Q.    I'll even expand it a little.

23  I'm going to restate it --

24            MR. HUFNAGEL:  Maybe do one at

25       a time without expanding it would be

1         fine.  Thank you.

2         Q.    I'll ask my next question.

3    I'll withdraw the question and ask another

4    one.

5              Are there any industry

6    standards that relate to the performance of

7    the kind of examination you undertook?

8         A.    I based it on my knowledge and

9    past experience.  I don't recall the

10   industry standards.

11        Q.    You list on the front page of

12   your report and in your CV that you have at

13   least I think four qualifications.  The

14   first one is CPA.

15             Are there any standards that

16   apply when a CPA conducts an examination to

17   rebut an expert report?

18        A.    I don't recall.

19        Q.    What is a -- excuse me.

20        A.    I'm sorry, go ahead.

21        Q.    I think I might have

22   interrupted you, and I apologize.

23             What is a CFF?

24        A.    CFF is a certification in

25   financial forensics.

Gary Lampert
October 30, 2023

1      Q.    Okay, and do you know whether

2    there's any guidance or standards that

3    apply for a CFF?

4        A.    I don't recall.

5        Q.    What year did you earn your

6    CFF?

7        A.    Several years ago.  I don't

8    recall the exact date.  I'd have to check

9    my records.

10       Q.    You've been an accountant for

11   approximately 43 years, right?

12       A.    Yes.

13       Q.    And was it toward the beginning

14   of your career or the middle, or was it

15   recent that you got a CFF accreditation or

16   certification?

17       A.    It was not toward the beginning

18   because they didn't have the certification.

19   When they came out with the certification a

20   number of years ago, that's when I obtained

21   it.  I just don't recall the exact year.

22       Q.    Okay, and did you have to take

23   some kind of courses to obtain that

24   certification?

25       A.    No.

1      Q.    Was it a self-study

2   certification?

3      A.    No.  It was based on

4   experience.

5      Q.    Okay, what about a CFE, what is

6   that?

7      A.    A certified fraud examiner.

8      Q.    And again, I'll ask if you can

9   recall when you obtained that

10  certification.

11     A.    It was a few years ago.  I

12  don't remember the exact date.

13     Q.    Can you -- again, can you try

14  to put it in the context of the beginning

15  or middle or recently parts of your career?

16     A.    Probably within the last five

17  years.

18     Q.    What about that one, how did

19  you earn that one?

20     A.    I took an examination.  And in

21  addition to the examination you had to have

22  experience in the related fields.

23     Q.    And again, by proportion of

24  your engagements, your professional

25  engagements, how many would you say involve

1    the skills that are connected with a

2    certified fraud examiner?

3        A.    It could be -- most -- it could

4    be in every bankruptcy case that I have

5    that may require the investigation into the

6    transactions.  So it could be every case; I

7    just don't know until I'm working on a

8    particular matter.

9        Q.    Okay.  Is it fair to say that

10   you're frequently called upon to use your

11   skills as a certified fraud examiner?

12       A.    Yes.

13       Q.    What is a CIRA?  What is that

14   accreditation?

15       A.    That's certified insolvency and

16   restructure advisor.

17       Q.    Can you briefly describe what

18   that certificate is?

19       A.    That's a certificate that's

20   provided by the association of the AIRA

21   that provides insolvency and restructure

22   issues.

23       Q.    Do you recall when you earned

24   that certificate, approximately?

25       A.    Probably between the last five

1   or ten years.

2        Q.    All right, back to the

3   introduction of your report, which is page

4   1, tell me when you have that.

5        A.    Yes, I have it.

6        Q.    Great.  You say that you

7   reviewed and analyzed the expert report of

8   Mr. Bracco dated August 7, 2023, financial

9   records of several entities, and deposition

10  transcripts of David Cameo, Ari Cameo and

11  Shoshana Ostran.  Do you see that?

12       A.    Yes.

13       Q.    In number 3 you say, "In

14  addition, I had communications with Cameo,

15  his counsel and his accountant."  Do you

16  see that?

17       A.    Yes.

18       Q.    Who is the accountant to whom

19  you refer there?

20       A.    I don't recall his name.  His

21  name is Mark.  I don't recall his last

22  name.

23       Q.    And do you remember when you

24  spoke to Mark?

25       A.    I never spoke with Mark.

1      Q.    How did you communicate with

2    him?

3      A.    Through e-mails.

4      Q.    Do you recall, again,

5    approximately how many e-mails you

6    exchanged with Mark?

7      A.    There were a few, probably less

8    than ten e-mails.

9      Q.    And what about with Cameo

10    himself, without telling me what you said,

11    just please tell me did you ever speak with

12    him or was that by e-mail as well?

13      A.    I spoke to Mr. Cameo over the

14    phone probably less than five times.

15      Q.    Did you also have -- excuse me.

16      A.    And I had -- and I sent e-mails

17    to him.  There were e-mail communications

18    but I don't recall the number.

19      Q.    Okay --

20      A.    I'd have to check.

21      Q.    All right.  And then on page 4,

22    I'm talking about the pages at the bottom

23    of the report, the paper pages if you will,

24    it's a statement of compensation.  Is it

25    correct that your hourly rate is $350 per

1   hour?

2        A.    Yes.

3        Q.    And your paraprofessional's

4   rate is $120 an hour, correct?

5        A.    Yes.

6        Q.    And it says you received a

7   retainer in the amount of $120,000, is that

8   right?

9        A.    At the time that I prepare the

10  report, yes.

11       Q.    And have you received

12  additional retainer since then?

13       A.    Yes.

14       Q.    What about?

15       A.    5,000.

16       Q.    I understand you received the

17  retainer.  Do you have an approximation of

18  the amount of your billings to date?  How

19  many fees have been incurred?

20       A.    Well, can you repeat the

21  question, please?

22       Q.    Yes.  Or I can rephrase it if

23  that would be helpful.  I'll withdraw it.

24             How much have you billed so far

25  in this engagement?

 1        A.      I'd have to check my records,

 2    but it's at least 25,000.

 3        Q.      Do you have any understanding

 4    of what the source of the $25,000 retainer

 5    you received so far is?

 6        A.      I was told it came from David's

 7    brother Ari.

 8        Q.      Okay.  Are you of the belief

 9    that the bankruptcy estate currently does

10    not have any cash on hand?

11        A.      I don't have any information

12    about the bankruptcy estate.

13        Q.      Okay.

14                All right, I think you said

15    earlier that a majority of your --

16    withdrawn.  I think you said earlier that

17    more than 90 percent of your engagements

18    have been by the trustee in bankruptcy.

19    When you are retained by the debtor, do you

20    employ the same methods of examining the

21    financial issues in bankruptcy as you would

22    if you were employed by the trustee?

23        A.      It depends on the circumstances

24    of the case.

25        Q.      Did you employ any different

1   means than your usual means or methods in

2   examining the -- or rebutting the Bracco

3   report as you would have in a retention by

4   the trustee?

5           MR. HUFNAGEL:  Can you just

6       restate that question?  I'm not

7       understanding it myself, so please

8       just restate it.

9       Q.    I think it was something like

10  this.  Did you employ any different means

11  or methods in examining the Bracco report

12  as you would in an engagement where you're

13  retained by the trustee?

14      A.    Not necessarily.  Here I

15  reviewed and analyzed books and records and

16  deposition transcripts and documents and

17  documents related to the litigation as I

18  would in any bankruptcy matter if it was

19  necessary.

20      Q.    All right, I have put into the

21  chat box and hopefully shared with everyone

22  what we've marked as Plaintiff's

23  Exhibit 107.

24          (Whereupon, CFE Code of

25      Professional Standards was marked as

1          Plaintiff's Exhibit 107 for

2          identification as of this date by the

3          Reporter.)

4               MR. HUFNAGEL:  We have it open.

5          Feel free to scroll this.

6          Q.    Yes, feel free to take a look.

7    The document is an excerpt of the Code of

8    Professional Standards for certified fraud

9    examiners.  Feel free to look through it

10   and tell me whether you recognize any of

11   these from your time obtaining your

12   certificate as a CFE.

13        A.    (The witness reviews the

14   document.)

15             Okay, I reviewed it.  Can you

16   please repeat the question?

17        Q.    Yes.  I asked whether you

18   recognize any of these standards from the

19   time that you obtained your CFE.

20        A.    These standards appear to be

21   familiar.  I -- they do appear to be

22   familiar, yes.

23        Q.    And let's take a look if we

24   could at page 3.  This is the standard

25   having to do with a CFE drawing

1    conclusions.  And the standard is,

2    "Conclusions shall be supported with

3    evidence that is relevant, reliable and

4    sufficient."  Do you see that?

5        A.    Yes.

6        Q.    And then the guidance for the

7    standard defines each of those terms.  It

8    says, "Relevant evidence" -- I'm in the

9    middle paragraph, "Relevant evidence is

10   evidence that tends to make some fact at

11   issue more or less likely than it would be

12   without the evidence.

13           Are you both able to see it?

14       A.    Yes.  I see it.

15       Q.    Okay, and then in the next

16   paragraph, which is the last paragraph on

17   this page, it says, "Evidence is reliable

18   if it comes from a trustworthy or

19   believable source."  Do you see that?

20       A.    Yes.

21       Q.    And then the next sentence is,

22   "Evidence is sufficient to support a CFE's

23   findings and conclusions where the weight

24   of the evidence is sufficient such that a

25   reasonable professional could draw the same

1    or a similar conclusion to that of the

2    member."  Do you see that?

3        A.    Yes.

4        Q.    And the member is a person

5    who's earned the CFE, correct?

6        A.    Yes.

7        Q.    And did you employ this

8    standard in reviewing and rebutting

9    Mr. Bracco's report?

10        A.    Yes.

11        Q.    And then the last page of the

12    exhibit, the excerpt is about exercising

13    reasonable skepticism.  And the guidance

14    there says that "CFEs must be alert to the

15    possibility of conjecture, unsubstantiated

16    opinion, and bias of witnesses and others."

17    Do you see that?

18        A.    Yes.

19        Q.    And then a few more lines down

20    in that guidance it says, "The CFE should

21    not accept questionable or illogical

22    statements at face value but instead should

23    seek to corroborate such claims with other

24    evidence before relying on them."  Do you

25    see that?

Gary Lampert
October 30, 2023

```
 1        A.    Give me one second --

 2        Q.    Sure.

 3        A.    -- please.  Sorry, can you

 4   repeat that?

 5        Q.    It's the seventh line down in

 6   the middle of the paragraph, it says, "The

 7   CFE should not accept questionable or

 8   illogical statements at face value but

 9   instead should seek to corroborate such

10   claims with other evidence before relying

11   on them."  Do you see that?

12        A.    Yes.

13        Q.    And then it continues, "The CFE

14   should be cognizant of the potential motive

15   that some witnesses or suspects might have

16   for lying, which might include the

17   motivation to," and there's a list of

18   bullet points.  And the first one is "cover

19   up their own wrongdoing or deflect

20   suspicion away from themselves."  Do you

21   see that?

22        A.    Yes.

23        Q.    Did you employ this standard in

24   performing your rebuttal of Mr. Bracco's

25   report?
```

```
 1       A.    Yes.

 2       Q.    Bear with me while I share one

 3   more exhibit, excuse me.

 4             Okay, I've put in the chat box

 5   and shared with everyone what's been marked

 6   as Plaintiff's Exhibit 108, which is an

 7   application to employ your services in an

 8   Eastern District of New York bankruptcy

 9   called In Re Marine Risks, Inc.

10             (Whereupon, Application for

11         Order Authorizing Retention of Mr.

12         Lampert was marked as Plaintiff's

13         Exhibit 108 for identification as of

14         this date by the Reporter.)

15       Q.    Tell me when you've got that

16   up.

17       A.    We're looking at -- I think

18   this case is Maywood Capital.

19       Q.    Hmm, then maybe I made a

20   mistake.  Bear with me.  I'm sorry, this is

21   the correct one.

22             So for the record, it's

23   Plaintiff's Exhibit 108, and it's In Re

24   Maywood Capital Corp. in the Southern

25   District of New York Bankruptcy Court.
```

1              In this application the trustee

2     is seeking an order to appoint you as an

3     examiner for the trusts, is that correct?

4          A.    No.

5          Q.    What is happening here?

6          A.    Seeking to authorize the

7     retention of me as accountant for the

8     trustee.

9          Q.    Okay, I beg your pardon.

10    "Examiner" is a technical term that means

11    something different, is that right?

12         A.    Yes.

13         Q.    And beginning on PDF page 5

14    there's an affidavit from you that

15    describes your disinterest in the trust and

16    the tasks that the trustee has asked you to

17    undertake.  Do you see that?

18         A.    Yes, but this is not a trust.

19         Q.    It's a bankruptcy estate,

20    right?

21         A.    Yes.

22         Q.    Okay.  So the tasks that you

23    undertook were, I'm looking at page 5,

24    "Trace the assets of the debtor's from the

25    books and records, verifying the existence,

1    if any, of any transfers or concealments of

2    assets or other fraudulent conveyances."

3    Do you see that?

4        A.    Yes.

5        Q.    Is that a typical task you

6    would undertake if you were engaged as

7    accountant for a bankruptcy estate?

8        A.    If I was engaged for the

9    accountant -- for the bankruptcy trustee,

10   yes.

11       Q.    Is that also a task that you

12   undertook with respect to representing the

13   debtor, David Cameo?

14       A.    No.

15       Q.    So one difference when you're

16   retained by the trustee in bankruptcy or

17   the debtor is you do not attempt to

18   determine whether there's been any

19   concealments of assets or fraudulent

20   conveyances, right?

21       A.    No, my retention with David

22   Cameo was basically in connection with the

23   review and possible rebuttal of

24   Mr. Bracco's report.

25       Q.    So you made no effort to verify

1    that there were or were not transfers or

2    concealments of assets or other fraudulent

3    conveyances with respect to Mr. Cameo,

4    right?

5        A.    That's correct, I didn't -- I

6    did not take on that review.

7        Q.    And the next thing in the

8    exhibit is "Review the activities of the

9    principals insofar as it affects the

10   debtors as to use of corporate funds and/or

11   assets."  Do you see that?

12       A.    Yes.

13       Q.    Is that something that you

14   undertook with respect to your engagement

15   for Mr. Cameo?

16       A.    I don't understand how this is

17   related to Mr. Cameo.  I don't know who the

18   principals are, I don't know who are the

19   debtors, so I can't answer that question.

20       Q.    Okay, so I think that's a "no,"

21   right?  It's not something you agreed to

22   undertake.

23       A.    No, that's not -- that was not

24   my answer.  I said I don't think I can

25   answer the question based upon the way it

1    was presented.

2        Q.    Do you know who the debtor is?

3    In the Cameo matter.

4        A.    The debtor in the Cameo matter

5    is David Cameo.

6        Q.    Okay, in connection with your

7    rebuttal of the Bracco report, did you come

8    to learn that he was the principal of the

9    company called Jersey Cameras 2?

10        A.    Yes.

11        Q.    Okay, and did you come to learn

12    he was the principal of a company called

13    Cameo Distribution?

14        A.    I don't know if he was the

15    principal but he had an ownership interest.

16        Q.    I guess I take "principal" to

17    be an ownership interest, but I appreciate

18    that clarification.

19            Did you come to learn that he

20    was affiliated with a company called

21    Digital Direct and More, and previously its

22    principal?

23        A.    How would you describe

24    "affiliate"?  My understanding that he used

25    to be a stockholder of the company.

1        Q.    That -- okay, so in connection

2    with those companies, did you undertake any

3    investigation of whether Mr. Cameo as

4    principal used corporate funds or assets or

5    made transfers -- I beg your pardon.  Let

6    me rephrase it because I want to use the

7    correct words.

8              In connection with those

9    companies, did you review whether Mr. Cameo

10   as principal made any transfers or uses of

11   corporate assets that affected the debtor?

12       A.    No, I reviewed the information

13   in Mr. Bracco's report and the books and

14   records and the testimony.

15       Q.    Okay, did you make any review

16   of whether there were any preferential

17   transfers respecting Mr. Cameo in his

18   bankruptcy?

19       A.    How would you define

20   "preferential transfers"?

21       Q.    Well, take a look at your

22   affidavit in Plaintiff's Exhibit 108,

23   number 8.  You say, "Review all loans

24   payable to and from officers and

25   stockbrokers in order to determine whether

Gary Lampert
October 30, 2023

1   or not within the 12-month period prior to

2   the filing of petition there were any

3   corporate repayments against any such loans

4   or transactions with stockholders which

5   might be deemed preferential in nature."

6   I'm using it the way you're using it,

7   however you define it.

8       A.    Okay.  So can you -- so can you

9   please repeat -- can you repeat the

10  question, please?

11      Q.    Yes, yes.  Did you make any

12  effort to determine whether there were any

13  preferential transfers respecting the

14  debtor?

15      A.    Respecting the debtor that he

16  has -- were there loans to the debtor or

17  were there loans from the debtor?  I'm a

18  little confused as to what you're asking

19  me.

20      Q.    Did you make any effort to

21  determine whether any preferential

22  transfers were made respecting the debtor?

23          MR. HUFNAGEL:  By

24      "preferential" are you referring to

25      the bankruptcy code statute with the

1          90 or one-year transfers?  That's why

2          he's confused because you're using

3          the word "preferential" and you're

4          not giving a context.  That's why he

5          seems confused.

6              You asked it already twice, so

7          if you're more specific that would

8          help you give the information you're

9          looking for.

10     Q.    Okay, you may answer.

11     A.    I'm sorry?

12     Q.    You may answer.

13          MR. HUFNAGEL:  You could

14     answer.  I can't repeat his question.

15     You can answer what he asked you.

16     A.    I did not review the records to

17 determine if there were any preferential

18 transfers because I wasn't aware -- no, the

19 answer is no, I did not review the records

20 to determine if there were preferential

21 transfers because it was not what I was

22 retained to do.

23     Q.    All right.  So what were you

24 retained to do in this matter?

25     A.    I was retained to review the

1    Bracco report and prepare a rebuttal report

2    if necessary of any opinions or information

3    in the report that I thought was incorrect

4    or I didn't agree with the opinion.

5         Q.    But you were not asked to rebut

6    the conclusion that fraudulent conveyances

7    were made, is that right?

8         A.    If that was -- if the

9    allegation that fraudulent conveyances were

10   made was included within the report, in the

11   Bracco report, yes, then I was asked to do

12   that.  But I don't recall that Mr. Bracco

13   alleged that there were fraudulent

14   transfers made in his report.

15             Would it be possible to take a

16   five-minute break, please?

17        Q.    Sure.

18        A.    Or whenever it's convenient.

19        Q.    This is a fine time.  Let's

20   take five.

21        A.    The time is 11:02 a.m. and

22   we're going off the record.

23             (Whereupon, a short recess was

24        taken.)

25             THE VIDEOGRAPHER:  The time is

1          11:11 a.m. and we're back on record.

2               MR. MAGLIERY:  Thank you.

3               I am sharing in the chat box

4          what we've marked as Plaintiff's

5          Exhibit 109, which is the expert

6          report of Anthony M. Bracco dated

7          August 7, 2023 in this case.

8               (Whereupon, Expert Report of

9          Mr. Bracco was marked as Plaintiff's

10          Exhibit 109 for identification as of

11          this date by the Reporter.)

12               MR. HUFNAGEL:  Okay, we have a

13          hard copy of the report, so I'm

14          handing that to Gary, the witness

15          here.  But to the extent we need to,

16          well scroll through the PDF which we

17          have open on the screen as well.

18          Q.    Mr. Lampert, do you recognize

19     this report as the one that you were called

20     upon to rebut?

21          A.    Without going through every

22     page, it appears to be the report.

23          Q.    If you would take a look at

24     hard copy page 8, number 8 at the bottom,

25     "Summary of opinions," here Mr. Bracco sets

1   forth five opinions that he summarizes.

2   And the first one is, "Cameo operated

3   Jersey Camera as a shell company or conduit

4   through which proceeds from sales of goods

5   on Amazon.com flowed to Digital Direct and

6   from which Cameo personally benefitted."

7   Do you see that?

8        A.    Yes.

9        Q.    Did you form an opinion that

10  that statement was untrue?

11       A.    Yes.

12       Q.    And did you include a rebuttal

13  of that opinion within your report?

14       A.    Yes.

15       Q.    Is it set forth in a separate

16  section or is it included in the kind of

17  item-by-item rebuttals that form your

18  report?

19       A.    My rebuttal report basically

20  followed the outline of the Bracco report,

21  so there should be a separate section for

22  that opinion.

23       Q.    Okay, I see.  All right, let's

24  go to your report then.  I think I

25  understand what you're saying, and I think

 1  it's on page 9 -- paper page 9 of your

 2  report.

 3          MR. HUFNAGEL:  Just for the

 4      record, can we just identify the

 5      exhibit?  I'm sorry, I just want to

 6      make sure.

 7          MR. MAGLIERY:  Yes, Plaintiff's

 8      Exhibit 106 is the Lampert report.

 9          MR. HUFNAGEL:  Thank you.  Page

10      9 you said?

11          MR. MAGLIERY:  Yes.

12          MR. HUFNAGEL:  Thank you.

13          Your report, page 9.

14      A.    I just want to make one comment

15  if I may.

16      Q.    Please.

17      A.    About Mr. Bracco's report.  On

18  page 8, the first item, the last few words

19  are "and from which Cameo personally

20  benefitted."  Then when Mr. Bracco appears

21  to provide detail on that opinion on page

22  10, the last part of that sentence is not

23  included on page 10.

24          So I didn't -- when I prepared

25  my report I just addressed the opinion --

Gary Lampert
October 30, 2023

1    or the information on page 10, not on page

2    8.

3        Q.    Okay, I understand.

4        A.    Okay.

5        Q.    So page 9 you rebut the opinion

6    by saying the opposite, right?  You say

7    Cameo did not operate Jersey Camera as a

8    shell.

9            And I take it that the

10   following paragraphs elaborate on that

11   point, is that right?

12       A.    I'm sorry, can you --

13       Q.    The following paragraphs

14   elaborate on the rebuttal?

15       A.    The following paragraphs that

16   are in italics are basically from the

17   Bracco report.  Anything in italics from

18   the Bracco reports, and it should be

19   footnoted.

20       Q.    Okay, so you -- I see.  You're

21   saying -- you're citing here the Bracco

22   report, pages 10 and 11.

23       A.    Yes.

24       Q.    And then the rebuttal begins in

25   what is paragraph 16 of your report,

 1   correct?

 2        A.    Yes.  My rebuttal with regard

 3   to that particular opinion, yes.

 4        Q.    Okay, so you conclude that the

 5   summary of the operation of Jersey Cameras'

 6   credit terms with the DDAM are incorrect

 7   because Jersey Camera maintains its books

 8   on a cash basis.

 9              Can you explain what that

10   means, to maintain the books on a cash

11   basis.

12        A.    I don't understand your

13   question because you talk about credit

14   terms and cash basis.  So I don't follow

15   the question.

16        Q.    Well, I'm just reading how your

17   paragraph 16 follows your paragraph 15.  It

18   seems to me that you're attempting to rebut

19   paragraph -- the excerpt in paragraph 15 in

20   paragraph 16.  Maybe I'm wrong.

21        A.    Okay, I think I understand what

22   you are asking.  But if you wouldn't mind,

23   can you please rephrase it?

24        Q.    Yes.  Am I correct that you

25   believe Mr. Bracco's description excerpted

1   in paragraph 15 of your report of Jersey

2   Cameras' operation on credit terms is

3   incorrect because Jersey Cameras operated

4   on a cash basis?

5        A.    No, the credit terms were

6   separate from the issues with the cash

7   basis.  The cash basis had to do with

8   Mr. Bracco's allegation that there was no

9   liability for the purchase of inventory

10  reflected on the books as a liability,

11  which is incorrect because there wouldn't

12  be a liability if the books are maintained

13  on a cash basis.

14       Q.    Okay, so when you say, looking

15  at paragraph 16, "the foregoing information

16  is incorrect."

17       A.    Yes.

18       Q.    The foregoing information is

19  the assertion that there should have been a

20  record of inventory and payables?

21       A.    No.  Mr. Bracco's report -- let

22  me quote it exactly.  Okay, in the -- on my

23  report, page 9, the middle paragraph which

24  is footnoted as number 3, the Bracco report

25  reflects that, "I would expect Jersey

1    Cameras' books and records to reflect

2    assets in the form of inventory and a

3    liability in the form of a payable to

4    Digital Direct.  However,".  So I was

5    referring to that particular statement.

6          Mr. Bracco goes on to say

7    "However, Jersey Cameras' general ledgers

8    do not reflect inventory or liability to

9    Digital Direct."  And my reply to that

10   particular statement is that the Jersey

11   Cameras maintain their ledger on a --

12   general ledger on a cash basis, and

13   therefore the liability would not be

14   reflected within the general ledger.

15        Q.   Okay.  So my question to you

16   then -- thank you, I appreciate that

17   explanation -- is how do you know that

18   Jersey Cameras maintain their books on a

19   cash basis?

20        A.   Well, the general ledger didn't

21   have any other accounts other than cash,

22   sales, purchases and bank charges, which

23   were all cash transactions, either cash

24   that was received or cash that was paid.

25   And I asked Mr. Cameo was it maintained on

1    a cash basis, and he told me yes, it was

2    maintained on a cash basis.

3         Q.    Okay, so how did you determine

4    the difference between the records being

5    missing and the books being maintained on a

6    cash basis?

7         A.    I don't know what records that

8    are missing that you are referring to.

9         Q.    How did you determine that

10   rather than intentionally not recording

11   inventory or payables, the books are kept

12   on a cash basis?

13        A.    If the books are on a cash

14   basis, then you don't record -- you don't

15   report payables because it's only based

16   upon the cash receipts and the cash

17   disbursements.  It doesn't appear that

18   anything was left out intentionally because

19   it's not -- for cash basis bookkeeping

20   that's not part of the accounting.

21        Q.    Okay, is it possible that a

22   business is using the accrual basis of

23   accounting but simply does not have

24   inventory or receivables or payables?

25        A.    Did you say it's possible that

1   they have cash basis of accounting?

2          MR. HUFNAGEL:  No, he didn't

3       say "they."  It's a very general

4       question.  Is it possible that a

5       business could not -- restate it,

6       please.  I think we're both kind of,

7       like, pondering over here your

8       question as to whether it's unique to

9       this company or just a general

10      question I think.

11         MR. MAGLIERY:  Sue, can you

12      read it back.

13         (Whereupon, the referred to

14      question was read back by the

15      reporter.)

16   A.    Yes, it is possible.

17   Q.    So on what basis did you make

18   the conclusion that Jersey Cameras was

19   operating on a cash basis?

20      A.    Because the general ledger only

21   reflects cash transactions.  It doesn't

22   have an account for accounts receivable, it

23   doesn't have an account for accounts

24   payable.  And Mr. Cameo told me he was on

25   cash basis when I asked him.

1      Q.    Okay, I'd like to break that up

2  into kind of two parts.  I think you

3  already just testified that the absence of

4  receivables, payables or inventory isn't

5  enough alone to determine whether the

6  business is on a cash basis or accrual

7  basis, correct?

8      A.    Yes, I did testify to that.

9      Q.    Okay, so the additional piece

10  that leads you to that conclusion is

11  Mr. Cameo's information, right?

12      A.    No, but also that this company

13  had receivables and had payables and did

14  not record them on the general ledger

15  because it was maintained on a cash basis.

16  So those assets and liabilities did exist;

17  they were just not recorded on the general

18  ledger.

19      Q.    Did you ask to see records of

20  the payables, receivables and inventory?

21      A.    I don't recall.

22      Q.    Do you think it would have been

23  prudent as a certified fraud examiner to

24  ask to see records to verify the payables,

25  receivables and inventory?

1        A.    I probably did ask for records

2    with regard to the purchases.  But I did

3    not request any of the records with regard

4    to the payables or the receivables because

5    it's not what I was retained to do.  And

6    the testimony of Mr. Cameo and the

7    information in Mr. Bracco's report reflects

8    that there were sales that were made with

9    regard to credit term, and there were

10   purchases that were made on credit terms.

11            So the information in those two

12   parts provided evidence that there were

13   accounts receivable and that there were

14   payables.

15       Q.    When you asked Mr. Cameo, were

16   you cognizant of the CFE requirement that

17   you only use evidence that is reliable,

18   meaning comes from a trustworthy or

19   believable source?

20       A.    When I asked Mr. Cameo what?

21       Q.    Whether the books and records

22   were kept on a cash basis.

23       A.    I was asking Mr. Cameo to

24   confirm what it appeared to be in the

25   general ledger that it appeared to be

1    maintained on a cash basis.

2        Q.    But you didn't, if I understand

3    you correctly, ask to see the records of

4    inventory and the payables, correct?

5        A.    I did -- I asked to see

6    invoices, which they told me that they

7    didn't have and that they did at the time

8    of the transactions.  But I did not ask for

9    accounts payable records, no.

10       Q.    Okay, or inventory records,

11   right?

12       A.    I don't recall if I asked for

13   inventory records.

14       Q.    So given that the invoices, if

15   they existed, were not produced to you or

16   unavailable, was there anything other than

17   Mr. Cameo's information to you that

18   payables, inventory and receivables existed

19   at Jersey Cameras?

20       A.    Based on his testimony and the

21   information within the Bracco report

22   indicated that Jersey Cameras sold goods on

23   credit and they had to wait a period of

24   time to be paid, which would create a

25   receivable, and they acquired goods on

1    credit, which would create a payable or a

2    liability.

3        Q.    The Bracco report is just

4    reciting what Cameo says.  So is there any

5    other document that you were able to view

6    that verified the existence of inventory,

7    receivables or payables?

8        A.    Well, I don't agree that the

9    Bracco report just recites what Cameo said.

10    I think he goes into more detailed analysis

11    and he based some of his opinions based

12    upon his analysis and the testimony of

13    Mr. Cameo.

14            So I was relying on the

15    information in the Bracco report and the

16    testimony of Mr. Cameo.

17        Q.    Okay, and where did Bracco get

18    his understanding of how the business

19    operated?

20        A.    You'll have to ask Mr. Bracco.

21        Q.    From the Cameo deposition,

22    right?  He cites it.

23        A.    That's what he put in his

24    report, but I don't know -- I don't know

25    how he -- I don't know what he used or what

1  he did to prepare his report.

2      Q.    Okay, well, did you notice that

3  he cited in footnotes throughout his report

4  where he got the information?  Just like

5  you did?

6      A.    Yes.  He said that he reviewed

7  various documents.

8      Q.    He wasn't able to review any

9  records of any payables, receivables or

10  inventory, was he?

11      A.    I don't know.

12      Q.    But regardless, in your

13  capacity as a CFE performing a rebuttal

14  report, your evidence that the books and

15  records were kept on a cash basis is

16  Cameo's testimony, right?

17      A.    It's Cameo's testimony and it's

18  based upon the actual general ledger that

19  only reflects the cash basis accounts.  And

20  I specifically asked Mr. Cameo and he told

21  me it was maintained on a cash basis.

22      Q.    We're going in circles a little

23  bit.  I understand that Cameo told you, and

24  I understand the ledger doesn't include

25  them.  And I'm just looking for the last

1   piece, which is you have not received any

2   documents, you have not set your eyes on

3   any documents that show any payables,

4   receivables or inventory.  It's an

5   assumption you're making, is that correct?

6          MR. HUFNAGEL:  Please restate

7       the question.  You have a lot of

8       background there --

9          MR. MAGLIERY:  I will not

10      restate it.  It's a perfectly

11      understandable question.

12         MR. HUFNAGEL:  Read back the

13      question, please.

14         (Whereupon, the referred to

15      question was read back by the

16      Reporter.)

17      Q.    I'll withdraw it and simplify

18  it.  Have you reviewed any books and

19  records of Jersey Cameras 2 that show

20  payables, receivables or inventory for the

21  company?

22      A.    The books and records I

23  reviewed include bank statements.  And the

24  bank statements include deposits, and these

25  deposits may have been receipts from

1    accounts receivable.

2             And it also -- the bank

3    statements also reflect payments, and the

4    payments may have reflected the payments of

5    the accounts of the accounts payable.

6             So those are the records I

7    reviewed that may relate to the accounts

8    receivable and the accounts payable, just

9    as the general ledger reflects the receipt

10   of the cash as an increase in cash and

11   sales and the payments of purchases, which

12   is a decrease of cash, which appears to pay

13   goods that were bought on credit.

14        Q.    Mr. Lampert, you've been an

15   accountant for 43 years, right?

16        A.    Yes.

17        Q.    What is the difference between

18   a payable and a payment?

19        A.    A payable is an accrual when

20   goods or services are provided at the time

21   of the transaction.

22             A payment is when a payment is

23   made either on a cash basis or a payment

24   for a payable that -- and the payment

25   reduces the amount of cash.

1       Q.    So are you testifying that the

2   evidence of the existence of payables is

3   payments?

4       A.    I'm testifying that that's what

5   it may be.

6       Q.    Okay, and what is the

7   difference between a receivable and a

8   receipt?

9       A.    A receivable is created when

10   something is sold or goods or services are

11   provided and it's not made, it's going to

12   be made pursuant to credit terms.

13            The receipt is the payment that

14   is received for the goods or services that

15   are provided.

16       Q.    And are you testifying that the

17   receipts that are shown in the bank

18   statement are evidence that there are

19   receivables?

20       A.    The receipt shown and combined

21   with the testimony of Mr. Cameo that he

22   sold goods on credit is the evidence that

23   the cash receipt -- the cash deposit into

24   the accounts were the collections of the

25   accounts receivable.

1      Q.    Okay, so other than the bank

2   statements which show receipts and

3   payments, you'll agree with me about that,

4   right?

5      A.    Correct.

6      Q.    Other than those, did you see

7   any documents that evidence inventory,

8   payables or receivables maintained by the

9   company?

10      A.    Not that I recall, but it

11   doesn't mean that the receivables didn't

12   exist and that the payables didn't exist.

13      Q.    And it doesn't mean they did,

14   right?  We can't tell one way or the other.

15      A.    I don't agree with that

16   statement because I'm relying on the

17   information -- on the testimony of

18   Mr. Cameo and the information in the Bracco

19   report.  So I don't agree with that

20   statement.

21      Q.    And Bracco is citing the Cameo

22   testimony, too, right?

23      A.    Parts of his report include

24   cites from Mr. Cameo's testimony, yes.

25      Q.    Well, he has no firsthand

1  knowledge, right?  He didn't render

2  services as an accountant to Jersey Cameras

3  2, did he?

4        A.    I don't know.

5        Q.    He says he didn't, right?

6        A.    Yes.

7        Q.    So he's just relying on the

8  evidence in the case, right?  If he's doing

9  his expert work properly.

10       A.    That's how it appears.

11       Q.    Do you have any -- withdrawn.

12 Are you aware that Jersey Cameras had

13 approximately $7 million of revenue from

14 inception through the time it became

15 defunct?

16       A.    I don't recall the exact

17 amount, but whatever the amount that was

18 reflected in the general ledger and the

19 bank statements is the amount.  I just

20 don't recall the exact amount.

21       Q.    Do you remember it being

22 millions of dollars?

23       A.    Yes.

24       Q.    Okay, and as a certified fraud

25 examiner, do you think it's unusual that a

1    company would have no records of its

2    payables, receivables or inventory for a

3    business of that magnitude?

4         A.    Not at all.  This was a very

5    small company.  It was a one-person

6    operation run out of someone's home on a

7    laptop.

8              My experience is -- in my

9    experience I've seen many, many companies

10   that maintain their records on a cash basis

11   for various reasons and don't record

12   payables and receivables and don't account

13   for inventory.  So to me it's very common.

14   It's not unusual.

15        Q.    Mr. Lampert, there's a big

16   difference between recording payables and

17   receivables on the general ledger and

18   maintaining no documents about them, isn't

19   there?

20        A.    Yes.

21        Q.    And even if a company employs

22   the cash basis of accounting on its general

23   ledger, it may still keep records of

24   payables and receivables and inventory,

25   right?

1        A.      Maybe.

2        Q.      And in fact, in prior

3    engagements you have determined that the

4    absence of payables, receivables or

5    inventory records is an indicia of

6    potential fraud, haven't you?

7        A.      Not that I recall.

8        Q.      You've never thought that not

9    having any books and records about the

10   amount of inventory or payables and

11   receivables is at least something that

12   requires further examination as a certified

13   fraud examiner?

14       A.      It depends on the circumstances

15   of the matter.  In this particular case,

16   this was a company that was owned and

17   maintained by one person.  They had no

18   employees, and they did -- and Mr. Cameo

19   did testify that he did have records at one

20   time to support the receivables and the

21   payables but he didn't maintain those

22   records.

23       Q.      He testified only that he had

24   purchase invoices, didn't he?

25       A.      I don't recall the exact

1    testimony.

2        Q.    I think you already said that

3    earlier.  I don't remember him ever saying

4    he had receivables or payables.  Do you

5    remember him saying that?  Did he tell you

6    that?

7        A.    I remember he said -- he talked

8    about the invoices for the purchases.  I

9    don't recall if he said that there were

10   invoices for the sales and the receivables.

11       Q.    I put into the chat what we've

12   marked as Plaintiff's Exhibit 110, which is

13   a letter you wrote to Judge Carla Craig in

14   a case called "In Re J&R Pizza Corp."

15            (Whereupon, 3/2/15 Letter to

16         Judge Craig was marked as Plaintiff's

17         Exhibit 110 for identification as of

18         this date by the Reporter.)

19       Q.    Does that case ring a bell to

20   you, Mr. Lampert?

21       A.    Yes.

22            MR. HUFNAGEL:  Just one second.

23            Okay, we have the exhibit.  For

24         the record, you asked if this is

25         familiar.  Just restate that.

1           MR. MAGLIERY:  I asked whether

2       the case was familiar and he said

3       yes.

4           MR. HUFNAGEL:  And he said yes,

5       exactly.  So that's clear.

6       Q.    Mr. Lampert, is Plaintiff's

7   Exhibit 110 familiar to you?

8       A.    It looks familiar.

9       Q.    Okay, in the second line you

10  say, "Subject to the availability and

11  condition of the debtor's books and

12  records, I propose to perform the following

13  services for the debtor's post petition

14  period."

15          What did you mean by "subject

16  to the availability and condition of the

17  debtor's books and records"?

18      A.    If the books and records are

19  complete and if they're accurate.

20      Q.    Okay, and what books and

21  records would you need to review to know if

22  they're complete and accurate?

23      A.    It depends -- you mean in this

24  particular case or in general?

25      Q.    Yes, in the R&J Pizza Corp.

1   case.

2          A.    I don't recall.  This was 2015.

3   I don't recall the exact records that I

4   would have reviewed as I sit here right

5   now.  I just don't recall the records.

6          Q.    But you do agree that you could

7   only perform the services you list subject

8   to the availability and condition of the

9   debtor's books and records, right?

10         A.    Depending on the availability

11  and the condition of the books and records,

12  yes.

13         Q.    And the fifth service that you

14  list you proposed to perform is to

15  determine if there was any debtor

16  misconduct, right?

17         A.    Yes.

18         Q.    So a condition of being able to

19  determine whether there's misconduct is the

20  availability and condition of the debtor's

21  books and records, right?

22         A.    Not necessarily.

23         Q.    Well, that's what you told the

24  judge.  Were you being true and accurate in

25  telling the judge that a condition of

1    determining whether there was any debtor

2    misconduct was the availability and

3    condition of the debtor's books and

4    records?

5        A.    Yes, that was part of my

6    letter.

7        Q.    And it's a true statement,

8    right?

9        A.    It's true, but it also -- it

10    depends.

11        Q.    Well, you didn't tell the judge

12    it depended, right?  You told her that you

13    needed have available and it depended on

14    the condition of the debtor's books and

15    records to be able to determine if there

16    was debtor misconduct, right?

17        A.    Yes.

18        Q.    Now, in general now, so zooming

19    out from the R&J Pizza Corp., what

20    documents -- I beg your pardon, what books

21    and records need to be available to perform

22    an assessment of any debtor misconduct?

23        A.    With regard to R&J Pizza?

24        Q.    No, in general.  In your many

25    engagements, what documents, what books and

1    records do you need to have available to

2    you to be able to make that assessment?

3        A.    It depends on the case, it

4    depends on the circumstances, it depends on

5    the allegations.

6        Q.    What are the minimum documents

7    that you need to see in every case?

8        A.    Bank records.

9        Q.    Is that it?

10        A.    Those are the minimum

11    documents, yes.

12        Q.    And so from bank statements

13    alone you are able to make an assessment

14    about debtor misconduct?

15        A.    Not necessarily.  Perhaps.

16    Sometimes you can't, but those are the

17    minimum documents that would -- sometimes

18    you can.  It just depends on the case, the

19    circumstances and the allegations.

20        Q.    Well, have you ever given an

21    opinion that failing to reconcile bank

22    accounts to the company owned books and

23    records is a failure on the part of a

24    business?

25        A.    I might have.  I just don't

1    recall as I sit here.  And I wouldn't say

2    it was a failure, but it was something that

3    was noted.

4         Q.    It was an indicator.

5         A.    It was something that I noted.

6    I don't know.  I'm not characterizing it; I

7    would just -- I would note it and let the

8    reader or the trier opine on it.

9         Q.    So would it be relevant to note

10   that in paragraph 16 of your rebuttal that

11   you never were able to view any

12   receivables, payables or inventory

13   documents?

14        A.    On page 16?

15        Q.    Paragraph 16.

16        A.    Paragraph 16.

17             MR. HUFNAGEL:  Page 10.

18        A.    No, because I relied on the

19   testimony of Mr. Cameo and the information

20   that was included in the Bracco report.

21        Q.    When Jersey Cameras was going

22   to issue a payment, how did Jersey Cameras

23   know that it had sufficient funds available

24   to cover the payments?

25             MR. HUFNAGEL:  Could you repeat

1        that question, please?  I'm kind of

2        confused myself.  Sorry, probably me.

3            MR. MAGLIERY:  Just "repeat the

4        question" is fine, Brian.  We don't

5        need to have a whole explanation.

6            MR. HUFNAGEL:  Understood.  I

7        don't understand it and you're very

8        clear, but just repeat it, please.

9        Q.    When Jersey Cameras was going

10   to issue a payment, how did it know it had

11   sufficient funds available to cover the

12   payment?

13        A.    I don't understand the

14   question.  I don't know what "sufficient

15   funds" means.

16        Q.    Okay.

17        A.    And I -- that was not part of

18   any -- that was not part of the testimony,

19   that was not part of the Bracco report.

20        Q.    Okay, when Jersey Cameras was

21   going to write a check to make a payment,

22   how would Jersey Cameras know that it had

23   sufficient funds to cover the payment?

24        A.    I don't know.  You'd have to

25   find out from Mr. Cameo or anyone that was

1    issuing the check.

2         Q.    Did you read all of the Cameo

3    deposition transcript?

4         A.    Yes.

5         Q.    When you issue a check, how do

6    you determine that you have enough money to

7    cover the check?

8              MR. HUFNAGEL:  Objection.

9              You can answer.

10        A.    I look at my checkbook to see

11   what the balance is.

12        Q.    And then -- excuse me.

13        A.    I'm sorry?

14        Q.    I'm sorry, please finish.

15        A.    And to see if it's enough to

16   cover the check.

17        Q.    Okay, and do you maintain a

18   ledger of checks that are written --

19             MR. HUFNAGEL:  Objection.

20         Sorry, finish the question.  My

21          apologies.

22        A.    Can you repeat that, please?

23        Q.    Do you maintain a ledger of

24   checks that were written even though they

25   were uncashed?

1      A.    I don't have a ledger.  I have

2   a checkbook, so yes.  If that's considered

3   a ledger, yes.

4      Q.    You have a record of checks

5   that are issued but not yet cleared your

6   bank, right?

7      A.    I have a record of checks that

8   are issued.  I don't know at the instant

9   whether the checks are cleared or not.

10      Q.    So how would a company know

11   whether it had sufficient funds to cover

12   all of the checks it's written, in your

13   experience as an accountant?

14      A.    In my experience as an

15   accountant, sometimes they call the bank or

16   they look -- someone will look on the

17   account online to see what the balance is.

18   Sometimes they don't -- sometimes companies

19   don't consider outstanding checks or

20   deposits in transit.  Sometimes they

21   maintain check books or keep information on

22   QuickBooks or some other type of accounting

23   software.  It just depends on the company

24   and who is operating the company.

25      Q.    Okay, and which of those

1   practices is the most prudent practice for

2   accounting purposes?  In your opinion.

3        A.    Maintaining the balance.

4        Q.    In some sort of journal or

5   ledger or checkbook or electronic file,

6   right?

7        A.    Right, but a lot of small

8   companies don't do that.  A lot of the

9   small companies, they just record the

10  transactions and they'll look at the bank

11  account online.  So for many companies it's

12  not necessary to maintain ledgers or

13  accountings of cash balances.

14       Q.    And does that not increase the

15  risk of multiple checks being presented to

16  banks at the same time and insufficient

17  funds for the clearance of those checks?

18       A.    Not necessarily.  In recent

19  history many transactions are done by wire

20  transfer.  So the issue of outstanding

21  checks is not as prevalent as it had been

22  in the past.

23       Q.    Okay, well, my question is

24  about checks, so let's stick with checks.

25  And I'd really like an answer.  Why do you

1    say "not necessarily"?

2        A.    I don't recall what question I

3    answered.

4        Q.    I said doesn't the failure to

5    maintain a cash balance ledger or a

6    checkbook increase the possibility of

7    multiple checks being presented for

8    clearance and there not being sufficient

9    funds to pay?

10       A.    No, not necessarily because

11   someone can look online to see if a check

12   is cleared.  So you don't have to have a

13   ledger or an accounting to find out if a

14   check that you issued is already cleared.

15       Q.    Right, but what if there are

16   multiple checks written but not yet

17   presented to a bank, then is the

18   possibility of multiple checks being

19   presented and there being insufficient

20   funds increased in the absence of a cash

21   ledger?

22       A.    Not necessarily because someone

23   can go online to see what checks are

24   outstanding and what checks have cleared.

25   And you don't need a cash ledger to

1    determine what the outstanding checks are

2    and to determine what your balances are.

3         Q.    Okay, how would you do that?

4    If you have no record of what checks you've

5    written, how would you determine the amount

6    of outstanding checks?

7         A.    Well, if you don't have a

8    record of the checks that you wrote, then

9    you don't know if you have any outstanding

10   checks.

11        Q.    Okay.

12        A.    I think that might answer your

13   question.

14        Q.    I think that's it.

15             Now, did you look at any Jersey

16   Cameras tax returns to determine whether

17   they reported to the government that they

18   were operating on a cash basis or an

19   accrual basis?

20        A.    No.

21        Q.    All right, I've put into the

22   chat what's been marked as Plaintiff's

23   Exhibit 111.

24             (Whereupon, Digital Direct 2012

25             Taxes was marked as Plaintiff's

1          Exhibit 111 for identification as of

2           this date by the Reporter.)

3          Q.    Tell me when you have that

4     available.

5              MR. HUFNAGEL:  All right, I'm

6           handing that to the witness.

7          Q.    This is a Form 1120, U.S.

8     income return for an S Corp. for a company

9     called Digital Direct, Inc.  Do you see

10    that?

11         A.    Yes.

12         Q.    Do you know how Digital --

13         A.    Excuse me, I just want to

14    clarify.  It's a Form 1120-S.

15         Q.    Sorry.  Do you know how Digital

16    Direct, Inc. is related to this case?

17         A.    I don't recall.

18         Q.    Did you review this tax return

19    in connection with forming your opinion?

20         A.    I don't recall.

21         Q.    Now, can you explain to me how

22    we would determine whether a company is

23    reporting on a cash or accrual basis to the

24    government?

25         A.    If you go to page 2, Schedule

1    B, item 1, you would check the box "cash

2    accrual or other."

3         Q.    On page -- here the box is

4    checked for "cash," correct?

5         A.    Yes.

6         Q.    So Digital Direct, Inc. is

7    reporting on a cash basis.

8         A.    That's how it appears, yes.

9         Q.    And if you take a look at the

10   first schedule, Schedule K1, would you

11   agree with me that David Cameo is the 100

12   percent owner of Digital Direct, Inc.?

13        A.    K1 reflects that Mr. David

14   Cameo is 100 percent owner.

15        Q.    Now, this is a 2012 tax return

16   so it's a while ago.

17             Am I correct that this

18   business, although reporting on a cash

19   basis, also maintains a record of its

20   inventory?  Is there a way to determine

21   that from the tax return?

22        A.    The tax return reflects the

23   opening and closing inventory.

24        Q.    Okay, so it's possible to

25   report on a cash basis and also maintain

1    records of your inventory, right?

2         A.    When you say "maintain

3    records," it's very common for small

4    companies not to record inventory

5    transactions in the general ledger, and

6    they just merely make an entry at the end

7    of the year to adjust the inventory amount

8    at the beginning of the year and at the end

9    of the year.

10              So for small companies, it may

11   not be necessary for them to maintain an

12   inventory ledger.

13        Q.    And then how would they go

14   about knowing the amount to record at the

15   beginning of the year and the end of the

16   year?

17        A.    They can do a physical count or

18   they might have other -- they may have some

19   other methodology of determining the amount

20   of the inventory.

21        Q.    Okay, so would it increase the

22   credibility of Jersey Cameras 2, having no

23   inventory payables or receivables, if there

24   were a tax return showing the beginning

25   year and end year inventory numbers?

1       A.    Would it increase the

2   credibility -- can you repeat that back to

3   me, please.

4       Q.    Yes.  So the certified fraud

5   examiner guidance says that evidence is

6   sufficient where there's a weight of

7   evidence such that a reasonable

8   professional could draw the same or similar

9   conclusion to that of a member and evidence

10  is reliable if it comes from a trustworthy,

11  believable source.

12          Do you remember we went over

13  those before?

14      A.    Yes.

15      Q.    Would it make more credible the

16  assertion that Jersey Cameras 2 was

17  operating on a cash basis and not

18  maintaining intra-year inventory records if

19  the tax returns at least showed the

20  beginning and ending inventory?

21      A.    Not necessarily.

22      Q.    You're not as a certified fraud

23  examiner interested at all in whether the

24  Jersey Cameras 2 tax returns showed

25  inventory or not?

1    A.    No, because even if they didn't

2    have any inventory at the beginning of the

3    year and the end of the year but had

4    inventory throughout the year, they still

5    could have maintained inventory.  So the

6    mere fact that they have a number for

7    beginning and ending inventory would not

8    have any effect.

9    Q.    Okay, so did you ask to see the

10   tax returns for Jersey Cameras 2 during

11   the --

12   A.    Excuse me?

13   Q.    Did you ask to see the tax

14   returns for Jersey Cameras 2 during the

15   course of your engagement?

16   A.    Yes.

17   Q.    And did you receive them?

18   A.    No.

19   Q.    Do you know why not?  Without

20   disclosing anything an attorney told you.

21        If you can't answer without it,

22   that's fine.

23   A.    I'm not sure if I could answer.

24   Q.    Why did you ask to see them?

25   A.    Because I wanted to see as many

1    records as I could for Jersey Cameras.

2         Q.    Did you also request the

3    records of -- withdrawn.

4              Excuse me for one second.

5              (Pause.)

6              I'm sorry, I just had someone

7    say something to me in the corner here.  My

8    son, who is ill today.

9              Would you prefer to have more

10   than one source to show the existence of

11   inventory in order to verify the testimony

12   of Mr. Cameo?

13        A.    Would I prefer to have more

14   than one source?

15        Q.    Yes.

16        A.    What do you mean by the

17   "existence of inventory"?

18        Q.    Well, in your professional

19   practice, as a certified fraud examiner do

20   you prefer to have corroboration?

21        A.    You always try to get as much

22   information as you can, but you have to --

23   you have to get whatever you can get and

24   you use whatever information is available.

25        Q.    What about in the 2012 Digital

1    Direct, Inc. tax returns, that's

2    Plaintiff's Exhibit 111, can we determine

3    from the tax returns whether payables are

4    recorded on the tax returns?

5         A.    What type of payables are you

6    referring to?

7         Q.    What types are listed?

8         A.    Excuse me?

9         Q.    What types are listed?

10        A.    There's accounts payable,

11   there's mortgage notes, bonds payable in

12   less than one year, other current

13   liabilities, loans to shareholders,

14   mortgage notes, bonds payable in one year

15   or more, and other liabilities.

16        Q.    Okay, so I think you're on

17   lines 16 through 21 of the tax return --

18        A.    22.

19        Q.    21, I beg your pardon.

20        A.    21, I'm sorry.

21        Q.    Okay, 21.  And here am I

22   correct that there are two types of

23   payables listed, other current liabilities

24   in line 18 and loans to shareholders in

25   line 19?

1      A.    Yes.

2      Q.    And then there's a statement

3  attached to line 18 which is statement 22,

4  is that right?

5      A.    Yes.

6      Q.    And does that occur later in

7  the tax return?

8      A.    Yes.

9            Okay, I'm not sure, did you ask

10 me a question?

11     Q.    Yes.  I just asked you if it

12 occurred later in the tax return.  And you

13 said yes.

14     A.    And I said yes.

15     Q.    Then if we go to PDF 8 of 26, I

16 think the statement 22 is listed there.

17 And it just lists something called "current

18 liabilities."  Do you see that?

19     A.    Current liabilities, beginning

20 of year, end of year.

21     Q.    And then NYS FTX.

22     A.    Yes.

23     Q.    Do you know what that is?

24     A.    Yes.

25     Q.    And then PROF, do you see that?

1        A.    Yes.

2        Q.    So again, I just want to

3    clarify with you.  It is possible that a

4    company can keep a cash accounting basis

5    and still record its payables, right?

6        A.    I don't know if these are

7    payables or if these are withholdings.  So

8    if they're withholdings, they're not

9    necessarily a payable in the context of a

10   purchase, which would be something that was

11   done on credit.  Because there's no entry

12   for anything on accounts payable which

13   would indicate or which may indicate that

14   this is the balance due for items that were

15   bought on credit.  These other current

16   liabilities may relate to withholding for

17   payroll.  Let's see.

18            So I'm not sure what these

19   liabilities relate to.  I'm not sure if

20   these -- I'm not sure what these

21   liabilities are for.  If it was -- if it

22   was on -- if they were reporting it on an

23   accrual basis, if they reported the balance

24   on an accrual basis, I would expect to see

25   entries in accounts receivable and entries

1    in accounts payable, which I don't see.

2         So I'm not quite sure what

3    these other current liabilities are.

4         Q.    But this company does its

5    reporting on a cash basis, right?

6         A.    Correct.

7         Q.    Now, can you go back with me to

8    the first page of the return, "other

9    deductions," and there's $317,000 of

10   deductions and it says that's listed on

11   statement 2.  Do you see that?

12        A.    Yes.

13        Q.    And now if you go down to

14   statement 2, can you -- do you have an

15   understanding as an accountant of what

16   "other deductions" are included in line 19

17   of the tax return?

18        A.    Other deductions total

19   $317,313.

20        Q.    And is it fair to say that

21   these are some sort of business expenses

22   that are deducted from income before the

23   tax is applied?

24        A.    That's how it appears.

25        Q.    And have you had occasion to

Gary Lampert
October 30, 2023

1    review at least several hundred small

2    business operating budgets for tax return

3    in your time as a forensic or bankruptcy

4    accountant?

5        A.    Did you say "operating

6    budgets"?

7        Q.    I don't know if I said

8    operating budgets.

9        A.    Can you repeat the question,

10   please?

11       Q.    Have you become familiar with

12   the expenses that are usually incurred by

13   small businesses in connection with your

14   several hundred engagements as a forensic

15   or bankruptcy accountant?

16       A.    I have reviewed hundreds and

17   hundreds of tax returns for all sizes of

18   businesses and small businesses.

19       Q.    Did these deductions for

20   business expenses appear to be typical to

21   you?

22       A.    I can't answer that.  I don't

23   know what the type of business is.  I don't

24   know anything about in company other than

25   it's called Digital Direct.  So I can't

1   tell you if it's typical, if it's -- if the

2   amounts are too high, if the expenses are

3   proper.  I cannot answer that.

4        Q.    Well, it says on Schedule B

5   that it's a camera and accessories company

6   and it sells products, right?

7        A.    Okay.

8        Q.    And I'm not asking you to opine

9   on the proprietary of the amounts.  I'm

10  asking you whether expenses listed here are

11  typical expenses of a small business.

12       A.    It depends on the small

13  business.  Some small businesses don't have

14  any expenses.  Some small businesses

15  operate out of their house and they really

16  don't have any expenses.  So it depends on

17  your definition of a "small business" and

18  how it's constructed and how many people

19  are there and what the owner does and how

20  it's operated.

21            So it just depends.

22       Q.    What is an overflow statement?

23  Do you know what that is?  Which is two

24  pages later.  It's PDF 10 of 26.

25       A.    Overflow statement?

1      Q.    That's the title at the top.

2  "1020-S, overflow statement."  And then the

3  words shipping and freight, interest, legal

4  and professional, and supplies appear.

5      A.    I do not know what the word

6  "overflow statement" means.

7      Q.    All right, I've put into the

8  chat window the next exhibit which we've

9  marked Plaintiff's Exhibit 112, a tax

10 return for another company called Cameo

11 Distribution in 2018.

12           (Whereupon, Cameo Distribution

13       2018 Tax Return was marked as

14       Plaintiff's Exhibit 112 for

15       identification as of this date by the

16       Reporter.)

17           MR. HUFNAGEL:  All right, we

18       have it up.

19     Q.    Take a look through the

20 document, and then when you're ready I'll

21 ask you if this is one of the documents you

22 reviewed in connection with your rebuttal

23 report.

24     A.    (The witness reviews the

25 document.)

1           I've reviewed the document.  Is

2    this one of the documents that I reviewed?

3    I probably reviewed the federal tax return

4    but not the city and state tax returns.

5        Q.    Now, in this tax return can you

6    identify whether the company is reporting

7    on a cash or accrual basis?

8        A.    Yes.  The page number is cut

9    off.  I think it's page -- let's see.  I

10   think on page 4, Schedule K, item 1,

11   there's an X in the box for "accrual."

12       Q.    Okay, so for Cameo

13   Distribution, in 2018 the company was

14   reporting on an accrual basis and not a

15   cash basis, right?

16       A.    That's how it appears.  And

17   when you say for 2018, it's for the fiscal

18   year ended November 30 of 2019.  So this

19   return is on a fiscal year from December 1,

20   2018 to November 30, 2019.

21       Q.    Okay, take a look if you would

22   at PDF 9 of Form 1125-E, "schedule of

23   officers."

24           MR. HUFNAGEL:  Just restate

25       what page we're looking for.

1              MR. MAGLIERY:  I think it's PDF

2         page 9.  I'm sorry, is that right.

3         A.    1125-E.

4              MR. HUFNAGEL:  This is

5         compensation of officers, not

6         schedule of officers.  I guess that's

7         why I was confused.

8              As long as we're on the same

9         page, I'm good.  Compensation of

10        officers.

11        Q.    Do you see that David Cameo is

12   named as an officer there?

13        A.    Yes.

14        Q.    Actually, if you go up another

15   page to Schedule G, "Information on certain

16   persons owning the corporation, the voting

17   stock."  Am I correct that David Cameo owns

18   a hundred percent of the voting stock of

19   Cameo Distribution within this tax period?

20        A.    I can't see it on the other

21   page because the column is cut off.

22              MR. HUFNAGEL:  He's reviewing

23         the prior page, page 8, to see if

24         it --

25        A.    Yes, a hundred percent.  Yes,

1    I'm sorry.

2            MR. HUFNAGEL:  Restate your

3        answer because we were talking over

4        each other.

5        A.    Okay, I'm sorry, what was the

6    question, please?

7        Q.    I just asked if it was correct

8    that David Cameo is listed as owning a

9    hundred percent of the voting shares of

10   Cameo Distribution within the tax year of

11   the fiscal year you earlier named.

12       A.    Schedule G of the Form 1120 for

13   that year reflects that David Cameo owns a

14   hundred percent.

15       Q.    Now, did you speak to

16   Mr. Cameo -- withdrawn.  Do you have any

17   understanding as to why Mr. Cameo accounted

18   for one company on a cash basis and a

19   different company on an accrual basis?

20       A.    I did not ask Mr. Cameo about

21   that.

22       Q.    I think you may have said

23   earlier that you were told that Jersey

24   Cameras 2 had purchase invoices at one time

25   but they were no longer available, is that

1   correct?

2        A.    I believe that was Mr. Cameo's

3   testimony.

4        Q.    Do you know why they are no

5   longer available?

6        A.    Mr. Cameo testified that he

7   didn't retain them.

8        Q.    In your experience as an

9   accountant do you typically expect to see

10  financial documents retained for some

11  period of time?

12       A.    You would usually expect to see

13  certain documents maintained for a period

14  of time.

15       Q.    And is one of the periods that

16  may be relevant to that document retention

17  the time in which a company could be

18  audited?

19       A.    Yes.

20       Q.    Back to your report now, which

21  is Plaintiff's Exhibit 106.  And I believe

22  we're on paper page 11, paragraph 19.

23            I believe you're discussing

24  here the terms on which Jersey Cameras

25  purchased goods from DDAM, Digital Direct

1    and More.  Do you see that?

2         A.    Yes.

3         Q.    And are you familiar with the

4    either agreement or testimony about the

5    arrangement for purchase of goods between

6    Jersey Cameras 2 and Digital Direct and

7    More?

8         A.    I've read the testimony of Ari

9    Cameo and Mr. Cameo which discussed the

10   credit terms.

11        Q.    You're aware that Mr. Bracco

12   has asserted that each time Jersey Cameras

13   2 obtained a receipt from Amazon, it paid

14   that money in nearly even amount or even

15   amount to Digital Direct and More, correct?

16        A.    What do you -- can you explain

17   what you mean by "obtained a receipt"?

18        Q.    Yes, was paid -- I'll ask it

19   again.

20             You're aware that Mr. Bracco

21   has asserted that whenever Jersey Cameras 2

22   was paid by Amazon, it paid that amount or

23   nearly that amount within the same day or a

24   few days to Digital Direct and More.  I'm

25   not asking if you agree.  I'm aware that

1    that's what it says.

2         A.    I am aware that that was in the

3    Bracco report.

4         Q.    Are you aware that Bracco has

5    determined in his opinion that the entire

6    $6.957 million paid by Amazon to Jersey

7    Cameras 2 was paid to Digital Direct and

8    More?

9         A.    That's in his report.

10        Q.    And did you undertake any

11   analysis of whether Jersey Cameras 2 would

12   receive money from Amazon and then pay it

13   out to Digital Direct and More?

14        A.    Yes.

15        Q.    And do you dispute or do you

16   agree that Jersey Cameras 2 would receive

17   money from Amazon and shortly thereafter

18   pay it to Digital Direct and More?

19        A.    That's what the documents

20   reflect.

21        Q.    So there's no dispute about

22   that happening, but you do have a

23   difference of opinion with Mr. Bracco about

24   why, correct?

25        A.    I think so, yeah.  I'm not --

1    you know.

2         Q.    Am I correct that you believe

3    that the amount received by Jersey Cameras

4    2 from Amazon was due to Digital Direct and

5    More because of the principal amount of the

6    merchandise sold plus the financing terms?

7         A.    Can you repeat that, please?

8         Q.    I can repeat it or I can ask a

9    different question.

10              Why do you think the amounts

11   that were paid to Jersey Cameras 2 by

12   Amazon were then paid to Digital Direct and

13   More?

14        A.    Well, Mr. Cameo testified that

15   he was paying Digital Direct and More

16   because he had acquired inventory on credit

17   and was making a payment for that inventory

18   pursuant to other credit terms.

19        Q.    Do you have an understanding of

20   what the credit terms were?

21        A.    The credit terms based on the

22   testimony of Ari Cameo and David Cameo were

23   between two weeks and a month or whenever

24   Jersey Camera got paid.

25        Q.    As a certified fraud examiner,

1    what do you make of the fact that the

2    amount of interest on the transactions is

3    always equal to the amount -- withdrawn.

4            Do you understand whether

5    Mr. Cameo -- I'm sorry, withdrawn again.

6            Do you have an understanding of

7    whether Jersey Cameras 2 made a profit on

8    any of its sales through Amazon?

9    A.    David Cameo testified that

10   there were profits; however, the profits

11   were never reflected because of the reserve

12   held back by Amazon.

13   Q.    Should the general ledger

14   reflect sales proceeds due from Amazon?

15   A.    No, because the general ledger

16   was on a cash basis and any sales proceeds

17   due from Amazon would be a receivable.  And

18   that should not be reflected on the general

19   ledger based on the cash basis maintained

20   by the general ledger -- on the general

21   ledger.

22   Q.    And therefore, the general

23   ledger also doesn't reflect any payable to

24   Digital Direct for interest due.

25   A.    I don't understand what you

1    mean "interest due."  What does that mean?

2         Q.    Well, what about the credit

3    terms?

4         A.    Is that -- I don't understand

5    the interest referral.  What interest are

6    you referring to?

7         Q.    The trade credit extended by

8    Digital Direct to Jersey Cameras 2.

9         A.    Oh, for the purchase?

10        Q.    Yes.

11        A.    Okay, I -- okay.  Yes, the cash

12   basis general ledger does not reflect the

13   payable due to Digital Direct and More.

14        Q.    There's no evidence in the

15   books and records of the company regarding

16   what profit, if any, Jersey Cameras made or

17   what amount was paid to Digital Direct for

18   credit as opposed to the wholesale price of

19   the merchandise, right?

20        A.    The information is reflected

21   within the general ledger.

22        Q.    How is it there?

23        A.    It shows the cash received and

24   the cash paid out.  So it's based on a cash

25   basis.

1        Q.     Right, okay, I think we might

2    be saying the same thing, but I don't know.

3    Is there any way to tell from the general

4    ledger whether Jersey Cameras 2 received a

5    profit on its sales of merchandise through

6    Amazon?

7        A.     No, the cash basis general

8    ledger doesn't reflect receivables and

9    which would reflect revenue that has been

10   paid, and it doesn't reflect payables which

11   would reflect the purchases that haven't

12   been paid.  So it doesn't include all the

13   transactions.

14       Q.     Are you aware of whether Jersey

15   Cameras 2 ever made a profit during the

16   time of its existence?

17       A.     I don't recall what Mr. Cameo's

18   testimony was about that.

19            MR. HUFNAGEL:  Do you want to

20        take five minutes then?

21            MR. MAGLIERY:  I just want to

22        finish asking these questions and

23        then we can take lunch.

24            MR. HUFNAGEL:  That works.

25       Q.     I just put into the chat box

1    and shared what's been marked as

2    Plaintiff's Exhibit 113, which is the

3    transcript of the deposition of David Cameo

4    in this case on December 15th, 2022, which

5    was day 2 of his deposition.

6                (Whereupon, 12/15/22 Deposition

7           Transcript of Mr. Cameo was marked as

8           Plaintiff's Exhibit 113 for

9           identification as of this date by the

10          Reporter.)

11       Q.    When you have it up, let me

12    know.

13       A.    We have it up.

14       Q.    Okay, great.  If you could go

15    to page 18.

16                MR. HUFNAGEL:  18 on the PDF?

17                MR. MAGLIERY:  No, I'm sorry,

18          18 at the bottom of the page, which

19          is actually also PDF 18 I think.

20                MR. HUFNAGEL:  I got this new

21          Adobe, it doesn't tell me anything.

22          I think we're there.

23       Q.    It's page 18 at the bottom.

24    Because the deposition was continued from

25    day-to-day, Mr. Lampert, at the top of the

Gary Lampert
October 30, 2023

1    page it says page 272.  So I'm at 272, and

2    starting at line 15 it says, "Question:

3    You had revenue from Amazon, right?

4              "Answer:   Not personally.

5              "Question:   So you mean

6    because Jersey Cameras 2 had the revenue?

7              "Answer:   That's correct.

8              "Question:   Okay, and then

9    what would happen with the profits that

10   were made from the sales?

11             "Answer:   There were no

12   profits, it would constantly get

13   reinvested."

14             Do you see that?

15        A.    Yes.

16        Q.    Okay, so do you agree with me

17   that Mr. Cameo says there were no profits

18   from Jersey Cameras?

19        A.    No.

20        Q.    Okay, why not?

21        A.    Just I don't -- I interpret

22   is -- you would have to go back I think to

23   the -- to the line of questioning to see

24   what they were talking about.

25        Q.    Okay.  I think it might be

1    later in the deposition -- I'm speculating

2    about what you're interested in seeing, but

3    if you go to page 75 of the deposition,

4    there's another discussion about profits

5    and reinvestment.

6        A.    I appreciate that, but I think

7    I can stick with this page.

8        Q.    Go ahead.

9        A.    My interpretation of this

10    testimony is that Mr. Cameo appears to

11    be -- I keep losing the page, I am sorry.

12            It appears that Mr. Cameo

13    appears to be talking about cash profits.

14    And he answered on line 22 that -- he

15    actually answers, the way I understand it,

16    that there were profits.  But it appears

17    that he means that he didn't take out the

18    profits; that it got reinvested.

19            So from the way I understand

20    his testimony is that whatever profit they

21    had got reinvested and there was no profit

22    left at the end of the day.  That's my

23    interpretation of the testimony.

24        Q.    Let's go to page -- at the

25    bottom of page 75, it's deposition page

1   329, let's try to understand whether there

2   were no profits distributed or whether

3   there were no profits.

4        A.    Can you repeat the page again,

5   please?

6        Q.    Yes.  At the bottom of the page

7   it's going to say 75, and at the top of the

8   page it's going to say 329.

9              MR. HUFNAGEL:  I'm sorry, we're

10           not finding the page, John.  Restate

11            it for us.

12       Q.    I can just share my screen if

13  that works.  It's this one, page 329 at the

14  top, 75 at the bottom.

15       A.    I'll see if I can find that.

16       Q.    Or you can look at the shared

17  screen.

18             MR. HUFNAGEL:  We got it now.

19       A.    So it's page 325?

20       Q.    329.

21       A.    Okay.

22       Q.    And I'm going to begin at line

23  3.  "Question:  You never made money off of

24  the Jersey Cameras account before November

25  28?

1          "Answer:   No.  I would have

2     made money if Amazon hadn't shut me down,

3     yeah.

4          "Question:   But before

5     November 2018 did you ever make any money

6     from that account?

7          "Answer:   No, we just

8     reinvested it constantly.

9          "Question:   Why didn't you

10    ever take any profits?

11         "Answer:   Because most of the

12    time Amazon was holding back money and I

13    had to pay Ari for the goods I owed him in

14    order for him to continue producing me."

15         Do you see that?

16    A.    Yes.

17    Q.    That doesn't indicate that

18    there are profits left over.  It indicates

19    that there was money due to Digital Direct

20    and More, right?

21    A.    It appears -- no, I don't agree

22    with everything -- I don't agree with that

23    statement.  It looks like he's saying that,

24    and this is my interpretation of

25    Mr. Cameo's testimony, is that one of the

1    reasons he didn't take any profits is

2    because he had to pay Digital Direct and

3    More, and because Amazon was holding back

4    money.

5         Q.    Okay, right, not because there

6    were profits paid that he was, in quotes to

7    me at least, reinvesting, right?  That's

8    not one of the reasons he lists.

9         A.    Well, that's what he said.  He

10   said he was reinvesting it.  Now, I don't

11   know what "reinvesting" means in his mind

12   or in the way he was thinking.  It could

13   mean -- I don't know what his intention was

14   or what his thoughts were with regard to

15   what does "reinvested" mean.  So I can't

16   answer that.

17        Q.    But you wrote an opinion about

18   it.  But what I'm pointing out to you is

19   that he says, "I had to pay Ari for the

20   goods that I owed him."  That's what he's

21   doing with the money, right?  That's his

22   answer for why he doesn't have profits.

23        A.    No.  His answer that -- well,

24   he didn't say he doesn't have profits.  He

25   said he didn't take any of the profits.  He

1  said because most of the time Amazon was

2  holding back money and I had to pay Ari.

3  So I think it's a combination of factors.

4      Q.    Neither of those things are

5  things that involve profits, right?  That's

6  not the company realizing more money than

7  it has in liabilities.  It's money he owes.

8      A.    Right, but I don't know what

9  Mr. Cameo's definition of "profit" is.  So

10  it's harder for us -- it's hard for me to

11  guess.

12      Q.    What's your definition of

13  "profit"?

14      A.    Income less expenses equals

15  profit.

16      Q.    Okay, so Mr. Cameo says that

17  all of the money he received from Amazon

18  had to be paid directly back to Digital

19  Direct and More because of the money he

20  owed Ari.

21      A.    I don't see where it says "all

22  of the money."  I see because most of the

23  time -- I see what you've asked me to look

24  at on page 329, but I don't see where

25  he's -- where Mr. Cameo is testifying that

1  all the money had to go to Ari.  I don't

2  see that.  I don't see it right now in the

3  transcript.

4      Q.    Okay, so if all of the money

5  didn't go to Ari, there were profits,

6  right?

7      A.    Not necessarily.

8      Q.    Why not?

9      A.    I don't know if the money went

10  anyplace else.

11      Q.    You looked at the books and

12  records of the company, right?

13      A.    Yes.

14      Q.    Where did it go?  Every dollar

15  that was paid in was paid out to Digital

16  Direct and More.  You already testified

17  that you agreed with that --

18      A.    Yes.

19      Q.    So it didn't go to anywhere

20  other than Digital Direct and More.  And he

21  testified that all the money he paid to

22  Digital Direct and More was for money he

23  owed Ari, right?

24      A.    Yes.  Well, it was the money he

25  owed to Digital Direct and More.  He didn't

1    owe it to Ari.

2          Q.    Okay, fair enough.

3                I think we're all ready for a

4    break.  Let's go off the record and we'll

5    talk for a minute.

6                THE VIDEOGRAPHER:  The time is

7          12:48 p.m. and we're going off the

8          record.

9                (Whereupon, a lunch recess was

10         taken.)

11               THE VIDEOGRAPHER:  The time is

12         1:23 p.m. and we're back on record.

13               MR. MAGLIERY:  Thank you.

14   By MR. MAGLIERY:

15         Q.    Welcome back, Mr. Lampert.  And

16   I'm sure you will acknowledge that you're

17   still under oath, right?

18         A.    Yes.

19         Q.    I think we're on to now

20   paragraph 25 of your report.  If you could

21   take a look at Plaintiff's Exhibit 106,

22   which is your report, we'll go to page --

23   paper page 14, paragraph 25.  Are you

24   there?

25         A.    Yes.

1      Q.     Excellent, okay.  Here you're

2   rebutting Mr. Bracco's conclusions about

3   the capitalization of Jersey Cameras and

4   you note that Mr. Bracco says Jersey

5   Cameras was not capitalized.  And your

6   response is it was not necessary for any

7   capitalization of Jersey Cameras.  Do you

8   see that?

9      A.     Yes.

10      Q.     And is it your opinion that

11   Jersey Cameras did not need to have any

12   capitalization?

13      A.     Yes.

14      Q.     And is the basis for that that

15   there were no identifiable expenses for

16   Jersey Cameras?

17      A.     There were no identifiable

18   startup expenses.  He worked out of his

19   home, didn't have any employees, didn't

20   need an office, didn't need any inventory

21   reserves.  And therefore they didn't

22   require any capitalization.

23      Q.     And in your experience as a

24   certified fraud examiner, if you

25   encountered companies when you were

1    retained by the trustee that had no

2    capitalization, what would you do to

3    determine whether that was appropriate?

4         A.    Well, it depended on the case

5    and the circumstances.  It was common for

6    small companies not to have any

7    capitalization or to have very little

8    capitalization.  It depended if

9    capitalization was an issue.  It depended

10   upon how old the company was, when did the

11   company start.  So it just depended on a

12   lot of different issues.

13        Q.    Would you agree with me that if

14   the company was not capitalized, that means

15   that it was not investing excess funds in

16   new inventory?

17        A.    I don't agree with that

18   statement.

19        Q.    Why not?

20        A.    Because I don't think the

21   capitalization has anything to do with

22   investing in new inventory.  I don't know

23   what you mean by "investing," and I don't

24   think it goes together.

25        Q.    Okay, well, wouldn't there need

1   to be money in order to buy inventory in

2   advance as opposed to pay in arrears?

3       A.    If that was necessary for the

4   company to buy inventory in advance, then

5   that may be necessary.

6             In this case it didn't appear

7   to be necessary as they relied on the

8   credit terms.

9       Q.    All the inventory was paid for

10  in arrears, right?

11      A.    I don't know if that's the

12  case.  I just can -- I can't answer that.

13  I just know that based on the testimony of

14  Mr. Cameo.

15      Q.    Well, that's what I'm asking.

16  I'm asking did you -- have you formed an

17  opinion that all of the inventory was paid

18  for in arrears based on the evidence that

19  you've reviewed?

20      A.    Based upon Mr. Cameo's

21  testimony, he testified that he had to pay

22  the inventory which was in arrears most of

23  the -- I think it was all the time.  I

24  don't recall exactly.

25      Q.    Because the arrangement was

1    that he would obtain inventory from Digital

2    Direct and More, offer it for sale on

3    Amazon, receive payment, and then pay back

4    Digital Direct and More, correct?

5        A.    Yes.

6        Q.    Now, there are few expenses for

7    a company that has no office space or

8    warehouse space, but have you ever seen a

9    company that has literally no expenses?

10        A.    Not that I recall right now.

11        Q.    And would you agree with me

12    that Mr. Cameo testified that he personally

13    went to Digital Direct and More warehouse

14    and shipped orders that were ordered on

15    Amazon?

16        A.    I believe that was his

17    testimony.

18        Q.    Okay, and would you agree with

19    me that there is a cost associated with

20    shipping goods?

21        A.    Yes.

22        Q.    Would you agree with me that if

23    there is packaging for the goods, there's a

24    cost associated with that?

25        A.    Yes.  However, I don't know

1    what his -- I don't recall if that was part

2    of his arrangement with Digital Direct and

3    More where he received certain benefits for

4    the arrangement, the exclusivity

5    arrangement, and Jersey Cameras didn't have

6    to pay rent.  I don't know if they received

7    other types of benefits in connection with

8    that arrangement.

9         Q.    Okay, but you have no

10   information that they did not have shipping

11   costs, right?

12             MR. HUFNAGEL:  Rephrase the

13        question because I think you had two

14        "nos" in the same question, so let's

15        not confuse them.

16        Q.    You could answer.

17        A.    I haven't seen any information

18   that reflected that they had any shipping

19   costs.

20        Q.    You haven't seen any

21   information that they recorded any shipping

22   costs, correct?

23        A.    Correct.

24        Q.    But do you have any information

25   that they did not incur any shipping costs?

1        A.     No.

2        Q.     Did you ask Mr. Cameo why there

3   are no expenses related to shipping in

4   connection with Jersey Cameras' books and

5   records?

6        A.     I don't recall if I asked him

7   that.

8        Q.     As a certified fraud examiner,

9   did you exercise reasonable skepticism

10  regarding the absence of any expenses for

11  Jersey Cameras 2?

12       A.     Yes, I spoke -- or I

13  communicated with Mr. Cameo and I asked him

14  about various expenses.  And he told me

15  they didn't have any, or they didn't pay

16  any.

17       Q.     Were you when you received his

18  answer cognizant of his potential motive

19  for covering up his own wrongdoing as

20  provided for in the CFE guidance?

21       A.     I don't know if I agree that

22  there was any wrongdoing.  I hadn't really

23  looked at that issue.

24       Q.     As an accountant and as a

25  certified fraud examiner, did you find it

1   believable that there were no costs related

2   to shipping, even though Mr. Cameo

3   testified that he personally went to the

4   Digital Direct and More warehouse, packaged

5   goods and shipped them?

6        A.    That was his testimony, and it

7   was consistent with I think there was -- I

8   think Ari may have testified to that.  So

9   it was consistent with sworn testimony.

10       Q.    It was consistent that he did

11  it, but was it believable that he had no

12  shipping costs?

13       A.    I had no reason not to believe

14  it.

15       Q.    Well, you know that it cost

16  money to ship things, right?  That's a

17  reason.

18       A.    Right, I didn't ask him that

19  specific question, but it's possible that

20  it was part of his arrangement with Digital

21  Direct and More.

22       Q.    Well, you would be engaging in

23  rank conjecture, right?  There's no

24  evidence that any shipping costs were

25  included in any agreement with Digital

1    Direct and More, right?

2        A.    I don't recall.  I don't recall

3    what the exact terms of the agreement was.

4        Q.    Well, how do you explain the

5    fact that Jersey Cameras 2 had no shipping

6    costs as an expense on the company even on

7    a cash basis?

8        A.    I can -- it's possible that as

9    part of his arrangement with Digital Direct

10   and More, Digital Direct and More paid for

11   the shipping cost.

12       Q.    It's possible, but there's no

13   evidence of it, right?

14       A.    It's possible -- right, I

15   haven't seen any evidence of it, but it is

16   possible.

17       Q.    If you were examining this

18   company for a trustee in bankruptcy, you

19   would recommend that the shipping costs be

20   adequately accounted for, right?

21       A.    It depends upon what the

22   purposes of the investigation was and what

23   the allegations were, if any.  It just

24   depends on the circumstances of the case.

25       Q.    Okay, what is, to the best of

1    your understanding, an examiner under the

2    Bankruptcy Code 1104-C, what is the purpose

3    of that position?

4        A.    Of an examiner?

5        Q.    Yes.

6        A.    It's to examine the books and

7    records and information in connection with

8    an investigation.

9        Q.    And what are you investigating

10   when you're an examiner?

11       A.    Depends upon what's in the

12   judge's order.

13       Q.    What if the judge orders you to

14   determine if there was any debtor

15   misconduct?

16       A.    Well, that's a very broad term.

17   I would try to get more definitive

18   description of what type of misconduct, and

19   then I would request the necessary

20   information so I could complete my

21   investigation.

22       Q.    I put into the chat window and

23   shared what's been marked as Plaintiff's

24   Exhibit 114, which is your report as an

25   examiner in that R&J Pizza Corp. case that

1    we had previously reviewed your letter of

2    appointment.

3                 (Whereupon, Report of Examiner,

4           In re R&J Pizza Corp. was marked as

5           Plaintiff's Exhibit 114 for

6           identification as of this date by the

7           Reporter.)

8                 MR. HUFNAGEL:  All right, we

9           have it open and I'm handing that

10          over to Gary.

11         Q.    Mr. Lampert, on page 4 -- paper

12    page 4, let me see if that's the same --

13    yes, page 4, you see the scope of the

14    examination.

15                I'm sorry, I should ask the

16    question.  Do you see the scope of the

17    examination listed there?

18         A.    Page 4?

19         Q.    Yes.

20         A.    Under the --

21                MR. HUFNAGEL:  Under

22          examination?

23         A.    Under examination?

24         Q.    Yes.  It says here that your

25    letter, the one we looked at before --

1       A.     Right.

2       Q.     -- became the scope of the

3   examination, and one of the items in the

4   scope was determine if there was any debtor

5   misconduct.

6       A.     Yes.

7       Q.     So you've been involved in

8   examinations to determine if there's debtor

9   misconduct before, right?

10      A.     Yes.

11      Q.     Now, in this examination you

12  examined bank accounts, accounting system,

13  payroll and employees, general ledgers,

14  payroll tax, sales tax, cash payments to

15  employees, personal car leases, house

16  transactions.  I think that's at least a

17  subset of what you examined.  Do you

18  remember that?

19      A.     Is that in the report?  Can you

20  tell me what page that's on, please?

21      Q.     I just flipped through the

22  report.  We can go item by item to see what

23  they are.

24             Let's start on page 5.

25      A.     I don't recall -- this was from

1    2015, so I don't want to guess.

2         Q.    Are you aware of whether you

3    have any other docketed expert reports in

4    any matter other than this one?

5         A.    Yes.

6         Q.    And how many are there?

7         A.    One other.

8         Q.    What is it?

9         A.    Romania Investments.  It's in

10   my CV.

11        Q.    I understand that this might

12   have been a while ago, but I'm trying to

13   understand if this is emblematic of the

14   kind of undertakings you would make to

15   examine a debtor.

16        A.    Okay.

17        Q.    So I'm on page 5.  One thing up

18   say on page 5 is, "Bank reconciliations

19   were not prepared by the debtor until

20   March 24, 2015.  It looks like they have

21   received advice, the debtor in this case,

22   to prepare bank reconciliations going

23   forward on a monthly basis."  Do you see

24   that?

25              MR. HUFNAGEL:  Bottom of page

1      5.

2      A.    Okay, bank reconciliations were

3   not prepared.  I do say that.

4      Q.    And then it looks like the

5   debtor in this case received advice that

6   bank reconciliations will be prepared on a

7   monthly basis.  Do you see that?  On the

8   bottom of that page.

9      A.    Yes.  It says "pursuant to

10  Klinger's recommendation," I don't recall

11  what the role of Mr. Klinger was here and

12  how it impacts the report.

13     Q.    Well, just go back one page,

14  ahead of that it says, "The firm of

15  Incorvaia & Associates provided accounting

16  services to the debtor for several years.

17  On March 9, 2015 Anthony Incorvaia advised

18  Wanda Borges of Borges & Associates that he

19  would not be able to provide additional

20  services to the debtor.  On March 9, 2015

21  Borges advised that the firm of Klinger &

22  Klinger would be retained to provide

23  accounting services to the debtor.  The

24  firm of Klinger & Klinger was retained

25  pursuant to court order date March 5 of

1    2015."  Do you see?

2         A.    Yes.

3         Q.    And it looks like they're the

4    new accountant for the debtor.

5         A.    Yes.

6         Q.    And you're reporting to the

7    court that bank reconciliations were not

8    prepared until March 24, 2015, but that the

9    new accounting firm, Klinger, has initiated

10   a procedure to prepare them on a monthly

11   basis.

12        A.    Yes.

13        Q.    Is that because preparing bank

14   reconciliations was a better practice than

15   not preparing bank reconciliations?

16        A.    Yes.  At that time in 2015,

17   yes, that was necessary.

18        Q.    On the next page you report

19   that the debtor used a point of sale system

20   for recording of cash register

21   transactions.  Do you see that?

22        A.    Yes.

23        Q.    And daily sales reports were

24   printed and reconciled to the cash sales,

25   charge card sales and bank deposits.  Do

1   you see that?

2        A.    Yes.

3        Q.    And then in the next paragraph

4   you conclude the information entered

5   Cascarino and the employee were incorrect

6   and incomplete.

7        A.    Yes.

8        Q.    Did you think it was a

9   criticism of the debtor that they enter

10  their transactions incorrectly and

11  incompletely?

12       A.    Yes.

13       Q.    And in fact, the new

14  accountants recommended hiring a bookkeeper

15  to make sure those entries were correct,

16  right?

17       A.    Yes.

18       Q.    The next page, page 7 I think,

19  there's something called a house account.

20  Do you remember what a house account was in

21  this context?

22       A.    I don't recall.

23       Q.    It says, "The debtor extends

24  credit to certain selected customers who

25  purchase goods on account, which are known

1    as house accounts."

2         A.    Yes, okay, I see that.

3         Q.    And does that refresh your

4    recollection that the debtor in this case

5    extended credit to certain select

6    customers?

7         A.    Yes.

8         Q.    And you see where it says at

9    the last line, "The debtor did not properly

10   account for the house account sales and

11   collections could not determine the correct

12   unpaid amount due to the debtor"?

13        A.    Yes.

14        Q.    And you were advising the court

15   in the report that that is a criticism of

16   the debtor; that it could not properly

17   account for the unpaid amounts due to the

18   debtor, right?

19        A.    Yes.  Because they weren't able

20   to determine how much was owed by the

21   customers.

22        Q.    And the unpaid amounts due to

23   the debtor is the same thing as a

24   receivable, right?

25        A.    Yes.

1      Q.     And then page 8, "findings,"

2   you say -- I'm in number 1, you say, "Some

3   of the sales information is inconsistent

4   with other records.  The cash balances

5   reported were incorrect as the bank

6   accounts were not reconciled," right?

7      A.     I'm sorry, where are you under

8   "findings"?

9      Q.     Number 1, "Analysis of the

10   debtor's monthly operating report."

11      A.     Yes, I see that information.

12      Q.     And you were advising the court

13   that you thought it was in need of

14   remediation that the cash balances were

15   incorrect as the bank accounts were not

16   reconciled, right?

17      A.     Well, here I'm talking about

18   the monthly operating reports.  And I was

19   advising the court that the information

20   within the monthly operating reports were

21   incorrect because the bank accounts were

22   not reconciled.

23      Q.     Okay, and the next paragraph

24   says that the bookkeeper is going to

25   correct errors and prepare monthly bank

1    reconciliations, right?

2        A.    Yes.

3        Q.    And so did you tell the court

4    this because it's you think an improvement

5    in the debtor's accounting to make sure

6    there are no errors and that the bank

7    accounts are reconciled?

8        A.    I told the court that they made

9    arrangements to cure the errors that I

10    highlighted in the report.

11        Q.    And I'm going next to page 11,

12    letter F.

13        A.    Which letter, I'm sorry?

14        Q.    F, as in Frank.

15        A.    Okay.

16        Q.    The title is "Issued checks

17    returned due to insufficient funds."  And

18    it says, "The debtor issued numerous checks

19    which were returned due to insufficient

20    funds and incurred over $30,000 of related

21    bank charges.  Cascarino issued checks as

22    he relied on incorrect balances."  Do you

23    see that?

24        A.    Yes.

25        Q.    And would you agree with me

1    that that is a consequence of not

2    maintaining a ledger of checks issued but

3    uncashed?

4        A.    No, this is the consequence of

5    not having bank reconciliations.

6        Q.    Would you agree with me it's a

7    consequence of writing checks when you

8    think you have money to cover it, but in

9    fact the money's not there?

10       A.    Yes, if a check is returned, a

11   check is returned because there aren't

12   sufficient funds to pay for it.

13       Q.    And in this case, wasn't it

14   because Cascarino relied on incorrect

15   balances of what was available in his

16   accounts?

17       A.    Yes, he relied on the incorrect

18   balances because the cash balances were not

19   reconciled and they were incorrect.

20       Q.    And then page 14 you note for

21   the court, "Payment for personal car

22   lease."  Do you see that?

23       A.    Yes.

24       Q.    If says, "Monthly lease

25   payments in the amount of $783.03 were paid

1    by the debtor for a car leased by

2    Cascarino."  Do you see that?

3         A.    Yes.

4         Q.    And the fix, if you will, is

5    that the debtor's representatives advised

6    that the automobile will be returned to the

7    lessor within a few days.  Do you see that?

8         A.    Yes.

9         Q.    Did you view it as an error

10   from an accounting standpoint for the

11   company to be paying a lease for a personal

12   use car?

13        A.    No, that was not the issue.

14        Q.    What was it?

15        A.    That the debtor had an

16   automobile that was used for delivery and

17   pickup and they didn't need another car,

18   and to make lease payments on the other

19   car.

20        Q.    Because the car was not for

21   company use; it was for personal use.  It

22   says so right there in your heading, right?

23        A.    I'm sorry, "payment for

24   personal car lease."  It was a personal car

25   lease that he was using for -- that the

Gary Lampert
October 30, 2023

1   debtor principal apparently was using for

2   business.  I don't recall all the exact

3   details.

4        Q.    Without the exact details, it

5   would be problematic if the company were

6   paying the lease for a personal use car,

7   right?

8        A.    For a personal use car or

9   personal lease -- I didn't hear what you

10  said.

11       Q.    Personal use car.  Paying the

12  lease for a personal use car.

13       A.    Well, this report doesn't

14  mention that it was for personal use.  It's

15  just mentioned that it was a personal lease

16  and the car was used by the debtor for

17  deliveries and to pick up supplies.

18       Q.    What does "payment for personal

19  car lease" mean?

20       A.    It means that the -- it's

21  possible that an individual leased the car

22  and the debtor was making the payments for

23  the car lease.

24       Q.    And that was something you

25  thought you should bring to the court's

1    attention as an accounting error, right?

2         A.    Not necessarily an accounting

3    error but something -- a transaction that

4    should be brought to the attention of the

5    court as it may not have been necessary to

6    pay for the car while they had another car

7    to use.

8         Q.    Okay, and if there were no

9    deliveries needed as part of the business

10   of the company, it would be even more

11   problematic to pay for a personal car,

12   right?

13        A.    I don't understand your

14   question.

15        Q.    In this case you're saying that

16   Cascarino asserted that he used the car for

17   some business purposes, correct?

18        A.    Yes.

19        Q.    What would you -- and you

20   thought that was worth bringing to the

21   court's attention, correct?

22        A.    Because they had another car at

23   their disposal to use.

24        Q.    But they had a legitimate

25   business reason to use an automobile

Gary Lampert
October 30, 2023

1  because they made deliveries, right?

2      A.    Yes.

3      Q.    And what if there were no

4  legitimate reason for the business to use

5  an automobile, would you still want to

6  bring it to the court's attention?

7      A.    Well, if there was no

8  legitimate reason, I don't know if they

9  would have made the payments on the car by

10  the debtor.

11     Q.    Let's say that they did though.

12  In my hypothetical the business is paying

13  for the car lease and there's no deliveries

14  associated with the company's business.

15     A.    Well, there might have been --

16  the hypothetical there might be other

17  reasons, other business purposes why the

18  car was used.  So it just depends on the

19  circumstances.

20     Q.    What are legitimate business

21  reasons for a company to pay for an

22  automobile?

23     A.    If it's being used in the

24  context of business, for business purposes.

25  To meet clients, to go to meetings, to go

1    to customers.  It just depends on the

2    circumstances.

3        Q.    All right, let's go back to

4    your report, which is Plaintiff's

5    Exhibit 106.  And I think we left off at

6    paragraph 25.  I think we might have made

7    it to page 15.  Paper page 15.  Are you

8    with me?

9            MR. HUFNAGEL:  Yes, we're here.

10        Page 15.

11        Q.    So Roman iv, "Jersey Cameras

12    had no evidence to document $7 million in

13    purported purchases of inventory."  And you

14    write, "At the time of the purchase, Jersey

15    Cameras received documents related to the

16    purchase of inventory."  Do you see that?

17        A.    Yes.

18        Q.    And what's the basis of that

19    statement?

20        A.    The basis of that statement is

21    Mr. Cameo's testimony.

22        Q.    Okay, no other basis though,

23    right?

24        A.    No.

25        Q.    You didn't review any purchase

1    records for the inventory, right?

2        A.    No, I did not.

3        Q.    The next one is about rent.

4    The next one after that is Roman vi,

5    "Jersey Camera's transferred sales" -- I

6    beg your pardon, I'm getting tongue tied.

7    Let me try again.  "Jersey Cameras

8    transferred sales receipts from Amazon to

9    DDAM with a few days."  That's from the

10   Bracco report because it's in italics,

11   correct?

12       A.    Yes.

13       Q.    And you write, "Per Cameo

14   testimony, the payments to DDAM for the

15   purchases of inventory were made because of

16   the low profit margins and Amazon holds

17   back a reserve.  So whatever you get from

18   Amazon you pay the supplier pursuant to

19   credit terms as the sales receipts were

20   received weeks after the purchase of the

21   inventory."

22           Do you see that?

23       A.    Yes.

24       Q.    What does that mean?

25       A.    That's Mr. Cameo's testimony.

1       Q.    If the full amount of the money

2   from Amazon is transferred back to DDAM,

3   it's not that there were low profit

4   margins; it's that the entire amount

5   received from Amazon covers the wholesale

6   cost of the goods plus whatever's owed on

7   the credit terms, right?

8       A.    Not necessarily.  It just

9   depends on the transaction.

10      Q.    He says you'll pay the supplier

11  pursuant to credit terms, right?

12      A.    Yes.

13      Q.    They would receive goods from

14  DDAM, sell them on Amazon, receive a

15  payment from Amazon and remit the entire

16  amount back to DDAM, right?

17      A.    Yes.

18      Q.    Okay, and the testimony was

19  that they did that because they were paying

20  for the cost of the goods plus the credit

21  terms, right?

22      A.    I don't know what you mean by

23  "plus the credit terms."  I don't know what

24  that means.

25      Q.    What did you understand the

1    "credit terms" to be?

2        A.    The credit terms are to mean

3    that there are -- that they have time to

4    pay the invoice.  They have two weeks or

5    whatever the time period is.  That's what I

6    understand the credit terms to be.

7        Q.    Okay.  So the term is just a

8    term in time, not a charge for the trade

9    credit?

10       A.    I wasn't aware of any term or

11   any charge.  I haven't -- I didn't note

12   that in the testimony or in any of the

13   documents.

14       Q.    Okay, so that's illuminating.

15   So it's not that they were acquiring goods

16   from DDAM at wholesale cost, selling them

17   on Amazon, receiving money from Amazon and

18   paying back DDAM for the wholesale cost

19   plus some interest rate.  That's not your

20   understanding.

21       A.    Correct, that's not my

22   understanding.

23       Q.    Okay, so let me ask you this.

24   Do you know what the purpose of a business

25   is?

1      A.    What the purpose of which

2  business?

3      Q.    Of a business.  Why do people

4  run businesses?

5      A.    At the end of the day so that

6  they can make profit and take out some of

7  the profit.

8      Q.    It's a profit-motivated

9  venture, correct?

10      A.    Yes.

11      Q.    So why would Jersey Cameras 2

12  buy, for example, a million dollars of

13  goods from DDAM, sell it on Amazon, receive

14  a million dollars back and send a million

15  dollars to DDAM?  What would the purpose of

16  that be?

17      A.    How has it been established

18  that the cost of the inventory is the same

19  as the sales price?

20      Q.    Ah, okay.  So what is the

21  cost -- what's your understanding of the

22  cost of the goods from DDAM?

23      A.    The cost was discounted by DDAM

24  pursuant to the agreement.  Based upon --

25  it was discounted based on a certain

1    percentage.

2        Q.    And then would Mr. -- would

3    Jersey Cameras sell the goods at a retail

4    price that is greater than the cost that

5    they acquired the goods from DDAM?

6        A.    It's possible.  I don't recall

7    any testimony with regard to that, but that

8    is possible.

9        Q.    And then Amazon would pay

10   Jersey Cameras and it would remit and even

11   some back to DDAM.  You've already

12   testified that you agreed with Mr. Bracco

13   that essentially all the money that came in

14   from Amazon was paid to DDAM, right?

15       A.    It went to Jersey Cameras.

16   Most of the -- yes, at the end of the day

17   most of the money went to DDAM.

18       Q.    And when we say "most" here

19   we're talking about on the magnitude of $7

20   million, off by no more than a few hundred

21   dollars.

22       A.    I don't remember the exact

23   amount, but it was -- I don't recall the

24   exact amount.  But it wasn't -- I don't

25   recall the exact amount.

1      Q.    They were materially the same,

2  the amount received from Amazon by Jersey

3  Cameras and paid to DDAM by Jersey Cameras,

4  right?

5      A.    Yes.

6      Q.    Now, what is the likelihood in

7  your view that whatever the retail

8  remissions were from Amazon every two weeks

9  was the exact amount due back to DDAM every

10  two weeks?

11      A.    I don't know if that's what the

12  testimony was.  I don't know if that was

13  the exact amount or they just paid them as

14  much as they could.

15      Q.    Why would they just pay them as

16  much as they could?  Shouldn't they pay

17  them what they owe them?

18      A.    Yes.

19      Q.    And so you've been at this for

20  43 years, you've examined over 500

21  companies.  What are the chances that every

22  two weeks the amount of income, the amount

23  of receipts for a company is the exact

24  amount you owe for the cost of goods sold?

25  Have you ever seen a scenario like that

1    before in any other case you've ever looked

2    at?

3         A.    It hasn't been determined that

4    that was the exact amount that they owed.

5    It's been determined that they made a

6    payment that was on -- due to the fact that

7    there was money owed.  It hasn't been

8    determined that that was the exact money

9    that was owed.

10        Q.    How would we know the exact

11   money owed?

12        A.    You'd have to get an accounting

13   from both parties, from the companies to

14   see what was paid and what was owed at each

15   particular date.

16        Q.    Did you undertake to do that?

17        A.    No.

18        Q.    Are there any records that

19   would show how much is owed from Jersey

20   Cameras to Digital Direct and More, as far

21   as you know?

22        A.    I don't know.

23        Q.    I'm not sure I understand that

24   answer.  I'm asking as far as you know, are

25   there any records that show the amount owed

1    by Jersey Cameras to Digital Direct and

2    More?

3        A.    I am not aware of any of those

4    records.

5        Q.    Did you ask Digital Direct and

6    More whether it had any records that would

7    show the amount due from Jersey Cameras 2?

8        A.    No.

9        Q.    Did you speak to Ari Cameo in

10   connection with your expert engagement?

11       A.    No.

12       Q.    If you were retained by the

13   trustee in bankruptcy to review the

14   business of Digital Direct and More, would

15   you -- withdrawn.

16            If you were retained by the

17   trustee in bankruptcy to review the

18   business of Jersey Cameras 2, would you

19   find that the fact that every receipt from

20   Amazon was transferred to Digital Direct

21   and More a fact that you would bring to the

22   court's attention in a report?

23       A.    It depends on the circumstances

24   and what I uncovered in my investigation.

25       Q.    Let's say debtor misconduct was

1    one of the scopes of your investigation.

2        A.    I'm not aware that this was

3    any -- I'm not aware that the transactions

4    you mentioned comprise debtor misconduct.

5        Q.    I'm not asking you to form an

6    opinion about that.  I understand you're

7    retained by Mr. Cameo.  I'm asking would

8    you bring that fact to the court's

9    attention like you brought other facts to

10   the court's attention in the pizza case?

11       A.    In the pizza case I was

12   appointed as an examiner with regard to --

13   asked to do specific things.  It just

14   depends on the circumstances and what the

15   results of my investigation is.

16       Q.    In how many cases right now are

17   you currently engaged by the trustee?

18       A.    How many cases right now?

19       Q.    Yes.

20       A.    I don't recall the number.  I'd

21   have to check my records.

22       Q.    Is it more than ten?

23       A.    Yes.

24       Q.    Would you be comfortable with

25   me sharing your expert report in this case

1    with all of those trustees?

2         A.    Yes.

3         Q.    You feel that you've acquitted

4    your obligation as a certified fraud

5    examiner with respect to Mr. Cameo?

6         A.    I was not retained to

7    investigate Mr. Cameo.  I was retained to

8    review and possibly rebut Mr. Bracco's

9    report.  I was not brought in to examine

10   the transactions of Mr. Cameo or Jersey

11   Camera or Digital Direct and More.

12        Q.    Do you believe that because you

13   were engaged to rebut Mr. Bracco's report,

14   the CFE standards go out the window, you

15   don't have to abide by them?

16        A.    I did abide by the standards in

17   connection with my review and analysis of

18   the report and the books and records and

19   when I prepared my report.

20        Q.    Okay, so let me ask again.  If

21   you were examining Mr. Cameo retained by

22   the trustee, would you bring the fact that

23   every dollar that came in from Amazon was

24   sent back out to Digital Direct and More

25   within a day or two of receipt?  Would that

1    be an important fact to you?

2        A.    I can't tell you based upon --

3    I'd have to get -- I don't know.  It would

4    depend upon the results of my

5    investigation.

6        Q.    Well, you are aware that being

7    an alter ego or a mere conduit for payment

8    is an indicia of fraud, right?

9        A.    Are you asking me to render a

10   legal conclusion?

11       Q.    I'm asking you whether you know

12   it's an indicia of fraud.  You're a

13   certified fraud examiner.  Is that

14   something you look for?

15       A.    Alter ego issues?

16       Q.    I'll ask a different question.

17             In your examinations is it

18   important to you in considering whether

19   fraud has occurred that all the money that

20   comes into a company immediately goes out

21   from the company?

22       A.    It's possible.  It might.  It

23   depends upon the circumstances and the

24   explanation for the transactions.

25       Q.    Have you ever heard the term

1    "money laundering" before?

2        A.    Yes.

3        Q.    Do you know what money

4    laundering is?

5        A.    Yes.

6        Q.    Can you describe it?

7        A.    Money laundering is when money

8    is transferred between entities or parties

9    to hide money or make it very hard or

10   impossible to trace.

11       Q.    And as a certified fraud

12   examiner, does it concern you that there's

13   possibly money laundering when money is

14   transferred between and among 12 or 13

15   different companies and ultimately

16   distributed right back to one single

17   entity?  Would that be something you would

18   want to investigate?

19       A.    It depends on the circumstances

20   and the transactions and the explanation

21   and the documents to support the

22   transactions.

23       Q.    Okay, let's get further into

24   the explanations then and we'll see whether

25   these explanations make any sense.

```
 1                Let's go to paragraph 30 of

 2     your report.  We're now talking about some

 3     of the many other entities, only a few that

 4     we were able to uncover that Mr. Cameo has

 5     set up.  You read his testimony that he

 6     established new companies, acquired

 7     existing Amazon third party selling

 8     accounts and set up bank accounts on which

 9     he was the sole signatory, right?

10         A.    No.  That's not my

11     understanding.

12         Q.    What's your understanding?

13         A.    My understanding is that he

14     assisted people, opened bank accounts, at

15     times he was the signatory and helped them

16     obtain an Amazon account so they can do

17     business with Amazon.

18         Q.    Okay, I think we said the same

19     thing.  He established the companies, he

20     acquired the third party accounts for the,

21     I think he called them his clients, and he

22     set up bank accounts on which he was the

23     sole signatory.  Those are the three things

24     he said he did.  Do you remember that?

25         A.    I don't think he said he
```

1    established the companies.  I don't agree

2    with that terminology.

3            MR. MAGLIERY:  Let's go off the

4        record for a minute.  I'll find it.

5            THE VIDEOGRAPHER:  The time is

6        2:12 p.m. and we're going off the

7        record.

8            (Whereupon, a short recess was

9        taken.)

10            THE VIDEOGRAPHER:  The time is

11        2:18 p.m. and we're back on record.

12    BY MR. MAGLIERY:

13        Q.   Mr. Lampert, I put into the

14    chat, it's taking a minute to load but it

15    will be there, the first day of Mr. Cameo's

16    deposition, which I've marked as

17    Plaintiff's Exhibit 115.  It looks like it

18    just got uploaded.

19            (Whereupon, Deposition

20        Transcript of Mr. Cameo was marked as

21        Plaintiff's Exhibit 115 for

22        identification as of this date by the

23        Reporter.)

24            MR. HUFNAGEL:  Sorry, hold on

25        one second.

1          MR. MAGLIERY:  Yeah, it took a

2      while, take your time.

3          MR. HUFNAGEL:  We have the

4      file.  Depending on what page you're

5      looking at, it may take us a few

6      minutes.  Go ahead.

7      Q.    I'm looking at PDF page 227,

8  which is also paper page 227.

9      A.    Okay.

10      Q.    You're welcome of course to

11  look at any part of the document you want,

12  but I'm asking Mr. Cameo about the

13  consulting service that he provided.  And

14  then on page 227, line 7 I say, "Question:

15  And what was included in your consulting

16  service?

17          "Answer:  Corporate

18  information.  Set up the corporation

19  information, set up a bank account and

20  provide them with an Amazon account."  Do

21  you see that?

22      A.    Yes.

23      Q.    Do you agree with me that

24  Mr. Cameo testified that he set up the

25  corporation, set up a bank account and

1    provided them with an Amazon account?

2        A.    That's in his testimony, yes.

3        Q.    Now, back in your report,

4    talking about these sellers, these

5    consulting clients, you say the Bracco

6    report is incorrect -- sorry, I'm at

7    paragraph 30, which is on paper page 17.  I

8    should have said that.

9            MR. HUFNAGEL:  Of which --

10           MR. MAGLIERY:  Of Mr. Lampert's

11       report.

12           MR. HUFNAGEL:  Paper 17.  We're

13        already on that.  That's fine.

14       Q.    Bracco says that "the entities

15    made disbursements to DDAM and do not

16    appear to have paid expenses or payroll

17    rent or office supplies based on their

18    analysis."  And you say it's incorrect for

19    the following reasons.  And you say, "Cameo

20    testified he provided services to these

21    entities to open bank accounts and obtain

22    Amazon accounts so they could sell goods on

23    Amazon.  And he testified that he presumes

24    the payments from the entities are for the

25    purpose of merchandise."  Do you see that?

1      A.    Yes.

2      Q.    Why would Cameo have to presume

3   what the payments are for if he is the only

4   signatory on the checking account?

5      A.    Well, he wasn't always the only

6   signatory on the checking accounts.  I

7   think he testified that at least -- at

8   least one other situation, there was at

9   least one other signatory.  And Mr. Cameo

10   testified that he would write checks based

11   upon the instructions of the owners of the

12   company.

13            And Mr. Cameo also testified

14   that it's not necessary to be a signatory

15   to be able to make transfers from the bank

16   account, as long as you had the login and

17   the password, which he -- I don't recall

18   exactly in which situation, but he said

19   that he provided that information so the

20   owner would be able to make those

21   transactions.

22      Q.    And you found it credible that

23   Mr. Cameo did not know what the payments to

24   Digital Direct and More based on those

25   items you just recited?

1      A.    Mr. Cameo testified that he

2    recalls that it was probably for

3    merchandise.

4      Q.    Is there any other indication

5    that you had from any book or record or

6    piece of information other than Mr. Cameo's

7    testimony for the reasons for the payment

8    to DDAM from the 11 entities?

9      A.    Yes -- well, in the DDAM

10   general ledger the payments from the 11

11   entities were recorded as merchandise sales

12   by DDAM, which would indicate that they --

13   the -- the monies from the 11 entities were

14   based upon sales of something.

15     Q.    Okay, and did you think that it

16   is -- withdrawn.

17          I think earlier you said you

18   had never seen another company whose

19   receipts and then payments were always of

20   even amount, like they were for Jersey

21   Cameras 2.  Do you remember that?

22     A.    When you say "even amounts,"

23   what are you referring to?

24     Q.    The same amounts.

25     A.    I don't recall that.  I do not

1    recall that, no.

2        Q.    When you say you don't recall

3    it, you mean the earlier testimony or

4    seeing it in the past?

5        A.    I don't recall seeing it in the

6    past on -- I don't recall seeing it in the

7    past.

8        Q.    Okay, and then did it

9    increase --

10       A.    Excuse me, can I -- no, I'm

11   done.  I finished my answer, I'm good.

12       Q.    Did it increase your interest

13   in that fact that the payments and the

14   receipts were of equal or nearly equal

15   amount, that there were 11 other entities

16   that Mr. Cameo began, also with no

17   expenses, that also received money from

18   Amazon and paid it out in the same amount

19   to DDAM?  Was that material to you?

20       A.    No, because based upon

21   Mr. Cameo's testimony, he explained it.

22       Q.    But essentially the explanation

23   was in sum and substance, like Jersey

24   Cameras, every one of these accounts

25   received the exact amount of money they

1   owed to DDAM and paid it to them

2   immediately, right?

3        A.    Not necessarily.  We don't -- I

4   don't know what was owed to DDAM at the

5   time of the payments.

6        Q.    Okay, would you agree with me

7   that either they are breaking even or

8   operating at a loss under that analysis?

9        A.    No, because we don't know what

10  the Amazon reserves are.  So you'd have to

11  factor in the Amazon reserves, you'd have

12  to get the accounts receivable information

13  and the accounts payable information to

14  determine what the complete set of

15  transactions are.

16       Q.    But Mr. Lampert, these are

17  operating on a cash basis, as you have

18  emphasized repeatedly.  So on a cash basis

19  is it correct that they are either breaking

20  even or operating at a loss?

21       A.    I never said they were

22  operating as a cash basis.  I said that the

23  general ledger was maintained on a cash

24  basis.  And if I said in my testimony that

25  they operated as a cash basis, I'd like to

1    correct that.  And my testimony is that the

2    general ledger is maintained on a cash

3    basis.  With regard to Direct Camera.

4         Q.    You also said that there's no

5    record of any payables or receivables or

6    inventory outside of the general ledger,

7    right?

8         A.    I've said that I haven't seen

9    any of those records.

10        Q.    And you certainly would have

11   asked for them because that was part of

12   your due diligence as a CPA and a CFE,

13   right?

14        A.    Are you referring to the 11

15   entities or to -- which entity are you

16   referring to, please?

17        Q.    Let's start with Jersey Cameras

18   2.  You've already said you asked for the

19   documents and you never got them, right?

20        A.    Correct.

21        Q.    So there's no evidence that

22   there's any unrealized amounts other than

23   what's being kept on the cash general

24   ledger, right?

25        A.    No, we -- no, it's possible

1  that there were documents to support the

2  transactions.  And they are not available

3  right now.

4      Q.    And why would they not be

5  available?

6      A.    Because they weren't retained.

7      Q.    Okay, so as we sit here today

8  there's no evidence of any receivables or

9  payables or inventory -- we've been through

10  it before.  There's nothing in Mr. Cameo's

11  testimony on that point, right?

12      A.    Mr. Cameo's testimony and

13  Mr. Bracco's report which refers to --

14  which may refer to the credit terms.  And I

15  don't recall what the agreement with Amazon

16  was which indicated that they would be

17  paid -- there would be a certain hold-back.

18          It's possible that the Jersey

19  Cameras agreement with Amazon could be a

20  piece of evidence that may recite the terms

21  and the payment arrangements with regard to

22  Jersey Cameras and Amazon.  And if Amazon

23  is holding back money or holding back a

24  reserve, that might create an accounts

25  receivable situation that's not reflected

1    on the general ledger.

2        Q.    Okay, so the entirety of the

3    possibility for profitability for Jersey

4    Cameras 2 is in the Amazon hold-back,

5    right?

6        A.    That's part of it, yes.

7        Q.    Isn't that all of it?

8        A.    We also don't have the other

9    side of the -- we also don't have the

10   payable side.  So we don't know -- I don't

11   have any documents or seen any documents

12   with regard to what may be owed and unpaid

13   which would affect the profitability at any

14   point in time.

15       Q.    I understand, and I'm just

16   trying to kind of set some bookends for the

17   possibility.

18            So I think what you said is

19   either Jersey Cameras 2 is remitting the

20   dollars owed to Digital Direct and More

21   exactly or something less than what is

22   owed.  Those are the two possibilities you

23   gave me.  They're not paying more than what

24   they owe, right?

25       A.    I don't know.  I haven't -- I

1    don't know if -- I don't know if that's a

2    possibility.

3        Q.    Well, we read Mr. -- again,

4    it's really getting repetitive now.  We

5    already looked at Mr. Cameo's testimony and

6    he said that's what he did, right?  I can

7    show it to you again but it's earlier in

8    the transcript.  It's going to look really

9    silly.

10            Do you remember we looked at

11    the transcript and he said I'm remitting

12    money to Digital Direct and More based on

13    what I owe and the credit terms?  Do you

14    remember that?

15        A.    Yes, that's what he said at

16    that particular time with regard to that

17    particular question.  Yes.

18        Q.    Okay, so if that's the case, if

19    he's remitting money that's owed to Digital

20    Direct and More and it's either what he

21    owes or somehow short of what he owes, the

22    only other money out there is the Amazon

23    hold-back, right?

24        A.    Probably.

25        Q.    That would be where the company

Gary Lampert
October 30, 2023

1    would become profitable if that money were

2    somehow released.

3        A.    Well, again, you'd have to also

4    examine the purchase side.  And we don't

5    know if there was any money that was owed

6    to DDAM at that time.

7        Q.    It could become profitable or

8    it could not, depending on what else is

9    owed.

10       A.    Right.  And all I'm aware of,

11   so there may be other issues or

12   transactions that I am not aware of that

13   might affect the profitability.

14       Q.    Right, but again, there's no

15   information about any other transactions,

16   right?

17       A.    Well, also keep in mind that

18   we've only examined one bank account of --

19   we're only talking about one bank account

20   of Jersey Cameras and for a limited amount

21   of time.  I don't know if they had other

22   bank accounts.  And that might affect the

23   profitability, so I don't know if we're

24   talking about all the transactions for

25   Jersey Cameras.

1        Q.    Do you believe that you were

2    provided access to all the documents that

3    were produced in the case?

4        A.    Yes.

5        Q.    Do you have any reason to think

6    you haven't seen all of Jersey Camera's

7    bank accounts?

8        A.    No.

9        Q.    Did you ask Mr. Cameo if there

10    was another Jersey Cameras 2 bank account?

11        A.    I don't recall.

12        Q.    If there were another bank

13    account, that would blow open the case and

14    show that Jersey Cameras 2 actually

15    recorded all of its expenses in the bank

16    account, you would bring that to our

17    attention in rebuttal to Mr. Bracco's

18    report, right?

19        A.    If that was -- if that

20    happened, then that would be -- then I

21    would investigate it and include the

22    information that would be necessary in my

23    report.

24        Q.    And you don't have any of that

25    information as you sit here today, right?

```
1        A.     I do not.

2        Q.     Now, back to paragraph 30 of

3   your report, in addition to Jersey Cameras

4   2, I think this is where we left off, there

5   are 11 other entities that also have no

6   payroll, rent, office or supplies, but that

7   remit the amount they receive from Amazon

8   back to Digital Direct and More within a

9   day or two of receiving it, right?

10              MR. HUFNAGEL:  Objection, but

11        you can answer if you can.

12       A.     That's my recollection, yes.

13       Q.     Mr. Cameo is at the least one

14  of the, if not the only, signatory on the

15  Jersey Cameras 2 and all of the 11

16  accounts, right?

17       A.     That's what he testified to,

18  yes.

19       Q.     Your conclusion is it does not

20  appear the 11 entities operated as a

21  conduit for which proceeds from the sale of

22  goods on Amazon.com floated to DDAM and

23  other entities.  Do you see that?

24       A.     Yes.

25       Q.     What's the basis of that
```

1   conclusion?

2       A.   The basis is that it was not a

3   conduit, that based upon the testimony of

4   Mr. Cameo and the general ledger of DDAM,

5   it appears that the transfers from these 11

6   entities to DDAM were for the purchases of

7   products.  And therefore it's not -- it

8   would not be a conduit.

9       Q.   Okay, you're aware that Amazon

10  has sued Mr. Cameo for fraud in this case,

11  right?

12      A.   I'm aware that he's been sued.

13  I don't recall the exact complaint.

14      Q.   Well, have you ever been

15  involved in an adversary proceeding where

16  the plaintiff in the adversary proceeding

17  is seeking a ruling that debt cannot be

18  discharged because of fraud?

19      A.   Yes.

20      Q.   And I will represent to you

21  that that is this case.  So knowing that

22  Mr. Cameo is accused of fraud, did you

23  think it was reasonable to rely just on

24  Mr. Cameo's testimony to come to the

25  conclusion that these 11 entities are not

1    just conduits for payment to Digital Direct

2    and More?

3         A.    I didn't rely just on

4    Mr. Cameo's testimony.  I went to a

5    secondary piece of evidence, which is the

6    general ledger of Digital Direct and More

7    to see how these payments from the 11

8    entities were recorded in the general

9    ledger.  And it was recorded that these --

10   the payments from these 11 entities to

11   Digital Direct and More were sales, which

12   would indicate that the payment to DDAM

13   were for the purchases of products.

14        Q.    Okay, and I don't think anyone

15   has asserted that there were products being

16   sold by these companies.  But what did you

17   make of the fact that for Jersey Cameras 2

18   and all 11 of the entities, every time they

19   got a payment from Amazon they sent up the

20   exact same amount to Digital Direct and

21   More?

22             In other words, let's stipulate

23   just for purposes of this deposition right

24   now that they were for merchandise sales.

25   So that's not in question.  Let's just say

1   for the immediate future they were for

2   merchandise sales.  What did you make of

3   the fact that every dollar they got in from

4   Amazon they paid to Digital Direct and

5   More?

6        A.    I can't answer that.

7        Q.    Okay.  Well, do you know what a

8   conduit is?

9        A.    Yes.

10       Q.    Is that a term you've used in

11   your own professional career?

12       A.    Probably.

13       Q.    And does it warrant further

14   investigation that these companies had no

15   financial transactions except for receipts

16   from Amazon and payments to Digital Direct

17   and More?

18       A.    No, not necessarily because we

19   don't know if these companies had other

20   bank accounts that we don't know about.

21   We're only aware of the one -- of the bank

22   accounts that were maintained at this

23   particular bank.  It's possible that these

24   companies had other accounts that were not

25   identified by Mr. Bracco or by Amazon.  And

1    then there are other transactions that we

2    don't know about.

3        Q.    But Mr. Cameo testified that he

4    established the companies, set up their

5    bank accounts and found their Amazon seller

6    accounts for them, right?  That's his

7    testimony.  We just looked at it.

8        A.    Yes, but it doesn't mean that

9    there aren't other bank accounts out there.

10       Q.    Again, you're relying on rank

11   speculation, right?  You have no evidence

12   that anything happened in these companies

13   other than receipts from Amazon and

14   immediate payments to Digital Direct and

15   More, right?  That's the only evidence we

16   have.

17       A.    The only evidence we have are

18   the bank statements.

19       Q.    And what I --

20       A.    And the bank records.

21       Q.    And what I just said is what

22   happens in those bank statements, right?

23       A.    Yes.

24       Q.    There are many, many

25   possibilities of other things that can

1    happen in the world, but we have no

2    evidence that the companies at issue have

3    any other statements or any other bank

4    accounts, right?  We just don't know one

5    way or the other.

6         A.    I agree with that, we don't

7    know.

8         Q.    Let's go on to the next page of

9    your report, I think it's page 18, and the

10   opinion is that "Cameo personally

11   benefitted from funds transferred by Jersey

12   Cameras and other entities to Digital

13   Direct and More."  And you say he's

14   incorrect.

15            There's descriptions on

16   paragraph 34 of why, but I think, correct

17   me if I'm wrong, but I think the essence of

18   the opinion is that it's not possible to

19   directly trace any particular receipts from

20   Digital Direct and More back to Mr. Cameo.

21   Is that the essence of what you're saying

22   here?

23        A.    I'm saying that Mr. Bracco

24   didn't establish that the funds that came

25   from Amazon that went to Digital Direct and

1    More that eventually were the subject of

2    the transfers were derived from the Amazon

3    payments to Jersey Cameras.

4        Q.    And how would someone go about

5    showing that the same money in is the money

6    that goes out?  How would you do that?

7        A.    One way would be to trace the

8    funds.

9        Q.    Mm-hmm.  And how would you do

10   that in juxtaposition to how Mr. Bracco did

11   it?

12       A.    I don't think Mr. Bracco did

13   it.  At least he didn't mention that he did

14   it or attempted to do it.  And he doesn't

15   address the tracing issue at all in his

16   report.

17       Q.    Now, do you remember the year

18   that Mr. Cameo claims that he was no longer

19   a part owner of Digital Direct and More?

20       A.    Yes.

21       Q.    And what year was that?

22       A.    2018.

23             I'm sorry, did you say a

24   shareholder?

25       Q.    Yes.  No longer an owner.

1       A.      Right, 2018, yes.

2       Q.      And then Mr. Cameo on behalf of

3    his company entered into the so-called

4    exclusivity agreement with Digital Direct

5    and More.  Do you remember that?

6       A.      Yes.

7       Q.      Now, after the disassociation

8    of Mr. Cameo from Digital Direct and More

9    there would not be any reason that any

10   funds would be transferred from Digital

11   Direct and More to Mr. Cameo, right?

12      A.      Not necessarily.

13      Q.      Why?  What are some

14   circumstances where he would be the

15   recipient of transfers from Digital Direct

16   and More?

17      A.      When you say "transfers" to

18   Mr. Cameo, what are you referring to?

19      Q.      Any transfer from Digital

20   Direct and More to David Cameo.

21      A.      Is that inclusive of the joint

22   account with his wife?

23      Q.      Let's start with no, not

24   inclusive of that.

25      A.      Well, after he -- so your

1    question -- I'm sorry, can you just

2    rephrase the question?

3         Q.    Yes.  After Mr. Cameo was no

4    longer one of the owners of Digital Direct

5    and More, there would be no reason for him

6    to receive transfers from Digital Direct

7    and More, right?

8         A.    Perhaps he -- I don't know.

9    There might have been other reasons for him

10   to receive transfers.

11        Q.    He wasn't getting any profit

12   distributions anymore, correct?

13        A.    Not that I'm aware of.

14        Q.    He never said he rendered

15   services or provided any goods to Digital

16   Direct and More, right?

17        A.    Let me correct my prior answer.

18   I'm not aware that he ever received any

19   profit distributions.  And you said

20   "anymore" so I just wanted to clarify that.

21        Q.    Okay.

22        A.    Sorry, can you repeat the last

23   question?

24        Q.    Yes.  He didn't say he rendered

25   any services or sold any goods to Digital

1   Direct and More, right?

2        A.    I didn't see -- I don't think

3   he testified to that, right.

4        Q.    Let's go to paragraph 35.  I

5   think you've listed, or maybe Mr. Bracco

6   listed some specific examples of fund

7   transfers.  Now, the first one is $150,000

8   transfer on June 22, 2018 to a joint

9   account held by Cameo and Ostran.  Do you

10  see that?

11       A.    Yes.

12       Q.    Mr. Bracco notes that that was

13  a transfer that was to David Cameo and

14  Shoshona Ostran personally.  Do you

15  disagree with that?

16       A.    Yes.

17       Q.    Why?

18       A.    I agree.

19       Q.    And we already looked at the

20  tax return.  Did you remember or should I

21  show again the tax return that Mr. Cameo

22  claims he's the 100 percent owner of Cameo

23  Distribution?

24       A.    I recall the tax return.

25       Q.    And do you remember that it

1    noted David Cameo is the 100 percent owner

2    of Cameo Distribution?

3         A.    For that particular tax return,

4    which might have been a different time

5    period than this transfer.

6         Q.    Let's take a look.  It's

7    Plaintiff's Exhibit 112.

8             MR. HUFNAGEL:  All right, we

9          have 112 open.

10        Q.    I think this has to do with the

11   fiscal year you were mentioning earlier.

12   Bear with me.

13             Okay, I've put into the chat

14   and I'm sharing what's been marked as

15   Plaintiff's Exhibit 116.

16             (Whereupon, Cameo Distribution

17             Tax Return 11/30/18 was marked as

18             Plaintiff's Exhibit 116 for

19             identification as of this date by the

20             Reporter.)

21             MR. HUFNAGEL:  All right, we

22             have 116 open, which looks to be a

23             2017 tax return for Cameo

24             Distribution, Inc.

25             MR. MAGLIERY:  Right.  It's

 1          Form 1120 for Cameo Distribution.

 2          Q.    Mr. Lampert, can you tell from

 3     this form what the fiscal year is covered

 4     by the tax return?

 5          A.    For 1120, tax year beginning

 6     December 1, 2017, ending November 30th,

 7     2018.

 8          Q.    Okay, just to cover it for the

 9     record, would you confirm that this lists

10     David Cameo as the 100 percent owner of

11     Cameo Distribution?  It's on page 8 of 55.

12     PDF page 8 of 55 in Schedule G I believe.

13          A.    Yes.  According to 1120

14     Schedule G, this form reflects David Cameo

15     as 100 percent owner.

16          Q.    Okay.  Then just to get back to

17     where we were, Mr. Cameo therefore was the

18     only owner during the time of the $150,000

19     transfer from Cameo Distribution to their

20     joint account on June 22, 2018, correct?

21          A.    Yes.

22          Q.    And then the next one was

23     $18,000 to Lasko Getaways.  And your

24     response is this transfer occurred several

25     months after Jersey Camera ceased

1    operations in approximately December 2018,

2    right?

3        A.    Correct.

4        Q.    And does that -- does the fact

5    that Jersey Cameras had ceased operations

6    impact your view about whether this is a

7    personal transfer made to -- on behalf of

8    Mr. Cameo from Cameo Distribution?

9        A.    No.  The purpose of the comment

10   was that this was an example of that the

11   funds were not traced from Amazon camera

12   down to this transfer.

13       Q.    Okay.

14       A.    And since Amazon -- since

15   Jersey Cameras ceased operations four

16   months later, it's very highly unlikely

17   that this transfer was -- this $18,000

18   transfer was derived from the funds that

19   originated from Amazon.

20       Q.    Okay, I see.  All right, let's

21   go to 36.  The Bracco report does not

22   reflect that Cameo received a benefit from

23   the funds transferred to DDAM as follows.

24   And in the first one you list Cameo

25   Distribution disbursing approximately

1   $12,000 to Ray Catina Lexus.  Do you see

2   that?

3        A.    Which page are you on?

4        Q.    Paragraph 26, the bottom, of

5   your report.

6        A.    Okay, yes, I see.

7        Q.    Do you see 36 iii?

8        A.    Yes.

9        Q.    And this was I think to support

10  the position that the Bracco report does

11  not reflect Cameo received a benefit from

12  the funds transferred to DDAM, right?

13       A.    Yes.

14       Q.    And the response is, "The

15  Bracco report acknowledges Ostran testified

16  she had a Lexus.  And there's no

17  information Cameo benefitted from the

18  transfer," right?

19       A.    Yes.

20       Q.    What do you mean by that?

21       A.    I mean that there's no evidence

22  or information that shows that Cameo --

23  David Cameo benefitted from this transfer.

24       Q.    Okay, so David Cameo is 100

25  percent owner of Cameo Distribution, right?

1        A.    Yes.

2        Q.    And he caused and is the only

3    person who could cause a distribution of

4    approximately $12,000 to Ray Catina Lexus,

5    right?

6              MR. HUFNAGEL:  Objection, but

7         you can answer.

8        A.    I don't know who caused the

9    transfer.  So --

10       Q.    Who else could authorize the

11   transfer if he's the only owner?

12       A.    Mr. Cameo testified that his

13   brother Ari would authorize transfers from

14   Cameo Distribution.

15       Q.    Mr. Cameo, David Cameo is the

16   sole owner of the company, right?

17       A.    Yes.

18       Q.    If he takes a distribution from

19   the company, that's a distribution to him,

20   right?  You can't distribute money to

21   non-owners of the company, right?

22       A.    Well, we haven't established

23   that it's a distribution.  It's a transfer.

24       Q.    Was Ms. Ostran a creditor of

25   Cameo Distribution in the amount of

1    $12,634?

2          A.    I don't know.

3          Q.    Was she taking a loan from the

4    company?

5          A.    I don't know.

6          Q.    Any evidence that she paid back

7    the $12,634?

8          A.    I didn't -- don't know if it's

9    a loan.  I don't know if it's -- I don't

10   know why the purchase was made -- why the

11   transfer was made.

12         Q.    Okay, but you seem to tie it

13   together with Ostran saying that she drove

14   a Lexus, right?

15         A.    Yes.

16         Q.    You make the connection between

17   the $12,000 coming from Cameo Distribution

18   to Ostran driving the Lexus from about 2018

19   to 2020.

20         A.    Yes, and I think Mr. Cameo also

21   testified that his wife drove a Lexus.

22         Q.    And was there any evidence in

23   the form of testimony or otherwise that the

24   Lexus was for some business purpose of

25   Cameo Distribution?

1      A.     No.

2      Q.     Is the essence of your opinion

3   that Mr. Cameo didn't benefit from his wife

4   having a Lexus?

5      A.     I don't know that he did

6   benefit, so there's no evidence or

7   information that shows that he did benefit.

8      Q.     Do you think -- did you ask him

9   if he's ever ridden in the car?

10     A.     No, I did not.

11     Q.     Do you know whether he has

12  children?

13     A.     I think he testified that he

14  has children.

15     Q.     Did you ask whether the

16  children ever rode in the car?

17     A.     I did not ask.

18     Q.     How could someone not benefit

19  from having a car driven by their wife?

20     A.     I don't see how he did that --

21  I don't see how he did benefit.

22     Q.     Well, he must have agreed that

23  there could be a $12,000 transfer, either a

24  profit distribution or something else out

25  of Cameo Distribution, right?

```
 1      A.     Not necessarily.  He testified

 2   that Ari would take -- he would make

 3   transfers and he would make transfers

 4   because he was paying -- he was getting

 5   repaid for capital contributions that he

 6   made in prior years.

 7      Q.     Is that how capital

 8   contributions work, that you can just take

 9   them back whenever you want, in your

10   experience?

11      A.     It depends on the agreement

12   between the shareholders at that time.

13      Q.     And Mr. Cameo, David Cameo, was

14   the sole bank signatory for this account.

15   So one way or the other he had to cause the

16   transfer to happen, right?

17      A.     Not necessarily.  I don't know

18   if he provided Ari with the information so

19   that he could make an online transfer.  I'm

20   really not sure.

21      Q.     And taking money out of a

22   business that you're the hundred percent

23   owner of and sending it to your wife to buy

24   a car is not something that you think is a

25   personal benefit, is that right?
```

1      A.    It depends on the

2  circumstances.  We haven't established that

3  the car wasn't for business purposes.

4      Q.    What business purpose did

5  Shoshona Ostran have for Cameo

6  Distribution?  She wasn't an employee,

7  officer, director or owner.

8      A.    I don't know.

9      Q.    None, right?

10     A.    Not that I could think of right

11  now.

12     Q.    Do you plan on testifying in

13  court about a transfer of $12,000 to buy

14  David Cameo's wife a car is not for his

15  benefit?

16     A.    I think my testimony is that it

17  hasn't been established that it's for his

18  benefit.

19     Q.    What else would be needed to

20  establish a benefit, in your professional

21  view?

22     A.    I'm not sure at this time.

23     Q.    Let's look at the next one,

24  number 2, little Roman ii, "On March 15,

25  2018 $5,000 was wired from Digital Direct

1    to Park Place Dealership, done on March 26,

2    2018, Cameo Distribution transferred

3    $73,046 to Digital Direct, and then that

4    same day Digital Direct wired that same

5    amount to Park Place Dealership."  Do you

6    see that?

7         A.    Yes.

8         Q.    And Ari drives a Bentley that

9    he might have purchased from Park Place

10   Dealership.  That was the testimony.  I

11   think you cited it.  Do you remember that?

12        A.    Yes.

13        Q.    Now, again, how could Cameo

14   Distribution make a transfer of $73,000

15   without its sole owner and signatory

16   causing that transfer to happen?

17        A.    Mr. Cameo testified that it was

18   for Ari and he was taking money out of the

19   company that he was entitled to.

20        Q.    So that's a loan to the company

21   then, right?

22        A.    Perhaps.  I don't know how it

23   was characterized.

24        Q.    Well, if it's capital and Ari

25   is removing capital from the company, were

1    the capital accounts adjusted?  Did you see

2    any documents that showed the capital

3    accounts were adjusted?

4          A.    No, but I do see that it was

5    perhaps a repayment from Digital Direct and

6    More back to Cameo Distribution for the

7    same amount.

8          Q.    I don't think so.  There was a

9    $73,000 transfer from Cameo Distributions

10   to Digital Direct.  And then on the same

11   date, Digital Direct paid the dealership

12   the $73,000.

13         A.    Oh, okay, yes, you are correct.

14   I misread it.

15         Q.    So just back to my question,

16   did you see any documents that showed that

17   the capital accounts were adjusted after

18   each one of these withdrawals for Ari?

19         A.    No.

20         Q.    And how could Ari have capital

21   in a company in which he's the zero percent

22   owner?  Isn't being an owner a prerequisite

23   to owning capital in a company?

24         A.    Mr. Cameo testified that Ari

25   was an owner.

1      Q.     Okay, so he lied on his tax

2   returns then.

3      A.     What?

4      Q.     So he lied on his tax returns.

5             MR. HUFNAGEL:  Objection, but

6        you can answer the question.  If you

7        can.

8      A.     No, he didn't provide me a time

9   period that he was an owner.  So I don't

10   know what time period Mr. Cameo was

11   referring to.

12      Q.     But we looked at the tax return

13   for this time period, the time of this

14   transfer.  And it shows that David Cameo is

15   the hundred percent owner, right?

16      A.     Yes.

17      Q.     And would you agree with me

18   that to own capital in a company means you

19   have to be one of the owners?

20      A.     When you say "own capital,"

21   capital would come from one of the owners.

22   But if it was a prior transaction, then it

23   might be called something else.

24      Q.     Right, like a loan for example,

25   right?  This would all make more sense if

1  it was a loan.  But it's not capital

2  because you have to be an owner to invest

3  capital.  Do you agree?

4      A.    Yes.

5      Q.    Okay, let's look at the next

6  one, little Roman iii on page 21.  "On

7  March 13, 2018 Cameo Distributions

8  disbursed $45,600 to Moore Lyons, Inc., a

9  jeweler located in Clifton, New Jersey.

10  And Cameo said he wasn't familiar with this

11  jewelry store and the Bracco report does

12  not reflect that Cameo received any benefit

13  from the transfer."

14          So what would you do as a

15  forensic accountant if you saw a $45,000

16  jewelry purchase from a company that you

17  were examining?  What would the next step

18  be?

19      A.    Well, it depends what type of

20  company it was and what did they do.

21      Q.    Let's say they sold cameras.

22      A.    I would probably -- I may

23  request the supporting documentation for

24  the transfer.

25      Q.    And in this case you have no

1    reason to believe that this transfer was

2    not an ordinary course transaction, right?

3         A.    I don't know.  Mr. Cameo did

4    testify that at times they bought and

5    sold -- that Cameo Distribution bought and

6    sold jewelry.  So I don't know if it's an

7    ordinary course with regard to business

8    purchase.

9         Q.    And if this was a purchase of

10   jewelry for his wife, do you think that

11   would mean that Cameo received no benefit

12   from the transfer?

13        A.    I don't see any benefit for

14   David Cameo if his wife received the

15   jewelry.

16        Q.    So he causes a distribution.

17   He's the sole owner.  So a distribution is

18   by definition a distribution to him, right?

19   He's the only one who could take profits

20   because he's the only owner.  And he

21   designates for payment a jewelry store.

22   It's still income to him, right?  He's got

23   to report that on his taxes.  Do you agree?

24        A.    We haven't determined how it

25   was classified on the records, whether it

1   was a distribution or whether it was

2   something else.

3       Q.   Well, what do you think the

4   appropriate classification would be if you

5   cause a large jewelry gift to be purchased

6   for your wife from money from your company?

7   How would you account for that?

8       A.   It depends.  It could be a

9   loan, it could be a distribution, it could

10   be something else.  It could be

11   compensation.  It could be something else.

12       Q.   Let's say it's a loan, a

13   distribution or compensation.  In any of

14   those cases it's to David, right?

15       A.   Excuse me?

16       Q.   In any of those three cases, a

17   loan, a distribution or compensation, it's

18   to David.  He's just designated the money

19   to be paid to a jewelry store.  He's the

20   one who's taken the money.  It will have to

21   be accounted in some way as him as the

22   recipient, correct?

23       A.   No.  It could be a loan from

24   his wife.

25       Q.   A loan, sorry?

1      A.    It could be a loan from his

2   wife.

3      Q.    A loan from his wife.

4      A.    Yes.  A loan due from his wife.

5   If she received the consideration for the

6   transfer, it might be considered a loan to

7   his wife.

8      Q.    Okay, and if he gave it to his

9   wife as a gift, as we know happened, then

10   would it be?

11      A.    It would be another type of

12   transaction.  It would be either a loan to

13   him or a distribution or some other type of

14   transaction.

15      Q.    And if he took a distribution

16   from Cameo Distribution and purchased a

17   piece of jewelry for his wife and gave it

18   to her, under that scenario did he derive a

19   personal benefit from the transfer?

20      A.    Yes.

21      Q.    We're winding down.  I

22   definitely have less than an hour.

23          MR. MAGLIERY:  Brian, I'm sure

24      you're going to be able to make your

25      4:30.  Do you want to take a last

1          break here, five or six minutes, and

2          then we'll come back and do the final

3          stretch?

4               MR. HUFNAGEL:  Yes, I think

5          that makes sense.

6               THE VIDEOGRAPHER:  It's 3:09

7          p.m. and we're going off the record.

8               (Whereupon, a short recess was

9          taken.)

10              THE VIDEOGRAPHER:  The time is

11         3:20 p.m. and we're back on record.

12     A.    With regard to the last line of

13  questioning in connection with the purchase

14  of jewelry based on a disbursement from

15  Cameo Distribution, I just wanted to add

16  that it may be possible that Mr. Cameo

17  testified that Ari authorized the payment

18  in connection with monies that were -- may

19  have been owed to Ari for past capital

20  contributions.

21     Q.    Right, and then I think we

22  agreed that only owners can own capital in

23  the company, correct?

24     A.    Well, that's at that particular

25  time.  I don't know if there were past

1    capital contributions.  I just wanted to

2    clarify that information.

3        Q.    Okay, and while we were off the

4    record, did you have a conference with your

5    counsel?

6        A.    Excuse me?

7        Q.    While we were off the record,

8    did you have a conference with counsel?

9        A.    No.

10        Q.    Did you determine who received

11    the jewelry that was purchased by Cameo

12    Distribution?

13        A.    No.

14        Q.    Do you have any information

15    about that?

16        A.    No.

17        Q.    Do you have an understanding

18    that Cameo Distribution owed Ari Cameo some

19    amount of money?

20        A.    I didn't hear all that.  Can

21    you please repeat it?

22        Q.    Did you have an understanding

23    that Cameo Distributions owed Ari Cameo

24    some amount of money?

25        A.    No.  It's based upon

1    Mr. Cameo's testimony.

2        Q.    All right, let's see, we'll

3    skip to page 22.  Now I'm in Roman v, "The

4    Bracco report reflects the following.  On

5    July 27, August 24th and October 23, 2018

6    Cameo Distribution disbursed $721, $721 and

7    $750 respectively to BMW Financial."  And

8    you write under it, "Cameo that his wife

9    used to have a BMW."  Do you see that?

10       A.    Yes.

11       Q.    How are those two sentences

12   related?

13       A.    That it doesn't appear that

14   Mr. Cameo received any benefit from the

15   transfers.

16       Q.    Same idea as the Lexus

17   discussion we had, right?

18       A.    Yes.

19       Q.    Based exclusively on the fact

20   that it's his wife's BMW instead of his,

21   right?

22       A.    Yes.

23       Q.    For number 6 Bracco says that

24   "There were about $769,000 of payments to

25   credit cards during the 2018 through April

1    12, 2019 time frame, but he was not

2    provided sufficient documentation to

3    determine the nature of the charges."  Do

4    you see that?

5        A.    Yes.

6        Q.    Did you have the ability to

7    review or analyze any of the charges on the

8    credit cards?

9        A.    No.

10       Q.    When you're undertaking an

11   examination of a company, do you -- for a

12   forensic review, do you usually seek to

13   review the credit card transactions?

14       A.    It depends on the company, it

15   depends upon what's -- what's reflected in

16   the books and records, depends on the

17   amount of the transfers.  It depends upon

18   communications with owners or employees or

19   accountants as to what the cards were used

20   for.  It all depends.

21       Q.    And then the next one,

22   Roman vii, Mr. Bracco says that there were

23   transfers from Digital Direct and Cameo

24   Distribution that may be related to the

25   purchase of four properties he identifies

1    in the report.

2              And you say that "The Bracco

3    report does not reflect that Cameo was an

4    owner of the properties and does not

5    reflect that Cameo personally benefitted

6    except that a mortgage recorded on May 21,

7    2020 in the amount of $335,600 made by

8    Citibank in connection with 366 Lake Avenue

9    lists Shoshana Ostran and Dave Cameo as

10   owners."  Do you see that?

11       A.    Yes.

12       Q.    Am I correct that at least for

13   the $335,600, you do acknowledge that there

14   is a potential personal benefit to Dave

15   Cameo as owner of that property?

16       A.    It's possible.  It doesn't --

17   it's possible.  I don't know if he owned

18   the property or if he was just on the

19   mortgage.  So there is the possibility,

20   yes.

21       Q.    And what is the standard you're

22   applying for personal benefit when you say

23   that David Cameo has no personal benefits

24   for this and all of the foregoing jewelry

25   and car charges that we've discussed?

1      A.    He didn't derive anything from

2   the transfer.

3      Q.    Okay, is that an accounting

4   doctrine or is it a CFE doctrine?  Is it a

5   defined term that we can look somewhere to

6   see what a personal benefit is?

7      A.    No.  Just my understanding of

8   what the meaning of "personal benefit" is.

9      Q.    If Cameo chooses to take money

10  out of its accounts -- if Cameo chooses to

11  take money out of his businesses and give

12  it to his wife, is that per se not a

13  personal benefit in your mind?

14     A.    It might be.

15     Q.    Might be a personal benefit or

16  might not be.

17     A.    Both.

18     Q.    And how would we determine

19  whether a personal benefit was derived from

20  a transfer to a business owner's spouse?

21     A.    Well, did the business owner

22  receive any type of benefit or anything in

23  return for the transfer.

24     Q.    And then is the accession to

25  wealth of your spouse a benefit?

Gary Lampert
October 30, 2023

```
 1      A.     Possibly.  But not necessarily.

 2      Q.     And is the increase of marital

 3   affection or goodwill a possible benefit to

 4   the business owner?

 5      A.     It might be a benefit.  I don't

 6   know how you quantify that.

 7      Q.     When you see -- in the ordinary

 8   course of your work for trustees, when you

 9   see transfers made to spouses, is that

10   relevant to your examination of forensic

11   review of debtors in bankruptcy?

12      A.     It depends on the circumstances

13   of the case.

14      Q.     Have you ever in your more than

15   500 engagements as trustee of bankruptcy

16   accounting services called to the court or

17   the trustee's attention transfers made to a

18   debtor, a debtor's principal's spouse?

19      A.     Yes.

20      Q.     And in what circumstances have

21   you found that to be relevant?

22      A.     My recollection that it might

23   have been a no-show job.

24      Q.     What's that mean?

25      A.     That she was getting paid and
```

1    she didn't work.

2         Q.    Have you ever drawn to the

3    trustee or the court's attention transfers

4    to a business owner's spouse as a potential

5    way to shield assets from judgment?

6         A.    Not that I recall.

7         Q.    Do you have any guiding

8    principle as to whether money being paid to

9    one spouse or the other benefits both of

10   them or each of them?

11        A.    No.

12        Q.    Is there any professional

13   guidance on that point?

14        A.    Not that I'm aware of.  But to

15   answer -- just to go back to your prior

16   question, payment to one spouse doesn't

17   necessarily mean that the other spouse is

18   gonna receive any type of benefit.

19        Q.    Are you aware of whether the

20   Cameos had any kind of prenuptial

21   agreement?

22        A.    No.  I am not aware.

23        Q.    And are you basing that last

24   statement purely on the title to the asset

25   as opposed to the use of the asset, or does

1    it matter?

2        A.    The asset -- what's the asset?

3        Q.    Whatever the thing is that's

4    inured to the benefit of the spouse, is

5    your opinion guided by who holds title to

6    the asset or who uses the asset, or both?

7        A.    Probably both.

8        Q.    Do you think that David Cameo

9    had a personal benefit from his home

10   because his wife was the owner and borrower

11   on the home and he lived there?

12       A.    If he was living there and

13   didn't pay rent or didn't provide any type

14   of services in connection with his living

15   there, then he might have received some

16   type of benefit.

17       Q.    I see.

18             24 we'll skip.  I think we've

19   talked about some of these issues at the

20   beginning of the deposition in 25, 26, I

21   think we've covered all these items

22   previously.

23             Bear with me.

24             Okay, I think that's it.  We

25   covered it all.  Thank you so much for your

1  time.  I appreciate it.  I have no further

2  questions.

3         MR. HUFNAGEL:  Thank you.

4         We'll speak to you again on the case

5         in a few days.

6         MR. MAGLIERY:  No questions

7         from you I take it.  We'll close the

8         deposition?

9         MR. HUFNAGEL:  No questions.

10        THE VIDEOGRAPHER:  The time is

11        3:35 p.m. and we're going off the

12        record.

13        MR. HUFNAGEL:  Just a written

14        transcript from me.

15        MR. MAGLIERY:  We'll take the

16        video and the transcript.

17        (Whereupon, at 3:35 p.m. the

18        examination of this witness was

19        concluded.)

20

21

22     °         °              °            °

23

24

25

1           D E C L A R A T I O N

2

3           I hereby certify that having been

4    first duly sworn to testify to the truth, I

5    gave the above testimony.

6

7           I FURTHER CERTIFY that the foregoing

8    transcript is a true and correct transcript

9    of the testimony given by me at the time

10   and place specified hereinbefore.

11

12

13

14   _____
                GARY LAMPERT

15

16

17
     Subscribed and sworn to before me
18

19   this _____ day of _____ 20___.

20

21   _____
            NOTARY PUBLIC
22

23

24

25

1               E X H I B I T S

2    PLAINTIFF EXHIBITS

3    EXHIBIT    EXHIBIT                       PAGE
     NUMBER     DESCRIPTION
4
     EX 106     Rebuttal Report of Mr. Lampert    11
5
     EX 107     CFE Code of Professional
6               Standards                     32

7    EX 108     Application for Order Authorizing
                Retention of Mr. Lampert      36
8
     EX 109     Expert Report of Mr. Bracco   45
9
     EX 110     3/2/15 Letter to Judge Craig  66
10
     EX 111     Digital Direct 2012 Taxes     78
11
     EX 112     Cameo Distribution 2018 Tax
12              Return                        90

13   EX 113     12/15/22 Deposition Transcript
                Of Mr. Cameo                  101
14
     EX 114     Report of Examiner, In re R&J
15              Pizza Corp.                   119

16   EX 115     Deposition Transcript of
                Mr. Cameo                     147
17
     EX 116     Cameo Distribution Tax Return
18              11/30/18                      170

19
        (Exhibits accompany the transcript.)
20

21

22

23

24

25

1                    I N D E X

2   EXAMINATION BY                        PAGE

3   Mr. Magliery                          5

4

5

6

7

8      INFORMATION AND/OR DOCUMENTS REQUESTED

9   INFORMATION AND/OR DOCUMENTS          PAGE

10  Cases in which Mr. Lampert has given
    testimony                            18
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

STATE OF NEW YORK        )

3                    :    SS.:

COUNTY OF DELAWARE       )

4

5          I, SUZANNE PASTOR, a Notary Public

6     for and within the State of New York, do

7     hereby certify:

8          That the witness whose examination is

9     hereinbefore set forth was duly sworn and

10    that such examination is a true record of

11    the testimony given by that witness.

12          I further certify that I am not

13    related to any of the parties to this

14    action by blood or by marriage and that I

15    am in no way interested in the outcome of

16    this matter.

17          IN WITNESS WHEREOF, I have hereunto

18    set my hand this day, October 30, 2023.

19

20          *Suzanne Pastor*

       _____

21          SUZANNE PASTOR

22

23

24

25

1                    *** ERRATA SHEET ***

2    NAME OF CASE: IN RE: DAVID CAMEO
     DATE OF DEPOSITION:  October 30, 2023
3    NAME OF WITNESS:  GARY LAMPERT
     PAGE  LINE  FROM          TO            REASON
4    _____|_____|_____|_____|_____

5    _____|_____|_____|_____|_____

6    _____|_____|_____|_____|_____

7    _____|_____|_____|_____|_____

8    _____|_____|_____|_____|_____

9    _____|_____|_____|_____|_____

10   _____|_____|_____|_____|_____

11   _____|_____|_____|_____|_____

12   _____|_____|_____|_____|_____

13   _____|_____|_____|_____|_____

14   _____|_____|_____|_____|_____

15   _____|_____|_____|_____|_____

16   _____|_____|_____|_____|_____

17   _____|_____|_____|_____|_____

18   _____|_____|_____|_____|_____

19

20                        _____

21   Subscribed and sworn before me

22   this_____day of_____,20___.
     _____      _____
23   (Notary Public)           My Commission Expires:

24

25

### Exhibits

**EX 0106 Gary Lampert 103023**
  11:8,12,17
  47:8 94:21
  109:21 133:5
  197:4

**EX 0107 Gary Lampert 103023**
  31:23 32:1
  197:5

**EX 0108 Gary Lampert 103023**
  36:6,13,23
  41:22 197:7

**EX 0109 Gary Lampert 103023**
  45:5,10
  197:8

**EX 0110 Gary Lampert 103023**
  66:12,17
  67:7 197:9

**EX 0111 Gary Lampert 103023**
  77:23 78:1
  84:2 197:10

**EX 0112 Gary Lampert 103023**
  90:9,14
  170:7 197:11

**EX 0113 Gary Lampert 103023**
  101:2,8
  197:13

**EX 0114 Gary Lampert 103023**
  118:24 119:5
  197:14

**EX 0115 Gary Lampert 103023**
  147:17,21
  197:16

**EX 0116 Gary Lampert 103023**
  170:15,18
  197:17

---

### $

**$12,000**
  173:1 174:4
  175:17
  176:23
  178:13

**$12,634**
  175:1,7

**$120**
  29:4

**$120,000**
  29:7

**$150,000**
  169:7 171:18

**$18,000**
  171:23
  172:17

**$25,000**
  30:4

**$30,000**
  127:20

**$317,000**
  87:9

**$317,313**
  87:19

**$335,600**
  190:7,13

**$350**
  28:25

**$45,000**
  182:15

**$45,600**
  182:8

**$5,000**
  178:25

**$6.957**
  96:6

**$7**
  63:13 133:12
  138:19

**$721**
  188:6

**$73,000**
  179:14
  180:9,12

**$73,046**
  179:3

**$750**
  188:7

**$769,000**
  188:24

**$783.03**
  128:25

---

### 1

**1**
  22:6 27:4
  79:1 91:10,
  19 126:2,9
  171:6

**10**
  5:25 17:24
  19:7 47:22,
  23 48:1,22
  71:17 89:24

**100**
  9:20 79:11,
  14 169:22
  170:1
  171:10,15
  173:24

**1020-S**
  90:2

**106**
  11:8,12,17,

  19,20 47:8
  94:21 109:21
  133:5

**107**
  31:23 32:1

**108**
  36:6,13,23
  41:22

**109**
  45:5,10

**10:09**
  3:7

**11**
  48:22 94:22
  127:11
  151:8,10,13
  152:15
  154:14
  160:5,15,20
  161:5,25
  162:7,10,18

**11/30/18**
  170:17

**110**
  66:12,17
  67:7

**1104-C**
  118:2

**111**
  77:23 78:1
  84:2

**112**
  90:9,14
  170:7,9

**1120**
  78:7 93:12
  171:1,5,13

**1120-S**
  78:14

**1125-E**
  91:22 92:3

**113**
  101:2,8

**114**
  118:24 119:5

**115**
  147:17,21

**11570**
  9:21
**116**
  170:15,18,22
**11:02**
  44:21
**11:11**
  45:1
**12**
  145:14 189:1
**12-month**
  42:1
**12/15/22**
  101:6
**12:48**
  109:7
**13**
  145:14 182:7
**14**
  109:23
  128:20
**15**
  6:1 49:17,19
  50:1 102:2
  133:7,10
  178:24
**15th**
  101:4
**16**
  48:25 49:17,
  20 50:15
  71:10,14,15,
  16 84:17
**17**
  149:7,12
**18**
  84:24 85:3
  101:15,16,
  18,19,23
  165:9
**19**
  84:25 87:16
  94:22
**1980**
  9:1,4
**1982**
  9:8

**1988**
  9:2
**1990**
  6:24 7:1,4,
  12 8:10,15
**1:23**
  109:12

---

## 2

---

**2**
  40:9 59:19
  63:3 78:25
  80:22 81:16,
  24 82:10,14
  87:11,14
  93:24 95:6,
  13,21 96:7,
  11,16 97:4,
  11 98:7 99:8
  100:4,15
  101:5 102:6
  115:11 117:5
  137:11
  141:7,18
  151:21
  154:18
  156:4,19
  159:10,14
  160:4,15
  162:17
  178:24
**20**
  17:24 19:8
**2005**
  7:13 8:2,9,
  10
**2012**
  77:24 79:15
  83:25
**2015**
  68:2 121:1,
  20 122:17,20
  123:1,8,16
**2017**
  170:23 171:6

**2018**
  90:11,13
  91:13,17,20
  105:5 166:22
  167:1 169:8
  171:7,20
  172:1 175:18
  178:25 179:2
  182:7 188:5,
  25
**2019**
  91:18,20
  189:1
**2020**
  175:19 190:7
**2022**
  101:4
**2023**
  3:7 27:8
  45:7
**21**
  84:17,19,20,
  21 182:6
  190:6
**22**
  84:18 85:3,
  16 103:14
  169:8 171:20
  188:3
**227**
  148:7,8,14
**23**
  188:5
**24**
  121:20 123:8
  194:18
**24th**
  188:5
**25**
  109:20,23
  133:6 194:20
**25,000**
  30:2
**26**
  85:15 89:24
  173:4 179:1
  194:20

**27**
  188:5
**272**
  102:1
**28**
  104:25
**2:12**
  147:6
**2:18**
  147:11

---

## 3

---

**3**
  16:18 27:13
  32:24 50:24
  104:23
**3/2/15**
  66:15
**30**
  3:6 91:18,20
  146:1 149:7
  160:2
**30th**
  171:6
**325**
  104:19
**329**
  104:1,8,13,
  20 107:24
**34**
  165:16
**35**
  169:4
**36**
  172:21 173:7
**366**
  190:8
**3:09**
  186:6
**3:20**
  186:11
**3:35**
  195:11,17

## 4

**4**
 28:21 91:10
 119:11,12,
 13,18
**43**
 24:11 60:15
 139:20
**4:30**
 185:25

## 5

**5**
 37:13,23
 120:24
 121:17,18
 122:1,25
**5,000**
 29:15
**500**
 13:23 18:23
 139:20
 192:15
**55**
 171:11,12

## 6

**6**
 188:23

## 7

**7**
 27:8 45:7
 124:18
 148:14
**75**
 14:22 103:3,
 25 104:7,14

## 8

**8**
 41:23 45:24
 47:18 48:2
 85:15 92:23
 126:1
 171:11,12

## 9

**9**
 47:1,10,13
 48:5 50:23
 91:22 92:2
 122:17,20
**90**
 14:22 15:5
 30:17 43:1

## A

**a.m.**
 3:7 44:21
 45:1
**abide**
 143:15,16
**ability**
 189:6
**able**
 33:13 57:5
 58:8 68:18
 69:15 70:2,
 13 71:11
 122:19
 125:19 146:4
 150:15,20
 185:24
**absence**
 54:3 65:4
 76:20 115:10
**accept**
 34:21 35:7
**access**
 159:2

**accession**
 191:24
**accessories**
 89:5
**account**
 53:22,23
 64:12 74:17
 75:11 104:24
 105:6
 124:19,20,25
 125:10,17
 146:16
 148:19,20,25
 149:1 150:4,
 16 158:18,19
 159:10,13,16
 167:22 169:9
 171:20
 177:14 184:7
**accountant**
 7:22 9:4,7
 16:21 24:10
 27:15,18
 37:7 38:7,9
 60:15 63:2
 74:13,15
 87:15 88:4,
 15 94:9
 115:24 123:4
 182:15
**accountants**
 8:13 124:14
 189:19
**accounted**
 93:17 117:20
 184:21
**accounting**
 6:16,21 7:2
 8:21,25
 13:21 52:20,
 23 53:1
 64:22 74:22
 75:2 76:13
 86:4 120:12
 122:15,23
 123:9 127:5
 129:10
 131:1,2

 140:12 191:3
 192:16
**accountings**
 75:13
**accounts**
 51:21 53:22,
 23 55:13
 56:9 58:19
 60:1,5,7,8
 61:24,25
 70:22 84:10
 86:12,25
 87:1 120:12
 125:1 126:6,
 15,21 127:7
 128:16
 146:8,14,20,
 22 149:21,22
 150:6 152:24
 153:12,13
 155:24
 158:22 159:7
 160:16
 163:20,22,24
 164:5,6,9
 165:4 180:1,
 3,17 191:10
**accreditation**
 24:15 26:14
**accrual**
 52:22 54:6
 60:19 77:19
 78:23 79:2
 86:23,24
 91:7,11,14
 93:19
**accurate**
 67:19,22
 68:24
**accused**
 161:22
**acknowledge**
 3:22 4:1
 109:16
 190:13
**acknowledges**
 173:15

acquired
 56:25 97:16
 138:5 146:6,
 20
acquiring
 136:15
acquitted
 143:3
activities
 39:8
actual
 58:18
add
 186:15
addition
 20:13 25:21
 27:14 160:3
additional
 29:12 54:9
 122:19
address
 9:20 166:15
addressed
 47:25
adequately
 117:20
adjust
 80:7
adjusted
 180:1,3,17
administered
 4:2
administrative
 7:24
Adobe
 12:2 101:21
advance
 112:2,4
adversary
 5:6 161:15,
 16
advice
 121:21 122:5
advised
 122:17,21
 129:5

advising
 125:14
 126:12,19
advisor
 26:16
affect
 5:19 156:13
 158:13,22
affected
 41:11
affection
 192:3
affects
 39:9
affidavit
 37:14 41:22
affiliate
 40:24
affiliated
 40:20
affirm
 4:18
ago
 6:6,8,23
 16:7 17:12,
 15,18 21:24
 24:7,20
 25:11 79:16
 121:12
agree
 4:12,15 5:14
 44:4 57:8
 62:3,15,19
 68:6 79:11
 95:25 96:16
 102:16
 105:21,22
 111:13,17
 113:11,18,22
 115:21
 127:25 128:6
 147:1 148:23
 153:6 165:6
 169:18
 181:17 182:3
 183:23

agreed
 39:21 108:17
 138:12
 176:22
 186:22
agreement
 4:9,10 95:4
 116:25 117:3
 137:24
 155:15,19
 167:4 177:11
 193:21
ahead
 10:10 23:20
 103:8 122:14
 148:6
aid
 8:5
AIRA
 26:20
alert
 34:14
allegation
 44:9 50:8
allegations
 70:5,19
 117:23
alleged
 44:13
alter
 144:7,15
Amazon
 19:24 95:13,
 22 96:6,12,
 17 97:4,12
 98:8,12,14,
 17 100:6
 102:3 105:2,
 12 106:3
 107:1,17
 113:3,15
 134:8,16,18
 135:2,5,14,
 15 136:17
 137:13
 138:9,14
 139:2,8
 141:20

143:23
 146:7,16,17
 148:20
 149:1,22,23
 152:18
 153:10,11
 155:15,19,22
 156:4 157:22
 160:7 161:9
 162:19
 163:4,16,25
 164:5,13
 165:25 166:2
 172:11,14,19
Amazon.com
 3:10 5:5
 22:10 46:5
 160:22
amount
 29:7,18
 60:25 63:17,
 19,20 65:10
 77:5 80:7,
 14,19 95:14,
 15,22,23
 97:3,5 98:2,
 3 99:17
 125:12
 128:25
 135:1,4,16
 138:23,24,25
 139:2,9,13,
 22,24 140:4,
 25 141:7
 151:20
 152:15,18,25
 158:20 160:7
 162:20
 174:25 179:5
 180:7
 187:19,24
 189:17 190:7
amounts
 89:2,9 97:10
 125:17,22
 151:22,24
 154:22

analysis
  57:10,12
  96:11 126:9
  143:17
  149:18 153:8
analyze
  189:7
analyzed
  27:7 31:15
and/or
  39:10
answer
  16:11 39:19,
  24,25 43:10,
  12,14,15,19
  73:9 75:25
  77:12 82:21,
  23 88:22
  89:3 93:3
  102:4,7,11
  105:1,7,11
  106:16,22,23
  112:12
  114:16
  115:18
  140:24
  148:17
  152:11
  160:11 163:6
  168:17 174:7
  181:6 193:15
answered
  76:3 103:14
answers
  103:15
Anthony
  45:6 122:17
anymore
  168:12,20
anyone
  72:25 162:14
anyplace
  108:10
apologies
  73:21
apologize
  23:22

apparently
  130:1
appeared
  55:24,25
appears
  45:22 47:20
  60:12 63:10
  79:8 87:24
  91:16
  103:10,12,
  13,16 105:21
  161:5
application
  36:7,10 37:1
applied
  87:23
apply
  22:16 23:16
  24:3
applying
  190:22
appoint
  37:2
appointed
  142:12
appointment
  119:2
appreciate
  40:17 51:16
  103:6 195:1
appropriate
  111:3 184:4
approximately
  5:24 8:10,
  12,14 9:1,2
  17:24 24:11
  26:24 28:5
  63:13 172:1,
  25 174:4
approximation
  17:13 29:17
April
  188:25
Ari
  20:2 27:10
  30:7 95:8
  97:22 105:13

106:19
107:2,20
108:1,5,23
109:1 116:8
141:9 174:13
177:2,18
179:8,18,24
180:18,20,24
186:17,19
187:18,23
around
  5:25
arrangement
  4:6 95:5
  112:25
  114:2,4,5,8
  116:20 117:9
arrangements
  127:9 155:21
arrears
  112:2,10,18,
  22
asked
  22:9 32:17
  37:16 43:6,
  15 44:5,11
  51:25 53:25
  55:15,20
  56:5,12
  58:20 66:24
  67:1 85:11
  93:7 107:23
  115:6,13
  142:13
  154:11,18
asking
  10:22 20:24
  42:18 49:22
  55:23 89:8,
  10 95:25
  100:22
  112:15,16
  140:24
  142:5,7
  144:9,11
  148:12
asserted
  95:12,21

131:16
162:15
assertion
  50:19 81:16
assessment
  69:22 70:2,
  13
asset
  193:24,25
  194:2,6
assets
  37:24 38:2,
  19 39:2,11
  41:4,11 51:2
  54:16 193:5
assist
  8:5
assisted
  146:14
associated
  113:19,24
  132:14
Associates
  8:20 122:15,
  18
association
  26:20
assumption
  59:5
attached
  85:3
attempt
  38:17
attempted
  166:14
attempting
  49:18
attention
  131:1,4,21
  132:6 141:22
  142:9,10
  159:17
  192:17 193:3
attorney
  82:20
attorneys
  3:21 5:4

**audited**
94:18
**August**
27:8 45:7
188:5
**authorize**
37:6 174:10,
13
**authorized**
186:17
**Authorizing**
36:11
**automobile**
129:6,16
131:25
132:5,22
**availability**
67:10,16
68:8,10,20
69:2
**available**
69:13,21
70:1 71:23
72:11 78:4
83:24 93:25
94:5 128:15
155:2,5
**Avenue**
190:8
**aware**
5:18 10:9
43:18 63:12
95:11,20,25
96:2,4
100:14 121:2
136:10 141:3
142:2,3
144:6
158:10,12
161:9,12
163:21
168:13,18
193:14,19,22

————————

**B**

————————

**bachelor's**

9:12
**back**
17:10,16,20
27:2 45:1
53:12,14
59:12,15
81:2 87:7
94:20 98:12
102:22
105:12 106:3
107:2,18
109:12,15
113:3 122:13
133:3 134:17
135:2,16
136:18
137:14
138:11 139:9
143:24
145:16
147:11 149:3
155:23
160:2,8
165:20
171:16 175:6
177:9 180:6,
15 186:2,11
193:15
**background**
59:8
**balance**
73:11 74:17
75:3 76:5
86:14,23
**balances**
75:13 77:2
126:4,14
127:22
128:15,18
**bank**
51:22 59:23,
24 60:2
61:17 62:1
63:19 70:8,
12,21 74:6,
15 75:10
76:17 120:12
121:18,22

122:2,6
123:7,13,15,
25 126:5,15,
21,25 127:6,
21 128:5
146:8,14,22
148:19,25
149:21
150:15
158:18,19,22
159:7,10,12,
15 163:20,
21,23 164:5,
9,18,20,22
165:3 177:14
**bankruptcy**
5:6 6:17
7:2,5 12:23
13:18,20,23
14:2,15
15:22 26:4
30:9,12,18,
21 31:18
36:8,25
37:19 38:7,
9,16 41:18
42:25 88:3,
15 117:18
118:2
141:13,17
192:11,15
**banks**
75:16
**bar**
10:19
**based**
23:8 25:3
39:25 52:15
56:20 57:11
58:18 97:21
98:19 99:24
112:13,18,20
137:24,25
144:2 149:17
150:10,24
151:14
152:20
157:12 161:3

186:14
187:25
188:19
**basically**
38:22 46:19
48:16
**basing**
193:23
**basis**
49:8,11,14
50:4,7,13
51:12,19
52:1,2,6,12,
14,19,22
53:1,17,19,
25 54:6,7,15
55:22 56:1
58:15,19,21
60:23 64:10,
22 77:18,19
78:23 79:7,
19,25 81:17
86:4,23,24
87:5 91:7,
14,15 93:18,
19 98:16,19
99:12,25
100:7 110:14
117:7 121:23
122:7 123:11
133:18,20,22
153:17,18,
22,24,25
154:3 160:25
161:2
**Bear**
10:13 36:2,
20 170:12
194:23
**beg**
37:9 41:5
69:20 84:19
134:6
**began**
152:16
**begin**
104:22

**beginning**
22:5 24:13,
17 25:14
37:13 80:8,
15,24 81:20
82:2,7 85:19
171:5 194:20

**begins**
48:24

**behalf**
3:13,15 8:6
167:2 172:7

**belief**
30:8

**believable**
33:19 55:19
81:11 116:1,
11

**believe**
49:25 94:2,
21,23 97:2
113:16
116:13
143:12 159:1
171:12 183:1

**bell**
66:19

**benefit**
172:22
173:11
176:3,6,7,
18,21 177:25
178:15,18,20
182:12
183:11,13
185:19
188:14
190:14,22
191:6,8,13,
15,19,22,25
192:3,5
193:18
194:4,9,16

**benefits**
114:3,7
190:23 193:9

**benefitted**
46:6 47:20

165:11
173:17,23
190:5

**Bentley**
179:8

**best**
117:25

**better**
123:14

**bias**
34:16

**big**
64:15

**billed**
29:24

**billings**
29:18

**bit**
58:23

**blow**
159:13

**BMW**
188:7,9,20

**bonds**
84:11,14

**book**
151:5

**bookends**
156:16

**bookkeeper**
124:14
126:24

**bookkeeping**
52:19

**books**
31:15 37:25
41:13 49:7,
10 50:10,12
51:1,18
52:5,11,13
55:21 58:14
59:18,22
65:9 67:11,
17,18,20
68:9,11,21
69:3,14,20,
25 70:22

74:21 99:15
108:11 115:4
118:6 143:18
189:16

**Borges**
122:18,21

**borrower**
194:10

**bottom**
28:22 45:24
101:18,23
103:25
104:6,14
121:25 122:8
173:4

**bought**
60:13 86:15
183:4,5

**box**
10:17,19
12:5 31:21
36:4 45:3
79:1,3 91:11
100:25

**Bracco**
27:8 31:2,11
40:7 44:1,
11,12 45:6,
9,25 46:20
47:20 48:17,
18,21 50:24
51:6 56:21
57:3,9,15,
17,20 62:18,
21 71:20
72:19 95:11,
20 96:3,4,23
110:4 134:10
138:12
149:5,14
163:25
165:23
166:10,12
169:5,12
172:21
173:10,15
182:11
188:4,23

189:22 190:2

**Bracco's**
34:9 35:24
38:24 41:13
47:17 49:25
50:8,21 55:7
110:2 143:8,
13 155:13
159:17

**break**
44:16 54:1
109:4 186:1

**breaking**
153:7,19

**Brian**
4:13 72:4
185:23

**briefly**
26:17

**bring**
130:25 132:6
141:21 142:8
143:22
159:16

**bringing**
131:20

**broad**
118:16

**brother**
30:7 174:13

**brought**
131:4 142:9
143:9

**budgets**
88:2,6,8

**bullet**
35:18

**burdensome**
18:25 19:9

**business**
7:1 9:16
52:22 53:5
54:6 57:18
64:3 70:24
79:18 87:21
88:2,20,23
89:11,13,17

130:2 131:9,
17,25 132:4,
12,14,17,20,
24 136:24
137:2,3
141:14,18
146:17
175:24
177:22
178:3,4
183:7
191:20,21
192:4 193:4

**businesses**
88:13,18
89:13,14
137:4 191:11

**buy**
112:1,4
137:12
177:23
178:13

---

**C**

---

**call**
11:2 12:25
18:17 21:22
74:15

**called**
8:25 16:18
26:10 36:9
40:9,12,20
45:19 66:14
78:9 85:17
88:25 90:10
124:19
146:21
181:23
192:16

**Cameo**
3:11 5:7 8:6
11:2 19:25
20:1,2 22:7,
9 27:10,14
28:9,13
38:13,22
39:3,15,17

40:3,4,5,13
41:3,9,17
46:2,6 47:19
48:7 51:25
53:24 55:6,
15,20,23
57:4,9,13,
16,21 58:20,
23 61:21
62:18,21
65:18 71:19
72:25 73:2
79:11,14
83:12 90:10,
12 91:12
92:11,17,19
93:8,10,13,
16,17,20
94:6 95:9
97:14,22
98:5,9
101:3,7
102:17
103:10,12
107:16,25
112:14
113:12
115:2,13
116:2 134:13
141:9 142:7
143:5,7,10,
21 146:4
147:20
148:12,24
149:19
150:2,9,13,
23 151:1
152:16 159:9
160:13
161:4,10,22
164:3
165:10,20
166:18
167:2,8,11,
18,20 168:3
169:9,13,21,
22 170:1,2,
16,23 171:1,
10,11,14,17,

19 172:8,22,
24 173:11,
17,22,23,24,
25 174:12,
14,15,25
175:17,20,25
176:3,25
177:13 178:5
179:2,13,17
180:6,9,24
181:10,14
182:7,10,12
183:3,5,11,
14 185:16
186:15,16
187:11,18,23
188:6,8,14
189:23
190:3,5,9,
15,23 191:9,
10 194:8

**Cameo's**
54:11 56:17
58:16,17
62:24 94:2
100:17
105:25 107:9
112:20
133:21
134:25
147:15 151:6
152:21
155:10,12
157:5 161:24
162:4 178:14
188:1

**Cameos**
193:20

**camera**
46:3 48:7
49:7 89:5
97:24 143:11
154:3 171:25
172:11

**Camera's**
134:5 159:6

**cameras**
40:9 50:3

51:11,18
53:18 56:19,
22 59:19
63:2,12
71:21,22
72:9,20,22
77:16 80:22
81:16,24
82:10,14
83:1 93:24
94:24 95:6,
12,21 96:7,
11,16 97:3,
11 98:7
99:8,16
100:4,15
102:6,18
104:24
110:3,5,7,
11,16 114:5
115:11 117:5
133:11,15
134:7 137:11
138:3,10,15
139:3 140:20
141:1,7,18
151:21
152:24
154:17
155:19,22
156:4,19
158:20,25
159:10,14
160:3,15
162:17
165:12 166:3
172:5,15
182:21

**Cameras'**
49:5 50:2
51:1,7 115:4

**capacity**
58:13

**capital**
36:18,24
177:5,7
179:24,25
180:1,2,17,

**20,23**
181:18,20,21
182:1, 3
186:19,22
187:1
**capitalization**
110:3,7,12,
22 111:2,7,
8,9,21
**capitalized**
110:5 111:14
**car**
120:15
128:21
129:1,12,17,
19,20,24
130:6,8,11,
12,16,19,21,
23 131:6,11,
16,22 132:9,
13,18 176:9,
16,19 177:24
178:3,14
190:25
**card**
123:25
189:13
**cards**
188:25
189:8,19
**career**
12:21 24:14
25:15 163:11
**Carla**
66:13
**Cascarino**
124:5 127:21
128:14 129:2
131:16
**case**
16:13 17:1
18:18 19:19
20:4 26:4,6
30:24 36:18
45:7 63:8
65:15 66:14,
19 67:2,24

68:1 70:3,7,
18 78:16
101:4 111:4
112:6,12
117:24
118:25
121:21 122:5
125:4 128:13
131:15 140:1
142:10,11,25
157:18
159:3,13
161:10,21
182:25
192:13 195:4
**cases**
12:19 13:23
14:1,2 15:1,
2,3,22 16:15
18:23 19:2,8
142:16,18
184:14,16
**cash**
30:10 49:8,
10,14 50:4,
6,7,13
51:12,19,21,
23,24 52:1,
2,6,12,13,
16,19 53:1,
19,21,25
54:6,15
55:22 56:1
58:15,19,21
60:10,12,23,
25 61:23
64:10,22
75:13 76:5,
20,25 77:18
78:23 79:1,
4,7,18,25
81:17 86:4
87:5 91:7,15
93:18 98:16,
19 99:11,23,
24 100:7
103:13 117:7
120:14

**123:20,24**
126:4,14
128:18
153:17,18,
22,23,25
154:2,23
**Catina**
173:1 174:4
**caused**
174:2,8
**causing**
179:16
**ceased**
171:25
172:5,15
**Centre**
9:21
**certain**
92:15 94:13
114:3 124:24
125:5 137:25
155:17
**certainly**
154:10
**certificate**
26:18,19,24
32:12
**certification**
23:24 24:16,
18,19,24
25:2,10
**certified**
9:6 25:7
26:2,11,15
32:8 54:23
63:24 65:12
81:4,22
83:19 97:25
110:24
115:8,25
143:4 144:13
145:11
**CFE**
25:5 31:24
32:12,19,25
34:5,20
35:7,13

**55:16 58:13**
115:20
143:14
154:12 191:4
**CFE's**
33:22
**CFES**
34:14
**CFF**
23:23,24
24:3,6,15
**challenge**
19:18
**chances**
139:21
**characterized**
179:23
**characterizing**
71:6
**charge**
123:25
136:8,11
**charges**
51:22 127:21
189:3,7
190:25
**chat**
10:16,19
12:5 31:21
36:4 45:3
66:11 77:22
90:8 100:25
118:22
147:14
170:13
**check**
6:6 13:14
14:5,13
15:10,18
16:5,9,11,13
17:3,16,20
18:6 24:8
28:20 30:1
72:21 73:1,
5,7,16 74:21
76:11,14

79:1 128:10,
11 142:21
**checkbook**
73:10 74:2
75:5 76:6
**checked**
79:4
**checking**
150:4,6
**checks**
73:18,24
74:4,7,9,12,
19 75:15,17,
21,24 76:7,
16,18,23,24
77:1,4,6,8,
10 127:16,
18,21 128:2,
7 150:10
**children**
176:12,14,16
**chooses**
191:9,10
**CIRA**
26:13
**circles**
58:22
**circumstances**
30:23 65:14
70:4,19
111:5 117:24
132:19 133:2
141:23
142:14
144:23
145:19
167:14 178:2
192:12,20
**cited**
58:3 179:11
**cites**
57:22 62:24
**Citibank**
190:8
**citing**
48:21 62:21

**city**
91:4
**claims**
34:23 35:10
166:18
169:22
**clarification**
15:4 40:18
**clarify**
78:14 86:3
168:20 187:2
**classificatio
n**
184:4
**classified**
183:25
**clear**
67:5 72:8
**clearance**
75:17 76:8
**cleared**
74:5,9
76:12,14,24
**click**
10:19,25
**clients**
132:25
146:21 149:5
**Clifton**
182:9
**close**
195:7
**closing**
79:23
**code**
31:24 32:7
42:25 118:2
**cognizant**
35:14 55:16
115:18
**collections**
61:24 125:11
**college**
9:11
**column**
92:21

**combination**
107:3
**combined**
61:20
**come**
40:7,11,19
161:24
181:21 186:2
**comes**
33:18 55:18
81:10 144:20
**comfortable**
142:24
**commenced**
16:14
**comment**
47:14 172:9
**common**
64:13 80:3
111:5
**communicate**
28:1
**communicated**
115:13
**communication
s**
27:14 28:17
189:18
**companies**
41:2,9 64:9
74:18 75:8,
9,11 80:4,10
110:25 111:6
139:21
140:13
145:15
146:6,19
147:1 162:16
163:14,19,24
164:4,12
165:2
**company**
6:14 10:4
40:9,12,20,
25 46:3 53:9
54:12 59:21
62:9 64:1,5,

21 65:16
70:22 74:10,
23,24 78:8,
22 86:4 87:4
88:24 89:5
90:10 91:6,
13 93:18,19
94:17 99:15
107:6 108:12
111:10,11,14
112:4 113:7,
9 117:6,18
129:11,21
130:5 131:10
132:21
139:23
144:20,21
150:12
151:18
157:25 167:3
174:16,19,21
175:4
179:19,20,25
180:21,23
181:18
182:16,20
184:6 186:23
189:11,14
**company's**
132:14
**compensation**
28:24 92:5,9
184:11,13,17
**complaint**
161:13
**complete**
9:9 67:19,22
118:20
153:14
**comprise**
142:4
**computer**
10:20
**concealments**
38:1,19 39:2
**concern**
145:12

**conclude**
49:4 124:4

**concluded**
195:19

**conclusion**
34:1 44:6
53:18 54:10
81:9 144:10
160:19
161:1,25

**conclusions**
22:13 33:1,
2,23 110:2

**condition**
5:18 67:11,
16 68:8,11,
18,20,25
69:3,14

**conducts**
23:16

**conduit**
46:3 144:7
160:21
161:3,8
163:8

**conduits**
162:1

**conference**
187:4,8

**confirm**
5:10 55:24
171:9

**confuse**
114:15

**confused**
22:20 42:18
43:2,5 72:2
92:7

**conjecture**
34:15 116:23

**connected**
26:1

**connection**
20:18,19
21:16,17
38:22 40:6
41:1,8 78:19

**consent**
4:6

**consequence**
128:1,4,7

**consider**
74:19

**consideration**
185:5

**considered**
74:2 185:6

**considering**
144:18

**consistent**
116:7,9,10

**constantly**
102:12 105:8

**constructed**
89:18

**consulting**
148:13,15
149:5

**context**
25:14 43:4
86:9 124:21
132:24

**continue**
105:14

**continued**
101:24

**continues**
35:13

**continuing**
11:7

**contributions**
177:5,8
186:20 187:1

**controller**
8:18

**convenient**
44:18

88:13 90:22
114:7 115:4
118:7 141:10
143:17
175:16
186:13,18
190:8 194:14

**conveyances**
38:2,20 39:3
44:6,9

**copy**
11:23,25
45:13,24

**corner**
83:7

**Corp**
36:24 66:14
67:25 69:19
78:8 118:25
119:4

**corporate**
39:10 41:4,
11 42:3
148:17

**corporation**
92:16
148:18,25

**correct**
16:22 19:4
21:18,19
28:25 29:4
34:5 36:21
37:3 39:5
41:7 49:1,24
54:7 56:4
59:5 62:5
79:4,17
84:22 87:6
92:17 93:7
94:1 95:15
96:24 97:2
102:7 113:4
114:22,23
124:15
125:11
126:25
131:17,21
134:11
136:21 137:9
153:19
154:1,20
165:16
168:12,17
171:20 172:3
180:13

184:22
186:23
190:12

**correctly**
56:3

**corroborate**
34:23 35:9

**corroboration**
83:20

**cost**
113:19,24
116:15
117:11
135:6,20
136:16,18
137:18,21,
22,23 138:4
139:24

**costs**
114:11,19,
22,25 116:1,
12,24 117:6,
19

**counsel**
3:4 4:5,24
18:16 21:6,8
27:15 187:5,
8

**count**
80:17

**County**
9:22,25

**couple**
8:22

**course**
12:1 82:15
148:10
183:2,7
192:8

**courses**
24:23

**court**
3:18 5:12
11:6 36:25
122:25 123:7
125:14
126:12,19

127:3,8
128:21 131:5
178:13
192:16
**court's**
130:25
131:21 132:6
141:22
142:8,10
193:3
**cover**
35:18 71:24
72:11,23
73:7,16
74:11 128:8
171:8
**covered**
171:3
194:21,25
**covering**
115:19
**covers**
135:5
**CPA**
6:13 8:11
10:4 23:14,
16 154:12
**Craig**
66:13,16
**create**
56:24 57:1
155:24
**created**
61:9
**credibility**
80:22 81:2
**credible**
81:15 150:22
**credit**
49:6,13
50:2,5 55:9,
10 56:23
57:1 60:13
61:12,22
86:11,15
95:10 97:16,
18,20,21

99:2,7,18
112:8 124:24
125:5 134:19
135:7,11,20,
23 136:1,2,
6,9 155:14
157:13
188:25
189:8,13
**creditor**
174:24
**criticism**
124:9 125:15
**cure**
127:9
**current**
9:15 84:12,
23 85:17,19
86:15 87:3
**customers**
124:24
125:6,21
133:1
**cut**
91:8 92:21
**CV**
12:17 23:12
121:10
**CW**
9:14

---

**D**

---

**daily**
123:23
**date**
6:7 11:13
17:2 24:8
25:12 29:18
32:2 36:14
45:11 66:18
78:2 90:15
101:9 119:6
122:25
140:15
147:22
170:19

180:11
**dated**
27:8 45:6
**dates**
8:23 15:25
16:14
**Dave**
190:9,14
**David**
3:10 5:7 8:6
20:1 22:7
27:10 38:13,
21 40:5
79:11,13
92:11,17
93:8,13
97:22 98:9
101:3 167:20
169:13 170:1
171:10,14
173:23,24
174:15
177:13
178:14
181:14
183:14
184:14,18
190:23 194:8
**David's**
30:6
**day**
95:23 101:5
103:22 137:5
138:16
143:25
147:15 160:9
179:4
**day-to-day**
101:25
**days**
21:24 95:24
129:7 134:9
195:5
**DDAM**
49:6 94:25
134:9,14
135:2,14,16
136:16,18

137:13,15,
22,23 138:5,
11,14,17
139:3,9
149:15
151:8,9,12
152:19
153:1,4
158:6 160:22
161:4,6
162:12
172:23
173:12
**dealership**
179:1,5,10
180:11
**debate**
19:10
**debt**
161:17
**debtor**
15:8,12 16:2
30:19 38:13,
17 40:2,4
41:11 42:14,
15,16,17,22
68:15 69:1,
16,22 70:14
118:14
120:4,8
121:15,19,21
122:5,16,20,
23 123:4,19
124:9,23
125:4,9,12,
16,18,23
127:18
129:1,15
130:1,16,22
132:10
141:25 142:4
192:18
**debtor's**
37:24 67:11,
13,17 68:9,
20 69:3,14
126:10 127:5
129:5 192:18

**debtors**
 39:10,19
 192:11
**December**
 91:19 101:4
 171:6 172:1
**decrease**
 60:12
**deducted**
 87:22
**deductions**
 87:9,10,16,
 18 88:19
**deemed**
 42:5
**define**
 41:19 42:7
**defined**
 191:5
**defines**
 33:7
**definitely**
 185:22
**definition**
 89:17 107:9,
 12 183:18
**definitive**
 118:17
**deflect**
 35:19
**defunct**
 63:15
**degree**
 9:12
**deliveries**
 130:17 131:9
 132:1,13
**delivery**
 129:16
**depend**
 144:4
**depended**
 69:12,13
 111:4,8,9,11
**depending**
 68:10 148:4
 158:8

**depends**
 30:23 65:14
 67:23 69:10
 70:3,4,18
 74:23 89:12,
 16,21
 117:21,24
 118:11
 132:18 133:1
 135:9 141:23
 142:14
 144:23
 145:19
 177:11 178:1
 182:19 184:8
 189:14,15,
 16,17,20
 192:12
**deponent**
 17:1
**deposed**
 5:21 17:21
**deposit**
 61:23
**deposition**
 3:3,22,23,25
 6:5 11:3
 16:22 18:9,
 13 19:22,24
 20:7 21:9
 27:9 31:16
 57:21 73:3
 101:3,5,6,24
 103:1,3,25
 147:16,19
 162:23
 194:20 195:8
**depositions**
 6:3
**deposits**
 59:24,25
 74:20 123:25
**derive**
 185:18 191:1
**derived**
 166:2 172:18
 191:19

**describe**
 26:17 40:23
 145:6
**describes**
 37:15
**description**
 49:25 118:18
**descriptions**
 165:15
**designated**
 184:18
**designates**
 183:21
**detail**
 47:21
**detailed**
 57:10
**details**
 130:3,4
**determine**
 16:14 17:4
 38:18 41:25
 42:12,21
 43:17,20
 52:3,9 54:5
 68:15,19
 69:15 73:6
 77:1,2,5,16
 78:22 79:20
 84:2 111:3
 118:14
 120:4,8
 125:11,20
 153:14
 187:10 189:3
 191:18
**determined**
 65:3 96:5
 140:3,5,8
 183:24
**determining**
 69:1 80:19
**difference**
 12:9 38:15
 52:4 60:17
 61:7 64:16
 96:23

**different**
 30:25 31:10
 37:11 93:19
 97:9 111:12
 144:16
 145:15 170:4
**Digital**
 40:21 46:5
 51:4,9 77:24
 78:9,12,15
 79:6,12
 83:25 88:25
 94:25 95:6,
 15,24 96:7,
 13,18 97:4,
 12,15 98:24
 99:8,13,17
 105:19 106:2
 107:18
 108:15,20,
 22,25 113:1,
 4,13 114:2
 116:4,20,25
 117:9,10
 140:20
 141:1,5,14,
 20 143:11,24
 150:24
 156:20
 157:12,19
 160:8 162:1,
 6,11,20
 163:4,16
 164:14
 165:12,20,25
 166:19
 167:4,8,10,
 15,19 168:4,
 6,15,25
 178:25
 179:3,4
 180:5,10,11
 189:23
**diligence**
 154:12
**Direct**
 40:21 46:5
 51:4,9 77:24

78:9,16
79:6,12 84:1
88:25 94:25
95:6,15,24
96:7,13,18
97:4,12,15
98:24 99:8,
13,17 105:19
106:2 107:19
108:16,20,
22,25 113:2,
4,13 114:2
116:4,21
117:1,9,10
140:20
141:1,5,14,
20 143:11,24
150:24 154:3
156:20
157:12,20
160:8 162:1,
6,11,20
163:4,16
164:14
165:13,20,25
166:19
167:4,8,11,
15,20 168:4,
6,16 169:1
178:25
179:3,4
180:5,10,11
189:23

**directly**
107:18
165:19

**director**
178:7

**disagree**
169:15

**disassociation**
167:7

**disbursed**
182:8 188:6

**disbursement**
186:14

**disbursements**
52:17 149:15

**disbursing**
172:25

**discharged**
161:18

**disclosing**
82:20

**discounted**
137:23,25

**discussed**
95:9 190:25

**discussing**
94:23

**discussion**
103:4 188:17

**disinterest**
37:15

**disposal**
131:23

**dispute**
96:15,21

**distinction**
12:22

**distribute**
174:20

**distributed**
104:2 145:16

**distribution**
40:13 90:11,
12 91:13
92:19 93:10
169:23
170:2,16,24
171:1,11,19
172:8,25
173:25
174:3,14,18,
19,23,25
175:17,25
176:24,25
178:6 179:2,
14 180:6
183:5,16,17,
18 184:1,9,
13,17
185:13,15,16

186:15
187:12,18
188:6 189:24

**distributions**
168:12,19
180:9 182:7
187:23

**District**
36:8,25

**divorce**
10:6

**docketed**
121:3

**doctrine**
191:4

**document**
10:23 11:6
32:7,14 57:5
90:20,25
91:1 94:16
133:12
148:11

**documentation**
182:23 189:2

**documents**
11:3 20:3,
12,14,16
21:1 31:16,
17 58:7
59:2,3 62:7
64:18 69:20,
25 70:6,11,
17 71:13
90:21 91:2
94:10,13
96:19 133:15
136:13
145:21
154:19 155:1
156:11 159:2
180:2,16

**doing**
63:8 106:21

**dollar**
108:14
143:23 163:3

**dollars**

63:22
137:12,14,15
138:21
156:20

**download**
10:22 11:1

**draw**
33:25 81:8

**drawing**
32:25

**drawn**
193:2

**driven**
176:19

**drives**
179:8

**driving**
175:18

**drove**
175:13,21

**due**
86:14 97:4
98:14,17,24
99:1,13
105:19
125:12,17,22
127:17,19
139:9 140:6
141:7 154:12
185:4

---

**E**

---

**e-mail**
28:12,17

**e-mails**
28:3,5,8,16

**earlier**
30:15,16
66:3 93:11,
23 151:17
152:3 157:7
170:11

**earn**
24:5 25:19

**earned**
26:23 34:5

ease
  11:25
Eastern
  3:8 36:8
education
  9:11
effect
  82:8
effort
  38:25 42:12,
  20
ego
  144:7,15
either
  10:3 16:25
  51:23 60:23
  95:4 153:7,
  19 156:19
  157:20
  176:23
  185:12
elaborate
  48:10,14
electronic
  75:5
Eli
  8:11,17
emblematic
  121:13
emphasized
  153:18
employ
  30:20,25
  31:10 34:7
  35:23 36:7
employed
  6:10,11 8:8,
  11,13 30:22
employee
  124:5 178:6
employees
  7:17 65:18
  110:19
  120:13,15
  189:18
employment
  7:1

employs
  64:21
encountered
  110:25
end
  11:3 80:6,8,
  15,25 82:3
  85:20 103:22
  137:5 138:16
ended
  91:18
ending
  81:20 82:7
  171:6
engaged
  38:6,8
  142:17
  143:13
engagement
  8:6 15:20
  16:2 29:25
  31:12 39:14
  82:15 141:10
engagements
  13:11 16:12
  25:24,25
  30:17 65:3
  69:25 88:14
  192:15
engaging
  116:22
enter
  3:16 124:9
entered
  124:4 167:3
entire
  12:6 96:5
  135:4,15
entirety
  156:2
entities
  27:9 145:8
  146:3
  149:14,21,24
  151:8,11,13
  152:15
  154:15

160:5,20,23
161:6,25
162:8,10,18
165:12
entitled
  18:20 179:19
entity
  145:17
  154:15
entries
  86:25 124:15
entry
  80:6 86:11
equal
  98:3 152:14
equals
  107:14
error
  129:9 131:1,
  3
errors
  126:25
  127:6,9
essence
  165:17,21
  176:2
essentially
  138:13
  152:22
establish
  165:24
  178:20
established
  137:17
  146:6,19
  147:1 164:4
  174:22
  178:2,17
estate
  30:9,12
  37:19 38:7
eventually
  166:1
everyone
  31:21 36:5
evidence
  33:3,8,9,10,

12,17,22,24
34:24 35:10
55:12,17
58:14 61:2,
18,22 62:7
63:8 81:5,7,
9 99:14
112:18
116:24
117:13,15
133:12
154:21
155:8,20
162:5
164:11,15,17
165:2 173:21
175:6,22
176:6
exact
  6:7 8:23
  14:4,21
  15:9,25
  17:25 18:7
  22:3 24:8,21
  25:12 63:16,
  20 65:25
  68:3 117:3
  130:2,4
  138:22,24,25
  139:9,13,23
  140:4,8,10
  152:25
  161:13
  162:20
exactly
  13:13 50:22
  67:5 112:24
  150:18
  156:21
examination
  5:1 22:18
  23:7,16
  25:20,21
  65:12
  119:14,17,
  22,23 120:3,
  11 189:11
  192:10

195:18
**examinations**
120:8 144:17
**examine**
118:6 121:15
143:9 158:4
**examined**
120:12,17
139:20
158:18
**examiner**
12:23 25:7
26:2,11
37:3,10
54:23 63:25
65:13 81:5,
23 83:19
97:25 110:24
115:8,25
118:1,4,10,
25 119:3
142:12 143:5
144:13
145:12
**examiners**
32:9
**examining**
30:20 31:2,
11 117:17
143:21
182:17
**examples**
169:6
**Excellent**
110:1
**excerpt**
32:7 34:12
49:19
**excerpted**
49:25
**excess**
111:15
**exchanged**
28:6
**exclusive**
6:25

**exclusively**
188:19
**exclusivity**
114:4 167:4
**excuse**
18:11 21:7
23:19 28:15
36:3 73:12
78:13 82:12
83:4 84:8
152:10
184:15 187:6
**exercise**
115:9
**exercising**
34:12
**exhibit**
10:11 11:8,
12,17,24
12:17 31:23
32:1 34:12
36:3,6,13,23
39:8 41:22
45:5,10
47:5,8
66:12,17,23
67:7 77:23
78:1 84:2
90:8,9,14
94:21 101:2,
8 109:21
118:24 119:5
133:5
147:17,21
170:7,15,18
**exhibits**
10:16 12:6
**exist**
22:17 54:16
62:12
**existed**
56:15,18
**existence**
37:25 57:6
61:2 83:10,
17 100:16
**existing**
146:7

**expand**
22:22
**expanding**
22:25
**expect**
50:25 86:24
94:9,12
**expense**
117:6
**expenses**
87:21 88:12,
20 89:2,10,
11,14,16
107:14
110:15,18
113:6,9
115:3,10,14
149:16
152:17
159:15
**experience**
23:9 25:4,22
64:8,9
74:13,14
94:8 110:23
177:10
**expert**
12:21 13:20
16:20 19:19,
24 22:10
23:17 27:7
45:5,8 63:9
121:3 141:10
142:25
**explain**
10:25 49:9
78:21 95:16
117:4
**explained**
152:21
**explanation**
51:17 72:5
144:24
145:20
152:22
**explanations**
145:24,25

**extended**
99:7 125:5
**extends**
124:23
**extent**
45:15
**eyes**
59:2

_____

**F**
_____

**face**
34:22 35:8
**fact**
33:10 65:2
82:6 98:1
117:5 124:13
128:9 140:6
141:19,21
142:8 143:22
144:1 152:13
162:17 163:3
172:4 188:19
**factor**
153:11
**factors**
107:3
**facts**
142:9
**failing**
70:21
**failure**
70:23 71:2
76:4
**fair**
20:11 26:9
87:20 109:2
**familiar**
10:12 32:21,
22 66:25
67:2,7,8
88:11 95:3
182:10
**far**
29:24 30:5
140:20,24

**federal**
  91:3
**feel**
  32:5,6,9
  143:3
**fees**
  29:19
**fewer**
  18:8,12
**fields**
  25:22
**fifth**
  68:13
**file**
  11:17 75:5
  148:4
**files**
  16:13
**filing**
  42:2
**final**
  186:2
**financial**
  23:25 27:8
  30:21 94:10
  163:15 188:7
**financing**
  97:6
**find**
  72:25 76:13
  104:15
  115:25
  141:19 147:4
**finding**
  104:10
**findings**
  33:23 126:1,
  8
**fine**
  12:13 13:3
  16:1 23:1
  44:19 72:4
  82:22 149:13
**finish**
  73:14,20
  100:22

**finished**
  152:11
**firm**
  6:12 7:11,
  13,15,18
  8:13,18,21,
  25 9:16
  122:14,21,24
  123:9
**first**
  10:11 12:24
  23:14 35:18
  46:2 47:18
  79:10 87:8
  147:15 169:7
  172:24
**firsthand**
  62:25
**fiscal**
  91:17,19
  93:11 170:11
  171:3
**five**
  8:14 13:16
  14:7,8
  15:15,17
  17:11,17
  25:16 26:25
  28:14 44:20
  46:1 100:20
  186:1
**five-minute**
  44:16
**fix**
  129:4
**flipped**
  120:21
**floated**
  160:22
**flowed**
  46:5
**focus**
  12:23
**folder**
  11:2,4
**follow**
  49:14

**followed**
  46:20
**following**
  48:10,13,15
  67:12 149:19
  188:4
**follows**
  49:17 172:23
**footnoted**
  48:19 50:24
**footnotes**
  58:3
**foregoing**
  50:15,18
  190:24
**forensic**
  6:15,17 7:2,
  5 12:24,25
  13:1,4,9,11
  88:3,14
  182:15
  189:12
  192:10
**forensics**
  23:25
**forgo**
  18:22
**form**
  46:9,17
  51:2,3 78:7,
  14 91:22
  93:12 142:5
  171:1,3,14
  175:23
**formed**
  112:16
**forming**
  78:19
**forth**
  46:1,15
**forward**
  121:23
**found**
  150:22 164:5
  192:21
**four**
  6:8 16:19

**17:4,8,10
  23:13 172:15
  189:25
**frame**
  189:1
**Frank**
  127:14
**fraud**
  25:7 26:2,11
  32:8 54:23
  63:24 65:6,
  13 81:4,22
  83:19 97:25
  110:24
  115:8,25
  143:4 144:8,
  12,13,19
  145:11
  161:10,18,22
**fraudulent**
  38:2,19 39:2
  44:6,9,13
**free**
  32:5,6,9
**freight**
  90:3
**frequently**
  26:10
**front**
  23:11
**FTX**
  85:21
**full**
  12:14 135:1
**fund**
  169:6
**funds**
  39:10 41:4
  71:23 72:11,
  15,23 74:11
  75:17 76:9,
  20 111:15
  127:17,20
  128:12
  165:11,24
  166:8 167:10
  172:11,18,23

173:12
**future**
  11:5 163:1

---

**G**

---

**Gary**
  3:3 6:13
  10:3 11:9
  45:14 119:10
**gave**
  6:2 16:24
  17:13 18:9,
  13 156:23
  185:8,17
**general**
  20:2 51:7,
  12,14,20
  53:3,9,20
  54:14,17
  55:25 58:18
  60:9 63:18
  64:17,22
  67:24 69:18,
  24 80:5
  98:13,15,18,
  20,22 99:12,
  21 100:3,7
  120:13
  151:10
  153:23
  154:2,6,23
  156:1 161:4
  162:6,8
**Getaways**
  171:23
**getting**
  134:6 157:4
  168:11 177:4
  192:25
**gift**
  184:5 185:9
**give**
  4:19 5:11
  10:25 13:14
  14:9 35:1
  43:8 191:11

**given**
  18:1,19
  56:14 70:20
**giving**
  43:4
**goes**
  51:6 57:10
  111:24
  144:20 166:6
**going**
  10:11,24
  11:24 22:23
  44:22 45:21
  58:22 61:11
  71:21 72:9,
  21 104:7,8,
  22 109:7
  121:22
  126:24
  127:11 147:6
  157:8 185:24
  186:7 195:11
**good**
  3:20 5:3
  92:9 152:11
**goods**
  46:4 56:22,
  25 60:13,20
  61:10,14,22
  94:25 95:5
  105:13
  106:20
  113:20,23
  116:5 124:25
  135:6,13,20
  136:15
  137:13,22
  138:3,5
  139:24
  149:22
  160:22
  168:15,25
**goodwill**
  192:3
**government**
  77:17 78:24
**great**
  9:15 27:6

101:14
**greater**
  138:4
**guess**
  40:16 92:6
  107:11 121:1
**guidance**
  24:2 33:6
  34:13,20
  81:5 115:20
  193:13
**guided**
  194:5
**guiding**
  193:7

---

**H**

---

**hand**
  4:17 11:24
  30:10
**handing**
  45:14 78:6
  119:9
**happen**
  102:9 165:1
  177:16
  179:16
**happened**
  159:20
  164:12 185:9
**happening**
  37:5 96:22
**hard**
  45:13,24
  107:10 145:9
**harder**
  107:10
**heading**
  129:22
**hear**
  130:9 187:20
**heard**
  5:4 144:25
**hearing**
  18:2

**held**
  98:12 169:9
**help**
  43:8
**helped**
  146:15
**helpful**
  29:23
**hide**
  145:9
**high**
  89:2
**highlighted**
  127:10
**highly**
  172:16
**hiring**
  124:14
**history**
  9:9 75:19
**Hmm**
  36:19
**hold**
  10:21 147:24
**hold-back**
  155:17 156:4
  157:23
**holding**
  105:12 106:3
  107:2 155:23
**holds**
  134:16 194:5
**home**
  64:6 110:19
  194:9,11
**hope**
  11:18
**hour**
  22:2 29:1,4
  185:22
**hourly**
  28:25
**house**
  89:15 120:15
  124:19,20
  125:1,10

**Hufnagel**
4:13 10:15,
21 11:14,19,
22 12:8
19:1,5,13,14
21:20 22:19,
24 31:5 32:4
42:23 43:13
45:12 47:3,
9,12 53:2
59:6,12
66:22 67:4
71:17,25
72:6 73:8,19
78:5 90:17
91:24 92:4,
22 93:2
100:19,24
101:16,20
104:9,18
114:12
119:8,21
121:25 133:9
147:24 148:3
149:9,12
160:10
170:8,21
174:6 181:5
186:4 195:3,
9,13
**hundred**
14:10 88:1,
14 92:18,25
93:9,14
138:20
177:22
181:15
**hundreds**
88:16,17
**hypothetical**
132:12,16

**I**

**idea**
188:16
**identifiable**
110:15,17

**identificatio
n**
11:12 32:2
36:13 45:10
66:17 78:1
90:15 101:9
119:6 147:22
170:19
**identified**
163:25
**identifies**
189:25
**identify**
47:4 91:6
**ii**
178:24
**iii**
173:7 182:6
**ill**
83:8
**illogical**
34:21 35:8
**illuminating**
136:14
**immediate**
163:1 164:14
**immediately**
144:20 153:2
**impact**
172:6
**impacts**
122:12
**important**
144:1,18
**impossible**
145:10
**improvement**
127:4
**inception**
63:14
**include**
35:16 46:12
58:24 59:23,
24 62:23
100:12
159:21

**included**
44:10 46:16
47:23 71:20
87:16 116:25
148:15
**inclusive**
167:21,24
**income**
78:8 87:22
107:14
139:22
183:22
**incomplete**
124:6
**incompletely**
124:11
**inconsistent**
126:3
**incorrect**
44:3 49:6
50:3,11,16
124:5 126:5,
15,21 127:22
128:14,17,19
149:6,18
165:14
**incorrectly**
124:10
**Incorvaia**
122:15,17
**increase**
60:10 75:14
76:6 80:21
81:1 152:9,
12 192:2
**increased**
76:20
**incur**
114:25
**incurred**
29:19 88:12
127:20
**indicate**
4:8 86:13
105:17
151:12
162:12

**indicated**
56:22 155:16
**indicates**
105:18
**indication**
151:4
**indicator**
71:4
**indicia**
65:5 144:8,
12
**individual**
130:21
**individuals**
3:11
**industry**
22:16 23:5,
10
**information**
30:11 41:12
43:8 44:2
48:1 50:15,
18 54:11
55:7,11
56:17,21
57:15 58:4
62:17,18
71:19 74:21
83:22,24
92:15 99:20
114:10,17,
21,24 118:7,
20 124:4
126:3,11,19
148:18,19
150:19 151:6
153:12,13
158:15
159:22,25
173:17,22
176:7 177:18
187:2,14
**initiated**
123:9
**insolvency**
26:15,21
**instant**

74:8

**instructions**
150:11

**insufficient**
75:16 76:19
127:17,19

**intention**
106:13

**intentionally**
52:10,18

**interest**
40:15,17
90:3 98:2,24
99:1,5
136:19
152:12

**interested**
81:23 103:2

**interpret**
102:21

**interpretation**
103:9,23
105:24

**interrupted**
23:22

**intra-year**
81:18

**introduction**
22:6 27:3

**inured**
194:4

**inventory**
50:9,20
51:2,8
52:11,24
54:4,20,25
56:4,10,13,
18 57:6
58:10 59:4,
20 62:7
64:2,13,24
65:5,10
71:12 79:20,
23 80:1,4,7,
12,20,23,25
81:18,20,25

82:2,4,5,7
83:11,17
97:16,17
110:20
111:16,22
112:1,4,9,
17,22 113:1
133:13,16
134:1,15,21
137:18 154:6
155:9

**invest**
182:2

**investigate**
143:7 145:18
159:21

**investigating**
118:9

**investigation**
26:5 41:3
117:22
118:8,21
141:24
142:1,15
144:5 163:14

**investing**
111:15,22,23

**Investments**
121:9

**invoice**
136:4

**invoices**
56:6,14
65:24 66:8,
10 93:24

**involve**
25:25 107:5

**involved**
10:5 120:7
161:15

**Island**
8:18

**issue**
33:11 71:22
72:10 73:5
75:20 111:9
115:23

129:13 165:2
166:15

**issued**
74:5,8 76:14
127:16,18,21
128:2

**issues**
26:22 30:21
50:6 111:12
144:15
158:11
194:19

**issuing**
73:1

**italics**
48:16,17
134:10

**item**
47:18 79:1
91:10 120:22

**item-by-item**
46:17

**items**
86:14 120:3
150:25
194:21

**iv**
133:11

---

### J

**J&r**
66:14

**Jersey**
40:9 46:3
48:7 49:5,7
50:1,3,25
51:7,10,18
53:18 56:19,
22 59:19
63:2,12
72:9,20,22
77:15 80:22
81:16,24
82:10,14
83:1 93:23

94:24 95:6,
12,21 96:6,
11,16 97:3,
11,24 98:7
99:8,16
100:4,14
102:6,18
104:24
110:3,4,7,
11,16 114:5
115:4,11
117:5
133:11,14
134:5,7
137:11
138:3,10,15
139:2,3
140:19
141:1,7,18
143:10
151:20
152:23
154:17
155:18,22
156:3,19
158:20,25
159:6,10,14
160:3,15
162:17
165:11 166:3
171:25
172:5,15
182:9

**jeweler**
182:9

**jewelry**
182:11,16
183:6,10,15,
21 184:5,19
185:17
186:14
187:11
190:24

**job**
192:23

**John**
4:11 12:11
104:10

**joint**
  167:21  169:8
  171:20
**Jose**
  3:12
**journal**
  75:4
**judge**
  66:13,16
  68:24,25
  69:11  118:13
**judge's**
  118:12
**judgment**
  193:5
**July**
  188:5
**June**
  169:8  171:20
**juxtaposition**
  166:10

---

**K**

**K1**
  79:10,13
**keep**
  64:23  74:21
  86:4  103:11
  158:17
**kept**
  52:11  55:22
  58:15  154:23
**kind**
  22:17  23:7
  24:23  46:16
  53:6  54:2
  72:1  121:14
  156:16
  193:20
**Klinger**
  122:11,21,
  22,24  123:9
**Klinger's**
  122:10
**know**
  17:7  24:1

26:7  39:17,
18  40:2,14
51:17  52:7
57:24,25
58:11  63:4
67:21  71:6,
23  72:10,14,
22,24  74:8,
10  77:9
78:12,15
82:19  85:23
86:6  88:7,
23,24  89:23
90:5  94:4
97:1  100:2
101:12
106:11,13
107:8  108:9
111:22
112:11,13
113:25  114:6
115:21
116:15  132:8
135:22,23
136:24
139:11,12
140:10,21,
22,24  144:3,
11  145:3
150:23
153:4,9
156:10,25
157:1  158:5,
21,23  163:7,
19,20  164:2
165:4,7
168:8  174:8
175:2,5,8,9,
10  176:5,11
177:17  178:8
179:22
181:10
183:3,6
185:9  186:25
190:17  192:6
**knowing**
  80:14  161:21
**knowledge**

23:8  63:1
**known**
  124:25

---

**L**

**Lake**
  190:8
**Lampert**
  3:3  4:16  5:3
  6:13  10:4,
  14,18  11:9,
  11  12:16
  18:19  22:4
  36:12  45:18
  47:8  60:14
  64:15  66:20
  67:6  101:25
  109:15
  119:11
  147:13
  153:16  171:2
**Lampert's**
  149:10
**laptop**
  64:7
**large**
  184:5
**Lasko**
  171:23
**laundering**
  145:1,4,7,13
**law**
  5:12
**lawsuit**
  10:3,8
**leads**
  54:10
**learn**
  40:8,11,19
**lease**
  128:22,24
  129:11,18,
  24,25  130:6,
  9,12,15,19,
  23  132:13

**leased**
  129:1  130:21
**leases**
  120:15
**ledger**
  51:11,12,14,
  20  53:20
  54:14,18
  55:25  58:18,
  24  60:9
  63:18  64:17,
  23  73:18,23
  74:1,3  75:5
  76:5,13,21,
  25  80:5,12
  98:13,15,19,
  20,21,23
  99:12,21
  100:4,8
  128:2  151:10
  153:23
  154:2,6,24
  156:1  161:4
  162:6,9
**ledgers**
  20:2  51:7
  75:12  120:13
**left**
  52:18  103:22
  105:18  133:5
  160:4
**legal**
  3:13,15  90:3
  144:10
**legitimate**
  131:24
  132:4,8,20
**Leonov**
  21:20
**lessor**
  129:7
**letter**
  66:13,15
  69:6  119:1,
  25  127:12,13
**Lexus**
  173:1,16
  174:4

175:14,18,
21,24 176:4
188:16
**liabilities**
54:16 84:13,
15,23 85:18,
19 86:16,19,
21 87:3
107:7
**liability**
50:9,10,12
51:3,8,13
57:2
**lied**
181:1,4
**lieu**
4:2
**likelihood**
139:6
**limited**
158:20
**line**
35:5 67:9
84:24,25
85:3 87:16
102:2,23
103:14
104:22 125:9
148:14
186:12
**lines**
34:19 84:17
**list**
18:18,22
19:2 20:22
23:11 35:17
68:7,14
172:24
**listed**
20:16 84:7,
9,23 85:16
87:10 89:10
93:8 119:17
169:5,6
**lists**
85:17 106:8
171:9 190:9

**literally**
113:9
**litigation**
31:17
**little**
22:22 42:18
58:22 111:7
178:24 182:6
**lived**
194:11
**living**
194:12,14
**LLC**
3:10 5:5
22:11
**load**
147:14
**loan**
175:3,9
179:20
181:24 182:1
184:9,12,17,
23,25 185:1,
3,4,6,12
**loans**
41:23 42:3,
16,17 84:13,
24
**located**
9:18 182:9
**login**
150:16
**long**
6:23 8:1,18
21:25 92:8
150:16
**longer**
93:25 94:5
166:18,25
168:4
**look**
12:8,10 20:9
32:6,9,23
41:21 45:23
73:10 74:16
75:10 76:11
77:15 79:9

90:19 91:21
104:16
107:23
109:21
144:14
148:11 157:8
170:6 178:23
182:5 191:5
**looked**
20:23,24
21:4 108:11
115:23
119:25 140:1
157:5,10
164:7 169:19
181:12
**looking**
12:7 14:21
36:17 37:23
43:9 50:14
58:25 91:25
148:5,7
**looks**
67:8 105:23
121:20 122:4
123:3 147:17
170:22
**losing**
103:11
**loss**
153:8,20
**lot**
59:7 75:7,8
111:12
**low**
134:16 135:3
**lunch**
100:23 109:9
**lying**
35:16
**Lyons**
182:8

────────────

**M**

────────────

**made**
36:19 38:25

41:5,10
42:22 44:7,
10,14 55:8,
10 60:23
61:11,12
98:7 99:16
100:15
102:10
104:23 105:2
127:8 132:1,
9 133:6
134:15 140:5
149:15 172:7
175:10,11
177:6 190:7
192:9,17
**Magliery**
4:11,25 5:2
11:16,20
12:12 18:16
19:4,7 45:2
47:7,11
53:11 59:9
67:1 72:3
92:1 100:21
101:17
109:13,14
147:3,12
148:1 149:10
170:25
185:23
195:6,15
**magnitude**
14:10 64:3
138:19
**maintain**
9:16 49:10
51:11,18
64:10 65:21
73:17,23
74:21 75:12
76:5 79:25
80:2,11
**maintained**
50:12 51:25
52:2,5 54:15
56:1 58:21
62:8 65:17

82:5 94:13
98:19 153:23
154:2 163:22

**maintaining**
64:18 75:3
81:18 128:2

**maintains**
49:7 79:19

**majority**
14:23 30:15

**make**
33:10 41:15
42:11,20
47:6,14
53:17 70:2,
13 72:21
80:6 81:15
98:1 105:5
121:14
124:15 127:5
129:18 137:6
145:9,25
150:15,20
162:17 163:2
175:16
177:2,3,19
179:14
181:25
185:24

**makes**
186:5

**making**
12:21 59:5
97:17 130:22

**Manhattan**
8:21

**manner**
4:7

**March**
121:20
122:17,20,25
123:8 178:24
179:1 182:7

**margins**
134:16 135:4

**Marine**
36:9

**marital**
192:2

**mark**
10:11 27:21,
24,25 28:6

**marked**
11:11 31:22,
25 36:5,12
45:4,9
66:12,16
77:22,25
90:9,13
101:1,7
118:23 119:4
147:16,20
170:14,17

**Master's**
9:13

**material**
152:19

**materially**
139:1

**matter**
3:9 10:14
13:5 22:8,11
26:8 31:18
40:3,4 43:24
65:15 121:4
194:1

**Maywood**
36:18,24

**Mckinney**
8:4

**mean**
7:6 62:11,13
67:15,23
83:16 95:17
99:1 102:5
106:13,15
111:23
130:19
134:24
135:22 136:2
152:3 164:8
173:20,21
183:11
192:24
193:17

**meaning**
55:18 191:8

**means**
31:1,10
37:10 49:10
72:15 90:6
103:17
106:11
111:14
130:20
135:24
181:18

**meet**
21:5,8
132:25

**meetings**
132:25

**member**
34:2,4 81:9

**memory**
5:19

**mention**
130:14
166:13

**mentioned**
20:13 21:2
130:15 142:4

**mentioning**
170:11

**merchandise**
97:6 99:19
100:5 149:25
151:3,11
162:24 163:2

**mere**
82:6 144:7

**Merrick**
9:20

**methodology**
80:19

**methods**
30:20 31:1,
11

**middle**
24:14 25:15
33:9 35:6
50:23

**million**
63:13 96:6
133:12
137:12,14
138:20

**millions**
63:22

**mind**
49:22 106:11
158:17
191:13

**minimum**
70:6,10,17

**minute**
109:5 147:4,
14

**minutes**
100:20 148:6
186:1

**misconduct**
68:16,19
69:2,16,22
70:14
118:15,18
120:5,9
141:25 142:4

**misread**
180:14

**missing**
52:5,8

**mistake**
36:20

**Mm-hmm**
10:7 166:9

**Monday**
3:6

**money**
73:6 95:14
96:12,17
104:23
105:2,5,12,
19 106:4,21
107:2,6,7,
17,19,22
108:1,4,9,
21,22,24
112:1 116:16

128:8 135:1
136:17
138:13,17
140:7,8,11
144:19
145:1,3,7,9,
13 152:17,25
155:23
157:12,19,22
158:1,5
166:5 174:20
177:21
179:18
184:6,18,20
187:19,24
191:9,11
193:8
**money's**
128:9
**monies**
151:13
186:18
**month**
97:23
**monthly**
121:23 122:7
123:10
126:10,18,
20,25 128:24
**months**
8:19 171:25
172:16
**Moore**
182:8
**morning**
3:20 5:3
**Morris**
4:14
**mortgage**
84:11,14
190:6,19
**motivation**
35:17
**motive**
35:14 115:18
**multiple**
75:15 76:7,

16,18

_____

_____

**N**

**name**
3:11 4:9
6:12 8:3
27:20,21,22
**named**
92:12 93:11
**Nassau**
9:22,24
**nature**
42:5 189:3
**necessarily**
31:14 68:22
70:15 75:18
76:1,10,22
81:21 86:9
108:7 131:2
135:8 153:3
163:18
167:12
177:1,17
192:1 193:17
**necessary**
22:14 31:19
44:2 75:12
80:11 110:6
112:3,5,7
118:19
123:17 131:5
150:14
159:22
**need**
19:15 45:15
67:21 69:21
70:1,7 72:5
76:25
110:11,20
111:25
126:13
129:17
**needed**
12:2 69:13
131:9 178:19

**never**
27:25 65:8
71:11 98:11
104:23
151:18
153:21
154:19
168:14
**no-show**
192:23
**non-bankruptcy**
13:1,8,11
**non-owners**
174:21
**Nora**
8:4
**nos**
114:14
**note**
71:7,9 110:4
128:20
136:11
**noted**
71:3,5 170:1
**notes**
84:11,14
169:12
**notice**
58:2
**November**
91:18,20
104:24 105:5
171:6
**number**
11:15 13:15
14:5,21
15:10 17:25
18:7,8,12
24:20 27:13
28:18 41:23
45:24 50:24
82:6 91:8
126:2,9
142:20
178:24
188:23

**numbering**
11:7
**numbers**
80:25
**numerous**
127:18
**NYS**
85:21

_____

**O**

**oath**
4:2 5:10
109:17
**Objection**
73:8,19
160:10 174:6
181:5
**objections**
4:7
**obligation**
143:4
**obtain**
24:23 113:1
146:16
149:21
**obtained**
24:20 25:9
32:19 95:13,
17
**obtaining**
32:11
**occasion**
87:25
**occasions**
7:8
**occur**
85:6
**occurred**
85:12 144:19
171:24
**October**
3:6 188:5
**offer**
113:2
**office**
9:19 110:20

113:7 149:17
160:6

**officer**
92:12 178:7

**officers**
41:24 91:23
92:5,6,10

**offices**
9:16

**official**
12:4

**okay**
6:9 9:3,15
12:18 13:2,
10 15:24
16:10,16
18:15 21:5,
12 24:1,22
25:5 26:9
28:19 30:8,
13 32:15
33:15 36:4
37:9,22
39:20 40:6,
11 41:1,15
42:8 43:10
45:12 46:23
48:3,4,20
49:4,21
50:14,22
51:15 52:3,
21 54:1,9
56:10 57:17
58:2 61:6
62:1 63:24
66:23 67:9,
20 72:16,20
73:17 74:25
75:23 77:3,
11 79:24
80:21 82:9
84:16,21
85:9 89:7
91:12,21
93:5 99:11
100:1 101:14
102:8,16,20,
25 104:21

106:5 107:16
108:4 109:2
110:1 111:25
113:18 114:9
117:25
121:16 122:2
125:2 126:23
127:15 131:8
133:22
135:18
136:7,14,23
137:20
143:20
145:23
146:18 148:9
151:15 152:8
153:6 155:7
156:2 157:18
161:9 162:14
163:7 168:21
170:13
171:8,16
172:13,20
173:6,24
175:12
180:13 181:1
182:5 185:8
187:3 191:3
194:24

**Once**
21:14

**one**
5:4,11 6:4
7:21 9:19
10:21 12:4,
5,9,13 15:20
16:3 22:24
23:4,14
25:18,19
35:1,18
36:2,21
38:15 45:19
46:2 47:14
62:14 65:17,
19 66:22
83:4,10,14
84:12,14
90:21 91:2

93:18,24
94:15 104:13
105:25 106:8
119:25 120:3
121:4,7,17
122:13
134:3,4
142:1 145:16
147:25
150:8,9
152:24
158:18,19
160:13
163:21 165:4
166:7 168:4
169:7 171:22
172:24
177:15
178:23
180:18
181:19,21
182:6 183:19
184:20
189:21
193:9,16

**one-person**
64:5

**one-year**
43:1

**ones**
20:16

**online**
74:17 75:11
76:11,23
177:19

**open**
10:20,23
32:4 45:17
119:9 149:21
159:13
170:9,22

**opened**
146:14

**opening**
79:23

**operate**
48:7 89:15

**operated**
46:2 50:3
57:19 89:20
153:25
160:20

**operating**
53:19 74:24
77:18 81:17
88:2,5,8
126:10,18,20
153:8,17,20,
22

**operation**
49:5 50:2
64:6

**operations**
172:1,5,15

**opine**
71:8 89:8

**opinion**
34:16 44:4
46:9,13,22
47:21,25
48:5 49:3
70:21 75:2
78:19 96:5,
23 106:17
110:10
112:17 142:6
165:10,18
176:2 194:5

**opinions**
22:12 44:2
45:25 46:1
57:11

**opposed**
14:17 99:18
112:2 193:25

**opposite**
48:6

**option**
11:1

**order**
14:9 36:11
37:2 41:25
83:11 105:14
112:1 118:12
122:25

**ordered**
113:14
**orders**
113:14
118:13
**ordinary**
183:2,7
192:7
**originated**
172:19
**Ostran**
20:2 27:11
169:9,14
173:15
174:24
175:13,18
178:5 190:9
**outline**
46:20
**outside**
154:6
**outstanding**
74:19 75:20
76:24 77:1,
6,9
**overflow**
89:22,25
90:2,6
**overly**
19:9
**owe**
109:1
139:17,24
156:24
157:13
**owed**
105:13
106:20
107:20
108:23,25
125:20 135:6
140:4,7,9,
11,14,19,25
153:1,4
156:12,20,22
157:19
158:5,9

186:19
187:18,23
**owes**
107:7 157:21
**owned**
65:16 70:22
190:17
**owner**
7:14 79:12,
14 89:19
150:20
166:19,25
169:22 170:1
171:10,15,18
173:25
174:11,16
177:23 178:7
179:15
180:22,25
181:9,15
182:2
183:17,20
190:4,15
191:21 192:4
194:10
**owner's**
191:20 193:4
**owners**
150:11 168:4
181:19,21
186:22
189:18
190:10
**ownership**
40:15,17
**owning**
92:16 93:8
180:23
**owns**
92:17 93:13

_____

_____

**P**

_____

**p.m.**
109:7,12
147:6,11
186:7,11

195:11,17
**Pace**
9:13
**packaged**
116:4
**packaging**
113:23
**page**
16:18 22:6
23:11 27:3
28:21 32:24
33:17 34:11
37:13,23
45:22,24
47:1,9,13,
18,21,23
48:1,5 50:23
71:14,17
78:25 79:3
87:8 91:8,9,
10,25 92:2,
9,15,21,23
94:22
101:15,18,23
102:1 103:3,
7,11,24,25
104:4,6,8,
10,13,19
107:24
109:22,23
119:11,12,
13,18
120:20,24
121:17,18,25
122:8,13
123:18
124:18 126:1
127:11
128:20
133:7,10
148:4,7,8,14
149:7 165:8,
9 171:11,12
173:3 182:6
188:3
**pages**
28:22,23
48:22 89:24

**paid**
51:24 56:24
95:13,18,22
96:6,7
97:11,12,24
99:17,24
100:10,12
106:6 107:18
108:15,21
112:9,17
117:10
128:25
138:14
139:3,13
140:14
149:16
152:18 153:1
155:17 163:4
175:6 180:11
184:19
192:25 193:8
**paper**
12:13 28:23
47:1 94:22
109:23
119:11 133:7
148:8 149:7,
12
**paragraph**
33:9,16 35:6
48:25 49:17,
19,20 50:1,
15,23 71:10,
15,16 94:22
109:20,23
124:3 126:23
133:6 146:1
149:7 160:2
165:16 169:4
173:4
**paragraphs**
48:10,13,15
**paraphrasing**
22:8
**paraprofessio
nal**
7:25

paraprofessio
nal's
  29:3
pardon
  37:9 41:5
  69:20 84:19
  134:6
Park
  179:1,5,9
part
  47:22 52:20
  69:5 70:23
  72:17,18,19
  114:1 116:20
  117:9 131:9
  148:11
  154:11 156:6
  166:19
participating
  3:21
particular
  11:23 26:8
  49:3 51:5,10
  65:15 67:24
  140:15
  157:16,17
  163:23
  165:19 170:3
  186:24
parties
  4:5 140:13
  145:8
parts
  25:15 54:2
  55:12 62:23
party
  10:2 13:20
  14:17 146:7,
  20
password
  150:17
past
  5:9 6:19
  15:22 23:9
  75:22 152:4,
  6,7 186:19,
  25

Pastor
  3:15
Pause
  83:5
pay
  60:12 76:9
  96:12,18
  105:13
  106:2,19
  107:2 112:2,
  21 113:3
  114:6 115:15
  128:12
  131:6,11
  132:21
  134:18
  135:10 136:4
  138:9
  139:15,16
  194:13
payable
  41:24 51:3
  53:24 56:9
  57:1 60:5,8,
  18,19,24
  84:10,11,14
  86:9,12 87:1
  98:23 99:13
  153:13
  156:10
payables
  50:20 52:11,
  15,24 54:4,
  13,20,24
  55:4,14
  56:4,18 57:7
  58:9 59:3,20
  61:2 62:8,12
  64:2,12,16,
  24 65:4,10,
  21 66:4
  71:12 80:23
  84:3,5,23
  86:5,7
  100:10 154:5
  155:9
paying
  97:15 129:11

130:6,11
132:12
135:19
136:18
156:23 177:4
payment
  60:18,22,23,
  24 61:13
  71:22 72:10,
  12,21,23
  97:17 113:3
  128:21
  129:23
  130:18
  135:15 140:6
  144:7 151:7
  155:21
  162:1,12,19
  183:21
  186:17
  193:16
payments
  60:3,4,11
  61:3 62:3
  71:24 120:14
  128:25
  129:18
  130:22 132:9
  134:14
  149:24
  150:3,23
  151:10,19
  152:13 153:5
  162:7,10
  163:16
  164:14 166:3
  188:24
payroll
  86:17
  120:13,14
  149:16 160:6
PDF
  37:13 45:16
  85:15 89:24
  91:22 92:1
  101:16,19
  148:7 171:12

pedantic
  7:6
penalty
  4:4
people
  89:18 137:3
  146:14
percent
  14:22 15:5
  30:17 79:12,
  14 92:18,25
  93:9,14
  169:22 170:1
  171:10,15
  173:25
  177:22
  180:21
  181:15
percentage
  138:1
perfectly
  59:10
perform
  6:14 67:12
  68:7,14
  69:21
performance
  23:6
performed
  6:20 7:8
performing
  35:24 58:13
period
  17:5 19:6
  42:1 56:23
  67:14 92:19
  94:11,13
  136:5 170:5
  181:9,10,13
periods
  94:15
perjury
  4:4
person
  4:3 7:22,24
  34:4 65:17
  174:3

personal
  120:15
  128:21
  129:11,21,24
  130:6,8,9,
  11,12,14,15,
  18 131:11
  172:7 177:25
  185:19
  190:14,22,23
  191:6,8,13,
  15,19 194:9
personally
  10:3,5 46:6
  47:19 102:4
  113:12 116:3
  165:10
  169:14 190:5
persons
  92:16
petition
  42:2 67:13
phone
  21:11 28:14
physical
  80:17
physically
  3:23
pick
  11:1 130:17
pickup
  129:17
piece
  54:9 59:1
  151:6 155:20
  162:5 185:17
pizza
  66:14 67:25
  69:19,23
  118:25 119:4
  142:10,11
place
  4:3 10:16
  21:23 179:1,
  5,9
plaintiff
  3:5 4:12

  161:16
Plaintiff's
  11:8,11,16
  31:22 32:1
  36:6,12,23
  41:22 45:4,9
  47:7 66:12,
  16 67:6
  77:22,25
  84:2 90:9,14
  94:21 101:2,
  8 109:21
  118:23 119:5
  133:4
  147:17,21
  170:7,15,18
plan
  178:12
please
  3:16 4:8,17
  22:21 28:11
  29:21 31:7
  32:16 35:3
  42:9,10
  44:16 47:16
  49:23 53:6
  59:6,13
  72:1,8
  73:14,22
  81:3 88:10
  93:6 97:7
  104:5 120:20
  154:16
  187:21
point
  48:11 123:19
  155:11
  156:14
  193:13
pointing
  106:18
points
  35:18
pondering
  53:7
position
  118:3 173:10

possibilities
  156:22
  164:25
possibility
  13:6,25
  34:15 76:6,
  18 156:3,17
  157:2 190:19
possible
  38:23 44:15
  52:21,25
  53:4,16
  79:24 86:3
  116:19
  117:8,12,14,
  16 130:21
  138:6,8
  144:22
  154:25
  155:18
  163:23
  165:18
  186:16
  190:16,17
  192:3
possibly
  143:8 145:13
  192:1
post
  9:14 67:13
postgraduate
  9:11
potential
  35:14 65:6
  115:18
  190:14 193:4
practice
  75:1 83:19
  123:14
practices
  75:1
prefer
  83:9,13,20
preferential
  41:16,20
  42:5,13,21,
  24 43:3,17,
  20

prenuptial
  193:20
prepare
  19:21 20:5,
  6,25 21:9
  22:11 29:9
  44:1 58:1
  121:22
  123:10
  126:25
prepared
  20:8,10
  47:24 121:19
  122:3,6
  123:8 143:19
preparing
  123:13,15
prerequisite
  180:22
present
  3:23
presented
  40:1 75:15
  76:7,17,19
presume
  150:2
presumes
  149:23
prevalent
  75:21
previously
  40:21 119:1
  194:22
price
  99:18 137:19
  138:4
primarily
  7:4,7
principal
  40:8,12,15,
  16,22 41:4,
  10 97:5
  130:1
principal's
  192:18
principals
  39:9,18

**principle**
  193:8
**printed**
  11:25 123:24
**prior**
  6:24 8:17,
  19,24 16:12
  42:1 65:2
  92:23 168:17
  177:6 181:22
  193:15
**probably**
  5:25 14:12
  15:5,17
  25:16 26:25
  28:7,14 55:1
  72:2 91:3
  151:2 157:24
  163:12
  182:22 194:7
**problematic**
  130:5 131:11
**procedure**
  123:10
**proceeding**
  5:6 10:6
  161:15,16
**proceedings**
  3:17
**proceeds**
  46:4 98:14,
  16 160:21
**produced**
  20:3 56:15
  159:3
**producing**
  105:14
**production**
  18:17
**products**
  89:6 161:7
  162:13,15
**PROF**
  85:25
**professional**
  15:19 25:24
  31:25 32:8

  33:25 81:8
  83:18 90:4
  163:11
  178:20
  193:12
**professionall
y**
  8:16
**profit**
  98:7 99:16
  100:5,15
  103:20,21
  107:9,13,15
  134:16 135:3
  137:6,7
  168:11,19
  176:24
**profit-
motivated**
  137:8
**profitability**
  156:3,13
  158:13,23
**profitable**
  158:1,7
**profits**
  98:10 102:9,
  12,17 103:4,
  13,16,18
  104:2,3
  105:10,18
  106:1,6,22,
  24,25 107:5
  108:5 183:19
**proper**
  89:3
**properly**
  63:9 125:9,
  16
**properties**
  189:25 190:4
**property**
  190:15,18
**proportion**
  14:16 25:23
**propose**
  67:12

**proposed**
  68:14
**proprietary**
  89:9
**provide**
  13:7,20 14:3
  47:21
  122:19,22
  148:20 181:8
  194:13
**provided**
  15:1 26:20
  55:12 60:20
  61:11,15
  115:20
  122:15
  148:13
  149:1,20
  150:19 159:2
  168:15
  177:18 189:2
**provides**
  26:21
**providing**
  13:7,25
**prudent**
  54:23 75:1
**public**
  9:7
**purchase**
  50:9 65:24
  86:10 93:24
  95:5 99:9
  124:25
  133:14,16,25
  134:20 158:4
  175:10
  182:16
  183:8,9
  186:13
  189:25
**purchased**
  94:25 179:9
  184:5 185:16
  187:11
**purchases**
  51:22 55:2,
  10 60:11

  66:8 100:11
  133:13
  134:15 161:6
  162:13
**purely**
  193:24
**purported**
  133:13
**purpose**
  118:2 136:24
  137:1,15
  149:25 172:9
  175:24 178:4
**purposes**
  75:2 117:22
  131:17
  132:17,24
  162:23 178:3
**pursuant**
  61:12 97:18
  122:9,25
  134:18
  135:11
  137:24
**put**
  12:5,13
  25:14 31:20
  36:4 57:23
  66:11 77:21
  90:7 100:25
  118:22
  147:13
  170:13
**putting**
  19:11

---

**Q**

**qualifications**
  19:18 23:13
**quantify**
  192:6
**question**
  22:20 23:2,3
  29:21 31:6
  32:16 39:19,

25 42:10
43:14 49:13,
15 51:15
53:4,8,10,14
59:7,11,13,
15 72:1,4,14
73:20 75:23
76:2 77:13
85:10 88:9
93:6 97:9
102:2,5,8
104:23
105:4,9
114:13,14
116:19
119:16
131:14
144:16
148:14
157:17
162:25
168:1,2,23
180:15 181:6
193:16
**questionable**
34:21 35:7
**questioning**
102:23
186:13
**questions**
5:15 16:11
100:22
195:2,6,9
**Quickbooks**
74:22
**quite**
87:2
**quote**
50:22
**quotes**
106:6

___

**R**

___

**R&j**
67:25 69:19,
23 118:25

119:4
**raise**
4:17
**rank**
116:23
164:10
**rate**
28:25 29:4
136:19
**Ray**
173:1 174:4
**read**
53:12,14
59:12,15
73:2 95:8
146:5 157:3
**reader**
71:8
**reading**
49:16
**ready**
90:20 109:3
**realizing**
107:6
**reason**
116:13,17
131:25
132:4,8
159:5 167:9
168:5 183:1
**reasonable**
33:25 34:13
81:7 115:9
161:23
**reasons**
64:11 106:1,
8 132:17,21
149:19 151:7
168:9
**rebut**
22:12 23:17
44:5 45:20
48:5 49:18
143:8,13
**rebuttal**
11:10 35:24
38:23 40:7

44:1 46:12,
19 48:14,24
49:2 58:13
71:10 90:22
159:17
**rebuttals**
46:17
**rebutting**
31:2 34:8
110:2
**recall**
6:2 7:10
13:13,17
14:4 15:9,25
16:4,8 17:19
18:7 19:20
22:3 23:9,18
24:4,8,21
25:9 26:23
27:20,21
28:4,18
44:12 54:21
56:12 62:10
63:16,20
65:7,25 66:9
68:2,3,5
71:1 76:2
78:17,20
100:17
112:24
113:10 114:1
115:6 117:2
120:25
122:10
124:22 130:2
138:6,23,25
142:20
150:17
151:25
152:1,2,5,6
155:15
159:11
161:13
169:24 193:6
**recalls**
151:2
**receipt**
60:9 61:8,

13,20,23
95:13,17
141:19
143:25
**receipts**
52:16 59:25
61:17 62:2
134:8,19
139:23
151:19
152:14
163:15
164:13
165:19
**receivable**
53:22 55:13
56:25 60:1,8
61:7,9,25
86:25 98:17
125:24
153:12
155:25
**receivables**
52:24 54:4,
13,20,25
55:4 56:18
57:7 58:9
59:4,20
61:19 62:8,
11 64:2,12,
17,24 65:4,
11,20 66:4,
10 71:12
80:23 100:8
154:5 155:8
**receive**
82:17 96:12,
16 113:3
135:13,14
137:13 160:7
168:6,10
191:22
193:18
**received**
29:6,11,16
30:5 51:24
59:1 61:14
97:3 99:23

100:4 107:17
114:3,6
115:17
121:21 122:5
133:15
134:20 135:5
139:2
152:17,25
168:18
172:22
173:11
182:12
183:11,14
185:5 187:10
188:14
194:15
**receiving**
136:17 160:9
**recent**
16:18 17:6
24:15 75:18
**recently**
25:15
**recess**
44:23 109:9
147:8 186:8
**recipient**
167:15
184:22
**recite**
155:20
**recited**
150:25
**recites**
57:9
**reciting**
57:4
**recognize**
32:10,18
45:18
**recollection**
125:4 160:12
192:22
**recommend**
117:19

**recommendatio
n**
122:10
**recommended**
124:14
**reconcile**
70:21
**reconciled**
123:24
126:6,16,22
127:7 128:19
**reconciliatio
ns**
121:18,22
122:2,6
123:7,14,15
127:1 128:5
**record**
3:2,18 4:10
19:11 36:22
44:22 45:1
47:4 50:20
52:14 54:14
64:11 66:24
74:4,7 75:9
77:4,8 79:19
80:4,14 86:5
109:4,8,12
147:4,7,11
151:5 154:5
171:9 186:7,
11 187:4,7
195:12
**recorded**
3:3 54:17
84:4 114:21
151:11
159:15
162:8,9
190:6
**recording**
52:10 64:16
123:20
**records**
6:7 13:14
14:5,14
15:10,18
16:5,10

17:3,16,20
24:9 27:9
30:1 31:15
37:25 41:14
43:16,19
51:1 52:4,7
54:19,24
55:1,3,21
56:3,9,10,13
58:9,15
59:19,22
60:6 64:1,
10,23 65:5,
9,19,22
67:12,17,18,
21 68:3,5,9,
11,21 69:4,
15,21 70:1,
8,23 80:1,3
81:18 83:1,3
99:15 108:12
115:5 118:7
126:4 134:1
140:18,25
141:4,6
142:21
143:18 154:9
164:20
183:25
189:16
**reduces**
60:25
**refer**
19:25 27:19
155:14
**referral**
99:5
**referred**
53:13 59:14
**referring**
14:25 20:1
42:24 51:5
52:8 84:6
99:6 151:23
154:14,16
167:18
181:11

**refers**
155:13
**reflect**
51:1,8 60:3
96:20 98:14,
23 99:12
100:8,9,10,
11 172:22
173:11
182:12
190:3,5
**reflected**
50:10 51:14
60:4 63:18
98:11,18
99:20 114:18
155:25
189:15
**reflects**
50:25 53:21
55:7 58:19
60:9 79:13,
22 93:13
171:14 188:4
**refresh**
125:3
**regard**
49:2 55:2,3,
9 69:23
106:14 138:7
142:12 154:3
155:21
156:12
157:16 183:7
186:12
**regarding**
99:15 115:10
**register**
123:20
**reinvested**
102:13
103:18,21
105:8 106:15
**reinvesting**
106:7,10,11
**reinvestment**
103:5

**relate**
  23:6 60:7
  86:16,19
**related**
  25:22 31:17
  39:17 78:16
  115:3 116:1
  127:20
  133:15
  188:12
  189:24
**released**
  158:2
**relevant**
  33:3,8,9
  71:9 94:16
  192:10,21
**reliable**
  33:3,17
  55:17 81:10
**relied**
  71:18 112:7
  127:22
  128:14,17
**rely**
  161:23 162:3
**relying**
  34:24 35:10
  57:14 62:16
  63:7 164:10
**remediation**
  126:14
**remember**
  8:23 15:16
  17:2,11
  20:15 21:22,
  25 25:12
  27:23 63:21
  66:3,5,7
  81:12 120:18
  124:20
  138:22
  146:24
  151:21
  157:10,14
  166:17 167:5
  169:20,25
  179:11

**remissions**
  139:8
**remit**
  135:15
  138:10 160:7
**remitting**
  156:19
  157:11,19
**remote**
  3:2,12,17
**remotely**
  3:25
**removing**
  179:25
**render**
  63:1 144:9
**rendered**
  168:14,24
**rent**
  114:6 134:3
  149:17 160:6
  194:13
**repaid**
  177:5
**repayment**
  180:5
**repayments**
  42:3
**repeat**
  29:20 32:16
  35:4 42:9
  43:14 71:25
  72:3,8 73:22
  81:2 88:9
  97:7,8 104:4
  168:22
  187:21
**repeatedly**
  153:18
**repetitive**
  157:4
**rephrase**
  5:16 29:22
  41:6 49:23
  114:12 168:2
**reply**
  51:9

**report**
  10:12 11:8,
  10 12:6,15,
  17 16:17
  17:5 19:23,
  24 20:6,9,
  20,23 22:5,
  9,12,13
  23:12,17
  27:3,7 28:23
  29:10 31:3,
  11 34:9
  35:25 38:24
  40:7 41:13
  44:1,3,10,
  11,14 45:6,
  8,13,19,22
  46:13,18,19,
  20,24 47:2,
  8,13,17,25
  48:17,22,25
  50:1,21,23,
  24 52:15
  55:7 56:21
  57:3,9,15,24
  58:1,3,14
  62:19,23
  71:20 72:19
  79:25 90:23
  94:20 96:3,9
  109:20,22
  118:24 119:3
  120:19,22
  122:12
  123:18
  125:15
  126:10
  127:10
  130:13 133:4
  134:10
  141:22
  142:25
  143:9,13,18,
  19 146:2
  149:3,6,11
  155:13
  159:18,23
  160:3 165:9
  166:16

  172:21
  173:5,10,15
  182:11
  183:23 188:4
  190:1,3
**reported**
  77:17 86:23
  126:5
**reporter**
  3:14,19,20
  4:16,23
  11:7,13 32:3
  36:14 45:11
  53:15 59:16
  66:18 78:2
  90:16 101:10
  119:7 147:23
  170:20
**reporting**
  3:24 4:8
  78:23 79:7,
  18 86:22
  87:5 91:6,14
  123:6
**reports**
  48:18 121:3
  123:23
  126:18,20
**represent**
  161:20
**representativ
es**
  129:5
**representing**
  38:12
**request**
  19:11 55:3
  83:2 118:19
  182:23
**requesting**
  19:6
**require**
  13:24 26:5
  110:22
**requirement**
  55:16

requires
  65:12
reserve
  98:11 134:17
  155:24
reserves
  110:21
  153:10,11
reside
  9:24
respect
  38:12 39:3,
  14 143:5
respecting
  41:17 42:13,
  15,22
respectively
  188:7
response
  110:6 171:24
  173:14
restate
  19:1 22:19,
  23 31:6,8
  53:5 59:6,10
  66:25 91:24
  93:2 104:10
restructure
  26:16,21
results
  142:15 144:4
retail
  138:3 139:7
retain
  94:7
retained
  12:20 13:6,
  19,22 14:16,
  19 15:6,8,
  11,21 18:23
  22:7,10
  30:19 31:13
  38:16 43:22,
  24,25 55:5
  94:10 111:1
  122:22,24
  141:12,16

142:7 143:6,
  7,21 155:6
retainer
  29:7,12,17
  30:4
retention
  31:3 36:11
  37:7 38:21
  94:16
retentions
  14:15
return
  78:8,18
  79:15,21,22
  80:24 84:17
  85:7,12
  87:8,17 88:2
  90:10,13
  91:3,5,19
  169:20,21,24
  170:3,17,23
  171:4 181:12
  191:23
returned
  127:17,19
  128:10,11
  129:6
returns
  21:4 77:16
  81:19,24
  82:10,14
  84:1,3,4
  88:17 91:4
  181:2,4
revenue
  63:13 100:9
  102:3,6
review
  12:1,2 20:12
  22:9 38:23
  39:6,8 41:9,
  15,23 43:16,
  19,25 58:8
  67:21 78:18
  88:1 133:25
  141:13,17
  143:8,17
  189:7,12,13

192:11
reviewed
  19:23 20:17,
  18 27:7
  31:15 32:15
  41:12 58:6
  59:18,23
  60:7 68:4
  88:16 90:22
  91:1,2,3
  112:19 119:1
reviewing
  34:8 92:22
reviews
  32:13 90:24
ridden
  176:9
right
  4:17 10:10
  16:17 18:10
  19:13 24:11
  27:2 28:21
  29:8 30:14
  31:20 37:11,
  20 38:20
  39:4,21
  43:23 44:7
  46:23 48:6,
  11 54:11
  56:11 57:22
  58:16 60:15
  62:4,14,22
  63:1,5,8
  64:25 68:4,
  9,16,21
  69:8,12,16
  74:6 75:6,7
  76:15 77:21
  78:5 80:1
  85:4 86:5
  87:5 89:6
  90:7,17
  91:15 92:2
  99:19 100:1
  102:3 105:20
  106:5,7,21
  107:5,8
  108:2,6,12,

23 109:17
  112:10
  113:10
  114:11
  116:16,18,23
  117:1,13,14,
  20 119:8
  120:1,9
  124:16
  125:18,24
  126:6,16
  127:1 129:22
  130:7 131:1,
  12 132:1
  133:3,23
  134:1 135:7,
  11,16,21
  138:14 139:4
  142:16,18
  144:8 145:16
  146:9 153:2
  154:7,13,19,
  24 155:3,11
  156:5,24
  157:6,23
  158:10,14,16
  159:18,25
  160:9,16
  161:11
  162:23
  164:6,11,15,
  22 165:4
  167:1,11
  168:7,16
  169:1,3
  170:8,21,25
  172:2,20
  173:12,18,25
  174:5,16,20,
  21 175:14
  176:25
  177:16,25
  178:9,10
  179:21
  181:15,24,25
  183:2,18,22
  184:14
  186:21
  188:2,17,21

**ring**
  66:19
**risk**
  75:15
**Risks**
  36:9
**Rivera**
  3:12
**Road**
  9:20
**Rockville**
  9:20
**rode**
  176:16
**role**
  122:11
**Roman**
  133:11 134:4
  178:24 182:6
  188:3 189:22
**Romania**
  121:9
**room**
  3:24
**Rossman**
  8:11,17
**ruling**
  161:17
**run**
  64:6 137:4

———————

**S**

———————

**sale**
  113:2 123:19
  160:21
**sales**
  46:4 51:22
  55:8 60:11
  66:10 98:8,
  14,16 100:5
  102:10
  120:14
  123:23,24,25
  125:10 126:3
  134:5,8,19
  137:19

  151:11,14
  162:11,24
  163:2
**saying**
  46:25 48:6,
  21 66:3,5
  100:2 105:23
  131:15
  165:21,23
  175:13
**says**
  29:6 33:8,17
  34:14,20
  35:6 57:4
  63:5 81:5
  87:10 89:4
  96:1 102:1,
  2,17 106:19
  107:16,21
  110:4 119:24
  122:9,14
  124:23 125:8
  126:24
  127:18
  128:24
  129:22
  135:10
  149:14
  188:23
  189:22
**scenario**
  139:25
  185:18
**schedule**
  78:25 79:10
  89:4 91:10,
  22 92:6,15
  93:12
  171:12,14
**Schneidman**
  8:20
**school**
  9:10
**scope**
  119:13,16
  120:2,4
**scopes**
  142:1

**screen**
  45:17
  104:12,17
**scroll**
  32:5 45:16
**second**
  10:22 19:16
  35:1 66:22
  67:9 83:4
  147:25
**secondary**
  162:5
**section**
  16:18 17:6
  46:16,21
**see**
  6:25 22:14
  27:11,16
  33:4,13,14,
  19 34:2,17,
  25 35:11,21
  37:17 38:3
  39:11 46:7,
  23 48:20
  54:19,24
  56:3,5 62:6
  70:7 73:10,
  15 74:17
  76:11,23
  78:9 82:9,
  13,24,25
  85:18,25
  86:17,24
  87:1,11 91:9
  92:11,20,23
  94:9,12 95:1
  102:14,23
  104:15
  105:15
  107:21,22,
  23,24 108:2
  110:8
  119:12,13,16
  120:22
  121:23 122:7
  123:1,21
  124:1 125:2,
  8 126:11

  127:23
  128:22
  129:2,7
  133:16
  134:22
  140:14
  145:24
  148:21
  149:25
  160:23 162:7
  169:2,10
  172:20
  173:1,6,7
  176:20,21
  179:6 180:1,
  4,16 183:13
  188:2,9
  189:4 190:10
  191:6 192:7,
  9 194:17
**seeing**
  103:2 152:4,
  5,6
**seek**
  34:23 35:9
  189:12
**seeking**
  37:2,6
  161:17
**select**
  125:5
**selected**
  124:24
**self-study**
  25:1
**sell**
  135:14
  137:13 138:3
  149:22
**seller**
  164:5
**sellers**
  149:4
**selling**
  136:16 146:7
**sells**
  89:6

**send**
137:14
**sending**
177:23
**sense**
145:25
181:25 186:5
**sentence**
33:21 47:22
**sentences**
188:11
**separate**
46:15,21
50:6
**service**
68:13
148:13,16
**services**
3:10 5:5
6:15,16,18,
21 7:3,5,9
12:22 13:21
22:10 36:7
60:20 61:10,
14 63:2
67:13 68:7
122:16,20,23
149:20
168:15,25
192:16
194:14
**set**
4:24 46:15
59:2 146:5,
8,22 148:18,
19,24,25
153:14
156:16 164:4
**sets**
45:25
**seventh**
35:5
**several**
6:5 17:15
24:7 27:9
88:1,14
122:16

171:24
**Seymour**
8:20
**share**
36:2 104:12
**shared**
10:15 31:21
36:5 101:1
104:16
118:23
**shareholder**
166:24
**shareholders**
84:13,24
177:12
**shares**
93:9
**sharing**
45:3 142:25
170:14
**Shavelson**
9:1
**shell**
46:3 48:8
**shield**
193:5
**ship**
116:16
**shipped**
113:14 116:5
**shipping**
90:3 113:20
114:10,18,
21,25 115:3
116:2,12,24
117:5,11,19
**short**
44:23 147:8
157:21 186:8
**shortly**
96:17
**Shoshana**
20:2 27:11
190:9
**Shoshona**
169:14 178:5

**show**
59:3,19 62:2
83:10
140:19,25
141:7 157:7
159:14
169:21
**showed**
81:19,24
180:2,16
**showing**
80:24 166:5
**shown**
61:17,20
**shows**
99:23 173:22
176:7 181:14
**shut**
105:2
**side**
10:19 156:9,
10 158:4
**signatory**
146:9,15,23
150:4,6,9,14
160:14
177:14
179:15
**silly**
157:9
**similar**
34:1 81:8
**simplify**
59:17
**simply**
52:23
**single**
145:16
**sir**
6:10 9:10
**sit**
68:4 71:1
155:7 159:25
**situation**
150:8,18
155:25

**sizes**
88:17
**skepticism**
34:13 115:9
**skills**
26:1,11
**skip**
188:3 194:18
**small**
64:5 75:7,9
80:3,10
88:1,13,18
89:11,12,13,
14,17 111:6
**so-called**
167:3
**software**
74:23
**sold**
56:22 61:10,
22 97:6
139:24
162:16
168:25
182:21
183:5,6
**sole**
7:14 146:9,
23 174:16
177:14
179:15
183:17
**solely**
6:15,17
**someone's**
64:6
**son**
83:8
**sort**
19:15 75:4
87:21
**source**
30:4 33:19
55:19 81:11
83:10,14
**Southern**
36:24

Gary Lampert
October 30, 2023

**space**
 113:7, 8
**speak**
 21:13 28:11
 93:15 141:9
 195:4
**specific**
 43:7 116:19
 142:13 169:6
**specifically**
 58:20
**speculating**
 103:1
**speculation**
 164:11
**spoke**
 21:10 27:24,
 25 28:13
 115:12
**spouse**
 191:20,25
 192:18
 193:4,9,16,
 17 194:4
**spouses**
 192:9
**standard**
 32:24 33:1,7
 34:8 35:23
 190:21
**standards**
 22:17 23:6,
 10,15 24:2
 31:25 32:8,
 18,20
 143:14,16
**standpoint**
 129:10
**start**
 20:21 111:11
 120:24
 154:17
 167:23
**started**
 7:13
**starting**
 102:2

**startup**
 110:18
**state**
 91:4
**statement**
 3:16 28:24
 46:10 51:5,
 10 61:18
 62:16,20
 69:7 85:2,3,
 16 87:11,14
 89:22,25
 90:2,6
 105:23
 111:18
 133:19,20
 193:24
**statements**
 34:22 35:8
 59:23,24
 60:3 62:2
 63:19 70:12
 164:18,22
 165:3
**stating**
 4:9
**statute**
 42:25
**step**
 182:17
**stick**
 75:24 103:7
**stipulate**
 162:22
**stock**
 92:17,18
**stockbrokers**
 41:25
**stockholder**
 40:25
**stockholders**
 42:4
**store**
 182:11
 183:21
 184:19

**stretch**
 186:3
**subject**
 19:17 22:11
 67:10,15
 68:7 166:1
**subset**
 120:17
**substance**
 152:23
**Sue**
 3:15 53:11
**sued**
 161:10,12
**sufficient**
 33:4,22,24
 71:23 72:11,
 14,23 74:11
 76:8 81:6
 128:12 189:2
**sum**
 152:23
**summarizes**
 46:1
**summary**
 45:25 49:5
**supplier**
 134:18
 135:10
**supplies**
 90:4 130:17
 149:17 160:6
**support**
 3:13,16
 33:22 65:20
 145:21 155:1
 173:9
**supported**
 33:2
**supporting**
 182:23
**sure**
 12:12 35:2
 44:17 47:6
 82:23 85:9
 86:18,19,20
 87:2 109:16

 124:15 127:5
 140:23
 177:20
 178:22
 185:23
**suspects**
 35:15
**suspicion**
 35:20
**swear**
 3:19 4:18
**sworn**
 116:9
**system**
 120:12
 123:19

---

**T**

---

**take**
 24:22 32:6,
 23 39:6
 40:16 41:21
 44:15,20
 45:23 48:9
 79:9 90:19
 91:21
 100:20,23
 103:17
 105:10
 106:1,25
 109:21 137:6
 148:2,5
 170:6 177:2,
 8 183:19
 185:25
 191:9,11
 195:7,15
**taken**
 3:4 5:11
 44:24 109:10
 147:9 184:20
 186:9
**takes**
 174:18
**taking**
 147:14 175:3

177:21
179:18
**talk**
49:13 109:5
**talked**
66:7 194:19
**talking**
28:22 93:3
102:24
103:13
126:17
138:19 146:2
149:4
158:19,24
**Tannenbaum**
4:14
**Tanten**
8:25
**task**
38:5,11
**tasks**
37:16,22
**tax**
21:4 77:16
78:18 79:15,
21,22 80:24
81:19,24
82:10,13
84:1,3,4,17
85:7,12
87:17,23
88:2,17
90:9,13
91:3,4,5
92:19 93:10
120:14
169:20,21,24
170:3,17,23
171:4,5
181:1,4,12
**taxation**
9:14
**taxes**
77:25 183:23
**technical**
37:10

**technician**
3:12
**tell**
5:14 27:4
28:11 32:10
36:15 62:14
66:5 69:11
78:3 89:1
100:3 101:21
120:20 127:3
144:2 171:2
**telling**
28:10 68:25
**ten**
14:10,13
17:12,17
27:1 28:8
142:22
**term**
37:10 55:9
118:16
136:7,8,10
144:25
163:10 191:5
**terminology**
147:2
**terms**
33:7 49:6,14
50:2,5 55:10
61:12 94:24
95:10 97:6,
18,20,21
99:3 112:8
117:3 134:19
135:7,11,21,
23 136:1,2,6
155:14,20
157:13
**testified**
5:8 13:5
16:20 17:8,9
19:3 54:3
65:23 94:6
97:14 98:9
108:16,21
112:21
113:12
116:3,8

138:12
148:24
149:20,23
150:7,10,13
151:1 160:17
164:3 169:3
173:15
174:12
175:21
176:13 177:1
179:17
180:24
186:17
**testify**
12:20 54:8
65:19 183:4
**testifying**
5:12 61:1,4,
16 107:25
178:12
**testimony**
4:19 13:7,8,
24 14:1,3
15:1 16:19,
25 17:6,9,14
18:2,9,13,19
20:19,21
21:18 41:14
55:6 56:20
57:12,16
58:16,17
61:21 62:17,
22,24 66:1
71:19 72:18
83:11 94:3
95:4,8 97:22
100:18
103:10,20,23
105:25
112:13,21
113:17
116:6,9
133:21
134:14,25
135:18
136:12 138:7
139:12 146:5
149:2 151:7

152:3,21
153:24 154:1
155:11,12
157:5 161:3,
24 162:4
164:7 175:23
178:16
179:10 188:1
**thank**
4:23,25 12:3
23:1 45:2
47:9,12
51:16 109:13
194:25 195:3
**thanks**
15:4
**thing**
12:7 39:7
100:2 121:17
125:23
146:19 194:3
**things**
107:4,5
116:16
142:13
146:23
164:25
**think**
12:6,19
14:6,8 15:14
16:6 18:20
20:22 23:13,
21 30:14,16
31:9 36:17
39:20,24
46:24,25
49:21 53:6,
10 54:2,22
57:10 63:25
66:2 77:12,
14 84:16
85:16 91:9,
10 92:1
93:22 96:25
97:10 100:1
101:19,22
102:22,25
103:6 107:3

109:3,19
111:20,24
112:23
114:13
116:7,8
120:16
124:8,18
127:4 128:8
133:5,6
146:18,21,25
150:7
151:15,17
156:18 159:5
160:4 161:23
162:14
165:9,16,17
166:12
169:2,5
170:10 173:9
175:20
176:8,13
177:24
178:10,16
179:11 180:8
183:10 184:3
186:4,21
194:8,18,21,
24

**thinking**
106:12

**third**
146:7,20

**thought**
44:3 65:8
126:13
130:25
131:20

**thoughts**
106:14

**thousand**
14:11

**three**
146:23
184:16

**tie**
175:12

**tied**
134:6

**time**
3:7,8,14
6:19 14:22,
23,24 15:6
16:24 17:9,
13 19:6
22:3,25 29:9
32:11,19
44:19,21,25
56:7,24
60:20 63:14
65:20 75:16
88:3 93:24
94:11,14,17
95:12 100:16
105:12
107:1,23
109:6,11
112:23
123:16
133:14
136:3,5,8
147:5,10
148:2 153:5
156:14
157:16
158:6,21
162:18 170:4
171:18
177:12
178:22
181:8,10,13
186:10,25
189:1 195:1,
10

**times**
5:24,25 6:1
13:19 14:18
15:7,15,17
17:23,25
18:4,8,13
21:12 28:14
146:15 183:4

**title**
90:1 127:16
193:24 194:5

**today**
3:6 5:19

20:25 83:8
155:7 159:25

**today's**
19:22 20:6

**told**
30:6 52:1
53:24 56:6
58:20,23
68:23 69:12
82:20 93:23
115:14 127:8

**tongue**
134:6

**top**
90:1 101:25
104:7,14

**total**
87:18

**trace**
37:24 145:10
165:19 166:7

**traced**
172:11

**tracing**
166:15

**trade**
99:7 136:8

**transaction**
60:21 131:3
135:9 181:22
183:2
185:12,14

**transactions**
26:6 42:4
51:23 53:21
56:8 75:10,
19 80:5 98:2
100:13
120:16
123:21
124:10 142:3
143:10
144:24
145:20,22
150:21
153:15 155:2
158:12,15,24

163:15 164:1
189:13

**transcript**
73:3 101:3,7
108:3 147:20
157:8,11
195:14,16

**transcripts**
19:25 27:10
31:16

**transfer**
75:20 167:19
169:8,13
170:5
171:19,24
172:7,12,17,
18 173:18,23
174:9,11,23
175:11
176:23
177:16,19
178:13
179:14,16
180:9 181:14
182:13,24
183:1,12
185:6,19
191:2,20,23

**transferred**
134:5,8
135:2 141:20
145:8,14
165:11
167:10
172:23
173:12 179:2

**transfers**
38:1 39:1
41:5,10,17,
20 42:13,22
43:1,18,21
44:14 150:15
161:5 166:2
167:15,17
168:6,10
169:7 174:13
177:3 188:15
189:17,23

192:9,17
193:3
**transit**
74:20
**trial**
16:21,25
18:2
**trier**
71:8
**true**
68:24 69:7,9
**trust**
37:15,18
**trustee**
14:17,19
15:6 30:18,
22 31:4,13
37:1,8,16
38:9,16
111:1 117:18
141:13,17
142:17
143:22
192:15 193:3
**trustee's**
192:17
**trustees**
143:1 192:8
**trusts**
37:3
**trustworthy**
33:18 55:18
81:10
**truth**
4:20,21
**try**
25:13 83:21
104:1 118:17
134:7
**trying**
121:12
156:16
**turn**
12:16
**twice**
43:6

**two**
54:2 55:11
84:22 89:23
97:23 114:13
136:4 139:8,
10,22 143:25
156:22 160:9
188:11
**type**
74:22 84:5
88:23 118:18
182:19
185:11,13
191:22
193:18
194:13,16
**types**
6:20 84:7,9,
22 114:7
**typical**
38:5 88:20
89:1,11
**typically**
94:9

―――――――

**U**

―――――――

**U.S.**
3:13,15 78:7
**ultimately**
145:15
**unavailable**
56:16
**uncashed**
73:25 128:3
**uncover**
146:4
**uncovered**
141:24
**understand**
5:8,10,15
18:24 29:16
39:16 46:25
48:3 49:12,
21 56:2
58:23,24
72:7,13

98:4,25 99:4
103:15,19
104:1
121:11,13
131:13
135:25 136:6
140:23 142:6
156:15
**understandable**
59:11
**understanding**
30:3 31:7
40:24 57:18
87:15 93:17
97:19 98:6
118:1
136:20,22
137:21
146:11,12,13
187:17,22
191:7
**Understood**
72:6
**undertake**
37:17 38:6
39:22 41:2
96:10 140:16
**undertaking**
189:10
**undertakings**
121:14
**undertook**
23:7 37:23
38:12 39:14
**unique**
53:8
**University**
9:13
**unpaid**
125:12,17,22
156:12
**unrealized**
154:22
**unsubstantiated**
34:15

**untrue**
46:10
**unusual**
63:25 64:14
**uploaded**
147:18
**usual**
31:1

―――――――

**V**

―――――――

**value**
34:22 35:8
**various**
58:7 64:11
115:14
**venture**
137:9
**verified**
57:6
**verify**
38:25 54:24
83:11
**verifying**
37:25
**version**
12:2
**versus**
3:10
**vi**
134:4
**video**
3:2,12
195:16
**VIDEOGRAPHER**
3:1 44:25
109:6,11
147:5,10
186:6,10
195:10
**view**
57:5 71:11
129:9 139:7
172:6 178:21
**vii**
189:22

**voting**
  92:16,18
  93:9

---

**W**

**wait**
  56:23
**waive**
  4:6
**Wanda**
  122:18
**want**
  41:6 47:5,14
  78:13 86:2
  100:19,21
  121:1 132:5
  145:18
  148:11 177:9
  185:25
**wanted**
  82:25 168:20
  186:15 187:1
**warehouse**
  113:8,13
  116:4
**warrant**
  163:13
**way**
  10:15 39:25
  42:6 62:14
  79:20 100:3
  103:15,19
  106:12 165:5
  166:7 177:15
  184:21 193:5
**wealth**
  191:25
**weeks**
  97:23 134:20
  136:4 139:8,
  10,22
**weight**
  33:23 81:6
**went**
  81:12 108:9
  113:13 116:3

138:15,17
162:4 165:25
**whatever's**
  135:6
**white**
  10:19
**wholesale**
  99:18 135:5
  136:16,18
**wife**
  167:22
  175:21
  176:3,19
  177:23
  178:14
  183:10,14
  184:6,24
  185:2,3,4,7,
  9,17 188:8
  191:12
  194:10
**wife's**
  188:20
**winding**
  185:21
**window**
  90:8 118:22
  143:14
**wire**
  75:19
**wired**
  178:25 179:4
**withdraw**
  23:3 29:23
  59:17
**withdrawals**
  180:18
**withdrawn**
  30:16 63:11
  83:3 93:16
  98:3,5
  141:15
  151:16
**withholding**
  86:16
**withholdings**
  86:7,8

**witness**
  3:19 4:3,15,
  22 11:25
  16:21,25
  32:13 45:14
  78:6 90:24
  195:18
**witnesses**
  34:16 35:15
**word**
  43:3 90:5
**words**
  41:7 47:18
  90:3 162:22
**work**
  12:24 13:1,
  4,9 63:9
  177:8 192:8
  193:1
**worked**
  8:20,24
  110:18
**working**
  16:15 26:7
**works**
  100:24
  104:13
**world**
  165:1
**worry**
  19:15
**worth**
  131:20
**write**
  72:21 133:14
  134:13
  150:10 188:8
**writing**
  128:7
**written**
  73:18,24
  74:12 76:16
  77:5 195:13
**wrong**
  49:20 165:17
**wrongdoing**
  35:19

115:19,22
**wrote**
  66:13 77:8
  106:17

---

**Y**

**yeah**
  96:25 105:3
  148:1
**year**
  16:7 24:5,21
  80:7,8,9,15,
  16,25 82:3,4
  84:12,14
  85:20 91:18,
  19 93:10,11,
  13 166:17,21
  170:11
  171:3,5
**years**
  6:6,8 8:22
  15:22 16:20
  17:5,8,10,
  12,15,18
  24:7,11,20
  25:11,17
  27:1 60:15
  122:16
  139:20 177:6
**York**
  9:21 36:8,25

---

**Z**

**zero**
  180:21
**Zone**
  3:8
**zooming**
  69:18